UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

APR 0 1 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| CARLOS RUBINSTEIN | § | |
| Plaintiff | § | |
| | § | |
| vs. | § | |
| | § | |
| CITY OF BROWNSVILLE, TEXAS | § | CAUSE NO. B-00-169 |
| & CITY COMMISSIONERS | § | |
| ERNIE HERNANDEZ, CARLTON "BUD" | § | |
| RICHARDS, & HARRY MCNAIR, | § | |
| Individually & Officially | § | |
| Defendants | § | |

**CITY DEFENDANTS' UNOPPOSED MOTION FOR LEAVE TO FILE
AMENDED ANSWER & THIRD DISPOSITIVE MOTION**

NOW COMES the CITY OF BROWNSVILLE, TEXAS, and COMMISSIONERS HERNANDEZ, RICHARDS, & MCNAIR, individually and officially (hereafter "CITY DEFENDANTS") and file this motion for leave to file an out of time Amended Answer and a third dispositive motion with regard to Plaintiff's Title VII cause of action.

The Scheduling Order in this cause, dated March 13, 2001, set a deadline for filing dispositive motions of February 1, 2002. However, the parties filed a Joint Motion on January 11, 2002 requesting that the Court extend certain deadlines related to discovery and or dispositive motions for a period of between 80-90 days. *See* Joint Motion to Extend Certain Scheduling Order Deadlines, filed January 11, 2002. As of the filing of this Motion for Leave, the Court has not ruled on the Joint Motion.

Attached as Exhibit 1 to this Motion for Leave is the CITY DEFENDANTS "First Amended Answer to Plaintiff's Third Amended Complaint."  Also attached as Exhibit 2 is the CITY DEFENDANTS, Motion for Summary Judgment As To Plaintiff's Title VII Claim.

As cause for requesting this leave motion, the CITY DEFENDANTS hereby apprize the Court that parties have recently concluded the deposition discovery of the Plaintiff and the individually named DEFENDANTS, and the case is ripe for the filing of certain dispositive motions.  In addition, certain claims and causes of action have recently been voluntarily dismissed by Plaintiff, thereby rendering portions of the Third Amended Complaint moot.  Finally, the parties voluntarily mediated this case on Monday, March 25, 2002.  Unfortunately, the mediation was unsuccessful, and respective counsel must continue to prepare the case for trial.

## CERTIFICATE OF CONFERENCE

In connection with this Motion for Leave, undersigned counsel had previously conferred with opposing counsel, Attorney Ed McAninch regarding extension of the Scheduling Order deadlines.  Attorney McAnich advises that continues to be in support of the previously filed Joint Motion to extend certain Scheduling Order Deadlines, and these filings are timely under that motion for extension as submitted.

City Defendants' Unopposed Motion to for Leave to
File Amended Answer & Third Dispositive Motion                    Page  2

**CONCLUSION**

THEREFORE, based on the foregoing reasons, the CITY DEFENDANTS request that the Court grant this motion for leave to file their First Amended Answer to Plaintiff's Third Amended Complaint, attached as Exhibit 1, as well as the Motion for Summary Judgment As To Plaintiff's Title VII Claim, attached as Exhibit 2.

CITY DEFENDANTS also request that the Court consider and approve the previously filed Joint Motion to Extend Certain Scheduling Order Deadlines.

Finally, CITY DEFENDANTS request and pray for such further and additional relief to which the Court may find they are entitled.

SIGNED on the 1st day of April, 2002.

Respectfully submitted,

**DENTON, NAVARRO & BERNAL**
A Professional Corporation
Bank of America Building
222 East Van Buren, Suite 405
Harlingen, Texas 78550
956/421-4904
956/421-3621 (Fax)

By: _Ricardo J. Navarro_
RICARDO J. NAVARRO
Attorney in Charge
State Bar No. 14829100
So. Dist. ID No. 5953

## CERTIFICATE OF SERVICE

I certify that a true copy of this document has been sent by first class U.S. Mail, postage prepaid, unless otherwise indicated, to the persons listed below on the ___1st___ day of April, 2002.

Mr. Ed McAninch        **CMRRR NO 7001 1940 0007 8404 5949**
LAW OFFICES OF EDWIN L. MCANINCH, P.C.
507 Fall River Road
Houston, Texas 77024-5613
COUNSEL FOR PLAINTIFF

_____
RICARDO NAVARRO

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CARLOS RUBINSTEIN | § | |
| Plaintiff | § | |
| | § | |
| vs. | § | |
| | § | |
| CITY OF BROWNSVILLE, TEXAS | § | CAUSE NO. B-00-169 |
| & CITY COMMISSIONERS | § | |
| ERNIE HERNANDEZ, CARLTON "BUD" | § | |
| RICHARDS, & HARRY MCNAIR, | § | |
| Individually & Officially | § | |
| Defendants | § | |

ORDER ON CITY DEFENDANTS' UNOPPOSED MOTION FOR LEAVE
TO FILED FIRST AMENDED ANSWER AND THIRD DISPOSITIVE MOTION

———————————————————————————————————————

On this day the Court took under consideration the City Defendants' Motion for Leave to file a First Amended Answer to Plaintiff's Third Amended Complaint, attached as Exhibit 1, as well as a Motion for Summary Judgment As To Plaintiff's Title VII Claim, attached as Exhibit 2. After due consideration of the unopposed motion, as well as the response thereto, the Court finds that the Motion for Leave has merit and should be GRANTED.

It is therefore ORDERED that the Clerk of the Court shall file-stamp and accept for filing the City Defendants' First Amended Answer to Plaintiff's Third Amended Complaint, as well as the City's Motion for Summary Judgment on the Title VII Complaint, and the accompanying exhibits there.

SO ORDERED.

SIGNED on the _____ day of _____, 2002.


_____
HON. HILDA G. TAGLE
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CARLOS RUBINSTEIN | § | |
|      Plaintiff | § | |
| | § | |
| vs. | § | |
| | § | |
| CITY OF BROWNSVILLE, TEXAS | § | CAUSE NO. B-00-169 |
| & CITY COMMISSIONERS | § | |
| ERNIE HERNANDEZ, CARLTON "BUD" | § | |
| RICHARDS, & HARRY MCNAIR, | § | |
| Individually & Officially | § | |
|      Defendants | § | |

## CITY DEFENDANTS' FIRST AMENDED ANSWER TO PLAINTIFF'S THIRD AMENDED COMPLAINT

NOW COMES the CITY OF BROWNSVILLE, TEXAS, and COMMISSIONERS HERNANDEZ, RICHARDS, & MCNAIR, individually and officially (hereafter "CITY DEFENDANTS") in the above-styled and numbered cause, and file CITY DEFENDANTS Answer To Plaintiff's Third Amended Original Complaint (hereafter "Plaintiff's Complaint").

### Admissions and Denials

1.   With respect to Section I of Plaintiff's Complaint, CITY DEFENDANTS admit this Court has proper removal jurisdiction over this matter.

2.   With respect to Section II of Plaintiff's Complaint, CITY DEFENDANTS deny the material factual allegations contained in this paragraph.

City Defendants' First Amended Answer to
Plaintiff's Third Amended Complaint

**EXHIBIT" 1 "**

3. With respect to Paragraph 3.01, CITY DEFENDANTS admit that Carlos Rubinstein is a natural person and further admit that at all times relevant to this controversy he was the duly appointed City Manager for the CITY OF BROWNSVILLE.

4. With respect to Paragraphs 3.02 to 3.05, CITY DEFENDANTS admit that City of Brownsville is a municipal corporation under the laws of the State of Texas and that COMMISSIONERS ERNIE HERNANDEZ, JR., CARLTON J. "BUD" RICHARDS AND HARRY E. MCNAIR, JR., are (or were) duly elected local officials who serve on the BROWNSVILLE CITY COMMISSION, at all times relevant to this controversy. At the filing of this First Amended Answer DEFENDANTS RICHARDS and MCNAIR are no longer serving as elected officials. DEFENDANT HERNANDEZ continues to serve on the CITY COMMISSION.

5. With respect to Paragraphs 4.01-4.09 of Plaintiff's Complaint, CITY DEFENDANTS admit that Plaintiff served as Brownsville City Manager under Mayors Gonzales and later, after the elections in May 1999, Mayor Blanca Sanchez Vela.

CITY DEFENDANTS admit DEFENDANT HERNANDEZ is a private business person and that he has a business interest in a private a wrecker service. CITY DEFENDANTS further admit that DEFENDANT McNAIR is also a private business person in the community. CITY DEFENDANTS deny Plaintiff's characterization of the facts,

further deny the material factual allegations contained in these paragraphs and object to them as conclusory and argumentative.

6. With respect to Paragraphs 4.10-4.18 of Plaintiff's Complaint, CITY DEFENDANTS admit that Defendant HERNANDEZ forwarded Exhibit A to Plaintiff addressing comments made by Mayor Gonzalez. CITY DEFENDANTS admit that Defendant RICHARDS forwarded Exhibit B to Defendant HERNANDEZ dated September 8, 1998. CITY DEFENDANTS deny Plaintiff's characterization of the facts, further deny the material factual allegations contained in these paragraphs and object to them as conclusory and argumentative.

7. With respect to Paragraphs 4.19 through 4.30 of Plaintiff's Complaint, CITY DEFENDANTS generally admit that the CITY was engaged in the process of purchasing vehicles including an SUV for the Brownsville Emergency Services Department, but deny Plaintiff's characterization of the facts, further deny the material factual allegations contained in these paragraphs, and object to them as conclusory and argumentative.

8. With respect to Paragraphs 4.31-4.32 of Plaintiff's Complaint, CITY DEFENDANTS admit that Mayor Vela and Defendant McNAIR met with Plaintiff on or about December 3, 1999. CITY DEFENDANTS admit that Mayor Vela requested Plaintiff's resignation from the position of City Mangager, as was her right

City Defendants' First Amended Answer to
Plaintiff's Third Amended Complaint                                    Page 3

and privilege to do.  CITY DEFENDANTS deny, however, Plaintiff's characterization of these meetings and further deny the material factual allegations pleaded by Plaintiff.

CITY DEFENDANTS admit that the CITY COMMISSION initiated proceedings in early December 1999 to separate Plaintiff from his position as City Manager and further admit that Plaintiff was in fact involuntarily separated from his position as City Manager effective January 6, 2000. CITY DEFENDANTS deny Plaintiff's characterization of the facts and circumstances surrounding these events and further deny the material factual allegations urged by Plaintiff.

9.  With respect to Section V of Plaintiff's Complaint, including all subparagraphs, alleging a First Cause of Action, CITY DEFENDANTS deny the material factual allegations contained in the paragraphs contained in Section V.  No Rule 8 response is required to the legal theory pleaded, but the Court should note that the Texas Constitutional claims against the INDIVIDUALLY NAMED DEFENDANTS has been dismissed.

10. With respect to Section VI of Plaintiff's Complaint, including subparagraphs, alleging a Second Cause of Action, CITY DEFENDANTS deny the material factual allegations contained in the paragraphs contained in Section VI.  No Rule 8 response is required to the legal theory pleaded, but the Court should

note that the statutory Whistleblower Act claims against both the INDIVIDUALLY NAMED DEFENDANTS, as well as the CITY OF BROWNSVILLE, has been dismissed. Further, the common law *Sabine Pilot* claim operates only against private sector defendants, and is barred against governmental defendants by governmental immunity. Consequently, the Second Cause of Action identified in Section VI has been rendered moot and of no consequence.

11. With respect to Section VII of Plaintiff's Complaint, including subparagraphs, alleging a Third Cause of Action, CITY DEFENDANTS deny the material factual allegations contained in the paragraphs contained in the paragraphs contained in Section VII. No Rule 8 response is required to the legal theories, but the Court should note that the Title VII claims under the Civil Rights Act of 1964, as amended, against the INDIVIDUALLY NAMED DEFENDANTS has been dismissed.

Further, CITY DEFENDANTS hereby interpose a defense of limitations on Plaintiff's Title VII claim, specifically that Plaintiff filed to timely file his administrative charge of discrimination as per 42 U.S.C. §2000e-5(e)(1).

12. With respect to Section VIII of Plaintiff's Complaint, including subparagraphs, alleging a Fourth Cause of Action, CITY DEFENDANTS deny the material factual allegations contained in

the paragraphs contained in the paragraphs contained in Section VIII. No Rule 8 response is required to the legal theories.

13. With respect to Section IX of Plaintiff's Complaint, including subparagraphs, alleging a Fifth Cause of Action, CITY DEFENDANTS deny the material factual allegations contained in the paragraphs contained in the paragraphs contained in Section IX. No Rule 8 response is required to the legal theories, but the Court should note that the common law claim for intentional infliction is barred against the CITY by governmental immunity.

14. With respect to Section X of Plaintiff's Complaint alleging Damages, CITY DEFENDANTS deny the material factual allegations contained in the paragraphs contained in the paragraphs contained in Section X. No Rule 8 response is required to the pleading for damages, other than a general denial.

15. With respect to Section XI of Plaintiff's Complaint alleging Punitive Damages, CITY DEFENDANTS deny the material factual allegations contained in Section XI. No Rule 8 response is required to the legal theories, and the Court should note that the Whistleblower Act claims have been dismissed in their entirety.

16. With respect to Section XII of Plaintiff's Complaint, praying for Attorney's Fees, CITY DEFENDANTS deny the material factual allegations contained in Section XII. No Rule 8

response is required to the legal theories, but the Court should note that Plaintiff's have yet to achieve prevailing party status for purposes of an award of fees.

17. With respect to Section XIII of Plaintiff's Complaint alleging Notice, CITY DEFENDANTS admit receiving the document attached as Exhibit "C" and attached to Plaintiff's Complaint on or about the date indicated. No Rule 8 response is required to the legal theories.

### GENERAL DENIAL

18. Except for those factual matters specifically admitted above, CITY DEFENDANTS generally deny all material allegations contained in Plaintiff's Third Amended Complaint and calls upon Plaintiff to prove his allegations by a preponderance of the evidence as required by law.

### AFFIRMATIVE DEFENSES

#### Government Immunity

19. CITY DEFENDANTS hereby assert the affirmative defense of government (sovereign) immunity from any and all state, federal or common law causes of action asserted by Plaintiff to the fullest extent allowed by law. This defense includes the prohibition of any and all intentional torts against CITY DEFENDANTS under state and common law causes of action.

### Statutory Caps

20.   CITY DEFENDANTS hereby assert and plead as a defense their entitlement to any and all damage cap limitations on liability recognized by state or federal law against the CITY DEFENDANTS.

### Qualified Immunity

21.   CITY DEFENDANTS, and specifically INDIVIDUALLY NAMED DEFENDANTS, hereby assert the affirmative defense of qualified immunity from any and all federal causes of action asserted by Plaintiff to the fullest extent allowed by law and specifically deny that Plaintiff has pleaded, or can prove, a violation of a clearly established constitutionally protected right.

### Legislative/Quasi-Judicial Immunity

22.   CITY DEFENDANTS, and specifically INDIVIDUALLY NAMED DEFENDANTS, hereby assert the affirmative defense of legislative and/or quasi-judicial immunity attributable to those official actions at issue in this controversy and to which these affirmative defenses precluding liability would apply.

### Official Immunity

23.   CITY DEFENDANTS, and specifically INDIVIDUALLY NAMED DEFENDANTS, hereby assert the affirmative defense of official immunity from any and all state or common law causes of action asserted by Plaintiff to the fullest extent allowed by law.

### Notice Requirements

24.  CITY DEFENDANTS hereby plead as a defense, Plaintiff's failure to meet any applicable notice or filing requirements imposed by state and/or federal law as a precondition to the court's exercise of subject matter jurisdiction over this matter and/or the imposition of any liability pursuant to any and all state law and common law claims and causes of action that contain such a notice requirement.

### Limitations Periods: Administrative and/or Statutory

25.  CITY DEFENDANTS hereby plead as a defense, Plaintiff's failure to  meet or satisfy any and all applicable limitations periods imposed by state and/or federal law either as a precondition to the court's exercise of subject matter jurisdiction over this matter and/or the imposition of any liability, or as a limitations period, and arising out of state of federal law.

### Failure to State a Claim

26.  CITY DEFENDANTS hereby assert as a defense from any and all alleged state and federally causes of action, Plaintiff's failure to plead a claim or cause of action recognized in law as a basis for damages and/or equitable relief.

### CONCLUSION AND PRAYER

Therefore, based on any one or more of the foregoing reasons, CITY DEFENDANTS request that the Court deny Plaintiff's claims for relief in their entirety and dismiss this lawsuit with prejudice.

CITY DEFENDANTS further pray for and hereby request other additional relief at law or in equity to which he may be entitled including costs of court and attorneys fees.

Signed this _____ day of April, 2002.

Respectfully Submitted,

**DENTON, NAVARRO & BERNAL**
A Professional Corporation
Bank of America Building
222 E. Van Buren, Suite 405
Harlingen, Texas 78550
956/421-4904
956/421-3621 (Fax)

By: _____
RICARDO J. NAVARRO
Attorney In Charge
State Bar No. 14829100
So. Dist. ID No. 5953

City Defendants' First Amended Answer to
Plaintiff's Third Amended Complaint                    Page 10

## CERTIFICATE OF SERVICE

I certify that a true copy of this document has been sent to the persons listed below on the 1st day of April, 2001.

Mr. Ed McAninch                    **CMRRR NO 7001 1940 0007 8404 5949**
LAW OFFICES OF EDWIN L. MCANINCH, P.C.
507 Fall River Road
Houston, Texas 77024-5613
COUNSEL FOR PLAINTIFF

RICARDO NAVARRO

City Defendants' First Amended Answer to
Plaintiff's Third Amended Complaint

Page 11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CARLOS RUBINSTEIN                §
        Plaintiff                §
                                 §
vs.                              §
                                 §
CITY OF BROWNSVILLE, TEXAS       §        CIVIL ACTION NO. B-00-169
& CITY COMMISSIONERS             §
ERNIE HERNANDEZ, CARLTON "BUD"   §
RICHARDS, & HARRY McNAIR,        §
Individually & Officially        §
        Defendants               §

TABLE OF CONTENTS
TO CITY DEFENDANTS' MOTION SUMMARY JUDGMENT
AS TO PLAINTIFF'S TITLE VII CLAIM
AND SUPPORTING BRIEF
_____

May It Please the Court:

COMES NOW the CITY OF BROWNSVILLE, TEXAS, as well as individually named DEFENDANTS, ERNIE HERNANDEZ, CARLTON "BUD" RICHARDS, and HARRY McNAIR, (hereafter " CITY DEFENDANTS"), and file this dispositive motion against Plaintiff's federal statutory cause of action under Title VII of the Civil Rights Act of 1964

Because the motion and supporting brief is longer than ten pages, the following Table of Contents is hereby initially provided as well, pursuant to the Court's Local Rule 5.H.3.

i

EXHIBIT" 2

# TABLE OF CONTENTS

TABLE OF CONTENTS                                                                    i

TABLE OF AUTHORITIES                                                              iii

NATURE OF THE CASE                                                                  1

PROCEDURAL HISTORY & STAGE OF THE PROCEEDINGS                                       2

OVERVIEW OF CLAIMS BY PLAINTIFF                                                     3

STATEMENT OF ISSUES PRESENTED                                                       4

SUMMARY OF THE ARGUMENT                                                             4

UNDISPUTED MATERIAL FACTS                                                           5

SUMMARY JUDGMENT STANDARD OF REVIEW                                                 6

ARGUMENTS & AUTHORITIES                                                             7

I.    Plaintiff's Title VII Claim Is Time Barred
      In That It Was Not Timely Filed Within 180 Days
      As Required By State And Federal Law                                          7

II.   Plaintiff's Title VII Claims Are Limited to
      Events Within 300 Days of the Filing of His
      Administrative Charge and All Prior Incidents
      and Events Are Time Barred                                                   13

CONCLUSION AND PRAYER                                                              17

INDEX OF EXHIBITS                                                                  19

ii

# TABLE OF AUTHORITIES

**U.S. SUPREME COURT**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ....................................    6

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ....................................    6

*Harris v. Forklift Systems, Inc.*, 510 U.S. 17(1993) ........    16

*Matsushita Elec. Indus. Co., Ltd. v.*
    *Zenith Radio Corp.*, 475 U.S. 574 (1986) ................    6

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ......    15

*Oncale v. Sundowner Offshore Services, Inc.*,
523 U.S. 75, 78 (1998) ....................................    16

**U.S. COURT OF APPEA1S**

*Abramson v. William Patterson College of New Jersey*,
    260 F.3d 265 (3rd Cir. 2001) ...........................    16

*Griffin v. City of Dallas*, 26 F.3d 610 (5th Cir. 1994) ......    9

*Hall v. Bodine Electric*, 276 F.3d 345 (7th Cir. 2002) .......    13

*Huckabay v. Moore*, 142 F.3d 233 (5th Cir. 1998) ............    13

*Sere v Univ. of Illinios*, 628 F.Supp. 1543
    (N.D. Ill. 1986) .......................................    12

*Vielma v. Eureka Company*, 218 F.3d 458 (5th Cir. 2000) ......    9

*Webb v. Cardiothoracic Surgery*, 139 F.3d 532
(5th Cir. 1998) .........................................    13

**U.S. DISTRICT COURTS:**

*Adams v. Cal-Ark Int'l*, 159 F.Supp. 2d 402
    (E.D. Tex. 2001) .......................................    12

*Jackson v. UT Anderson*, 172 F.Supp. 860
    (S.D. Tex. - Houston Div. 2001) ........................ 6

*Lowell v. Glidden-Durkee*, 529 F.Supp. 17 (N.D. Ill. 1981).. 12

*Martinez v. Local 1373* UAW, 722 F.2d 348 (7th Cir. 1985).... 11

*O'Young v. Hobart Corporation*, 579 F.Supp 418
    (N.D. Ill. Eastern Div. 1983) ........................... 10

*Proffit v. Keycom Elec. Publishing*, 625 F.supp. 400
    (N.D. Ill. 1985) ........................................ 11

**STATUTES & RULES:**

42 U.S.C. §2000e-5(e)(1) ................................... 8

Section 21.202, Tex. Labor Code ........................... 6

**LAW REVIEW ARTICLES:**

Note, *Untimely Filing of State Charges & Title VII's
    Limitations Periods*, 56 U.Cin. L.Rev. 569 (1987)    12

iv

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CARLOS RUBINSTEIN | § | |
| Plaintiff | § | |
| | § | |
| vs. | § | |
| | § | |
| CITY OF BROWNSVILLE, TEXAS | § | CIVIL ACTION NO. B-00-169 |
| & CITY COMMISSIONERS | § | |
| ERNIE HERNANDEZ, CARLTON "BUD" | § | |
| RICHARDS, & HARRY MCNAIR, | § | |
| Individually & Officially | § | |
| Defendants | § | |

CITY DEFENDANTS' MOTION SUMMARY JUDGMENT
AS TO PLAINTIFF'S TITLE VII CLAIM
AND BRIEF IN SUPPORT THEREOF

May it Please the Court:

COMES NOW the CITY OF BROWNSVILLE, TEXAS, as well as individually named DEFENDANTS, ERNIE HERNANDEZ, CARLTON "BUD" RICHARDS, and HARRY McNAIR, (hereafter " CITY DEFENDANTS"), and file this dispositive motion addressing Plaintiff's statutory cause of action under Title VII of the Civil Rights Act of 1964, as amended, (hereafter simply "Title VII") and as asserted in Plaintiff's Third Amended Complaint.

### NATURE OF THE CASE

This is an employment lawsuit arising out of the involuntary termination of Plaintiff's position with the CITY OF

BROWNSVILLE, TEXAS as the CITY's chief executive officer, that is, the City Manager.

Plaintiff contends that the termination of his employment was wrongful in that it was illegally motivated by the CITY DEFENDANTS in the City Commission vote that resulted in Plaintiff's separation from his job.

One of the causes of action urged is pursuant to Title VII, and, for purposes of simplicity, this dispositive motion addresses that claim only.

## PROCEDURAL HISTORY & STAGE OF PROCEEDINGS

The parties have exchanged exhaustive written discovery requests consisting of admission, interrogatories, and document production. Further, the parties have recently completed deposition discovery of the named parties to this litigation. In addition, the case has been streamlined somewhat by Plaintiff's consent to the two previously filed dispositive motions by CITY DEFENDANTS.

The parties had previously filed a joint motion to extend certain discovery and motion deadlines, which is currently pending before the Court. The Joint Pretrial Order is due on May 14, 2002, the pretrial conference is scheduled for May 30, 2002, and jury selection is scheduled for June 3, 2002. See Scheduling Order dated March 13, 2001 (doc #26).

## OVERVIEW OF CLAIMS BY PLAINTIFF

Plaintiff's live pleadings before the Court contain the following state and federal claims and causes of action arising out of the termination of Plaintiff's employment as City Manager:

1. that the CITY DEFENDANTS violated Title VII of the Civil Rights Act of 1964, as amended in that they discriminated and retaliated against Plaintiff because of his race and religion (Jewish);

2. that the CITY DEFENDANTS violated the First Amendment of the U.S. Constitution (freedom of religion and freedom of association clause) as well as the analogous clauses contained in the Texas Constitution;

3. that the CITY DEFENDANTS violated the Due Process clause of the Fourteenth Amendment to the U.S. Constitution by maligning his good name, thereby depriving him of a liberty interest; and,

4. that the CITY DEFENDANTS violated the Texas Whistleblower Act (Chapter 554, Texas Gov't Code) and the equivalent common law cause of action for whistleblower under *Sabine Pilot*

5. state common law claim for intentional infliction of emotional distress.

*See* Plaintiff's Third Amended Original Complaint at p. 2.

Plaintiff has already conceded that the Title VII claim, the statutory whistleblower claim, and the Texas Constitution claim do not run against the INDIVIDUAL DEFENDANTS, and these claims have been dismissed. *See* Court Order dated January 30, 2002 (doc #38).

Plaintiff has also conceded that the state statutory whistleblower claim brought under Chapter 554, Tex. Gov't Code is barred by virtue of its own peculiar ninety day limitations period. *See* Court Order dated March 7, 2002 (doc #42).

### STATEMENT OF ISSUES PRESENTED HEREIN

The scope of this motion, which addresses pure questions of law, focuses on whether Plaintiff's Title VII claim, either as a hostile environment claim, or a disparate treatment claim, is time-barred, in whole or in part.

### SUMMARY OF THE ARGUMENT

The limitations argument presented here is twofold. First, CITY DEFENDANTS contend that the applicable limitations period for the Title VII claim generally is 180 days, not 300 days, as per the terms of the relevant federal statute, and that any federal caselaw to the contrary relies upon a misconstruction of the statutory language itself.

Second, CITY DEFENDANTS contend that even if the Court should determine that a 300 day administrative limitations period applies, it would be only as to those adverse actions contained within the 300 days prior to the filing of the administrative charge with the EEOC that would be actionable. Here, that would be limited to Plaintiff's separation of employment on January 6, 2000. The claims for religious

City Defendants' Motion For Summary
Judgment As To Plaintiff's Title VII Claim                    Page 4

harassment based on alleged adverse actions prior to, and outside of, the 300 day period, are time barred.

## UNDISPUTED MATERIAL FACTS TO THIS MOTION

For purposes of this Motion the relevant material facts are the following:

1.    Plaintiff was the duly appointed City Manager on or about March 1, 1997. [Rubinstein Depo at p. 9; MSJ Exh. A].

2.    Plaintiff alleges that was subjected to "religious harassment" from the time he was first interviewed by the CITY COMMISSION in 1997 with regard to questions about his beard. [Rubinstein Depo at p. 40-44, MSJ Exh. A; *see also* Plaintiff's Rog Responses at pp. 23-32, MSJ Exh. B].[1]

3.    Plaintiff alleges that by March 1998, in connection with a communication with then COMMISSIONER RICHARDS in which Richards refers to the Brownsville Police Department as using "gestapo" tactics and in which RICHARDS makes references to "Hitler," Rubinstein admits having an awareness of the alleged religious intolerance towards him by at least one member of the City Commission, BUD RICHARDS. [Rubinstein Depo at pp. 58, 67-68, 74-79, 102, 118, MSJ Exh. A; *see also* Plaintiff's Rog Responses at pp. 23-32, MSJ Exh. B].

4.    The CITY COMMISSION, by majority vote involuntarily terminates Plaintiff from his position as City Manager on January 6, 2000. [Rubinstein Depo at p. 9, MSJ Exh. A; Personnel Action Form of Termination effective 1/6/2000, MSJ A.2].

---

[1]    BUD RICHARDS was not on the COMMISSION at the time; he was not elected into office until May 1997, so he was not involved in the decision to hire Rubinstein. Rubinstein Depo at pp. 48, MSJ Exh. A.

5.    Plaintiff does not initiate this lawsuit against the CITY DEFENDANTS until September 9, 2000.[2]

6.    Plaintiff does not file his administrative charge with the Equal Employment Opportunity Commission ("EEOC") until September 29, 2000. [Rubinstein Depo at p. 151 & Depo Exh. D-19, MSJ Exhs. A & A.1].[3]

7.    Finally, at no time did Plaintiff directly file an administrative charge with the State's deferral agency, the Texas Commission on Human Rights ("TCHR"), and there is no evidence in support of any allegation that Plaintiff took any such action.

The Exhibits establishing these material facts are indexed at the end of this dispositive motion and are hereby incorporated herein for all purposes.

## SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment should be granted if, upon review of the evidence presented in the light most favorable to the non-moving party, it nevertheless appears from the record that there is no genuine issue as to any material fact related to an essential element of a claim such that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587

---

[2]    CITY DEFENDANTS requests that the Court take judicial notice pursuant to Fed.R.Evid. 201, of the contents of the Court's file and specifically the date on which Plaintiff filed his Original Petition in this cause, that is, September 9, 2000.

[3]    The Right to Sue letter did not issue until October 29, 2000. *See* MSJ Exh. A.1.

(1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial – therefore, there can be no genuine issue of material fact on that claim or cause of action. *Celotex Corp.*, 477 U.S. at 323. Further, the non-moving party can not establish a genuine issue of material fact by resting on the mere allegations of his pleadings. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, (1986). FED. R. CIV. P. 56(c) permits summary judgment even if the parties disagree as to some of the facts; more specifically, summary judgment is precluded only if the disputed facts "might affect the outcome of the suit under the governing law" and if the dispute is genuine. *Anderson*, 477 U.S. at 247-48. A dispute is considered genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

## ARGUMENT & AUTHORITIES

I. **Plaintiff's Title VII Claim Is Time Barred In That It Was Not Timely Filed Within 180 Days As Required By State And Federal Law.**

Plaintiff's claim under Title VII contains a statutory administrative requirement that imposes a duty to timely exhaust

administrative remedies.  Here, the relevant federal statutory
provision provides in pertinent part as follows:

> (e)(1)  A charge under this section shall be filed
> within **one hundred and eighty days** after the alleged
> unlawful employment practice occurred and notice of
> the charge (including the date, place and
> circumstances of the alleged unlawful employment
> practice) shall be served upon the person against whom
> such charge is made within ten days thereafter, **except
> that** in a case of an unlawful employment practice with
> respect to which the person aggrieved **has initially
> instituted proceedings with a State or local agency
> with authority to grant or seek relief** from such
> practice or to institute criminal proceedings with
> respect thereto upon receiving notice thereof, such
> charge shall be filed by or on behalf of the person
> aggrieved within **three hundred days** after the alleged
> unlawful employment practice occurred, **or within
> thirty days after receiving notice that the State or
> local agency has terminated the proceedings under the
> State or local law**, whichever is earlier, and a copy
> of such charge shall be filed by the Commission with
> the State or local agency.

42 U.S.C. §2000e-5(e)(1)(emphasis added).

An untimely filed administrative charge is subject to a
limitations defense, and any judicial proceedings initiated
thereon are barred as a matter of law.  *See Jackson v. UT
Anderson*, 172 F.Supp. 860, 867 (S.D. Tex. - Houston Div.
2001)(citing cases).  Significantly, the State's deadline for
filing an administrative charge under the TCHR Act is identical
to that of Title VII, that is, 180 days.  *See* Section 21.202,
Tex. Labor Code.  Here, Plaintiff has clearly failed to file an

administrative charge, whether with the TCHR or the EEOC within 180 days of the last adverse action of which he complains, that is, his termination effective January 6, 2000.

The legal issue presented is whether Plaintiff can claim the benefit of the 300 day administrative limitations period under the federal statute, even though he never *timely* initiated a charge under state law, either directly, or constructively by filing with the EEOC within 180 days.

Texas is admittedly a "deferral" state in that it has created a state agency authorized to enforce employment discrimination laws. Further, CITY DEFENDANTS do not dispute that the State of Texas and the EEOC have a "work-sharing" agreement, although the exact details of this agreement are not part of this record. *But see Vielma v. Eureka Company*, 218 F.3d 458, 462-64 (5th Cir. 2000)(explaining relationship between TCHR and EEOC); *see also Griffin v. City of Dallas*, 26 F.3d 610, 612 (5th Cir. 1994)(further discussion of specific relationship).

CITY DEFENDANTS do not deny that based on the reasoning of *Vielma* and *Griffin* it would appear that Plaintiff's Title VII is governed by a 300 day limitations period, which would cover the CITY COMMISSION action on January 6, 2000 terminating Plaintiff's employment, if nothing else.

City Defendants' Motion For Summary
Judgment As To Plaintiff's Title VII Claim                    Page 9

Nevertheless, Plaintiff hereby urges to the Court, and wishes to preserve for appellate error, if such be necessary, the contention that the applicable administrative limitations period here, as determined by the language of the statue itself, and the procedural facts of this case, is 180 days - not 300 days.  For Plaintiff to get the benefit of the 300 day period, he would have first had to have initiated a proceeding in the state deferral agency, here the TCHR, something that he clearly did not do.

Although *Vielma* and *Griffin* side-stepped this requirement on the fiction that the filing in the EEOC served to trigger the 300 day period, by virtue of the operative effect of a work-sharing agreement, this reasoning nonetheless contravenes the specific language of the federal statute, which was drafted with the intention that claims be *timely* filed in a state deferral agency first if the 300 day period is to have any operative effect.

There is caselaw authority from other federal courts in support of the position that under the procedural facts of this case, it is the 180 period that applies.  The most closely reasoned case with material the procedural facts identical to

those presented here is *O'Young v. Hobart Corporation*, 579 F.Supp 418 (N.D. Ill. Eastern Div. 1983).

In *O'Young*, Chief Judge Magarr, held that the failure to file a *timely* administrative charge with the state deferral agency precluded the charging party from the benefit of the 300 day administrative limitations period. 579 F.Supp. At 420-421. Relying on the statutory text itself, the Court reasoned that "[s]trictly speaking, where the claimant files a time-barred claim with the state agency, the agency *is not an agency authorized to grant or seek relief* with respect to that complaint." 579 F.Supp at 421 (emphasis added). Moreover, a work-sharing agreement between the TCHR and the EEOC can not, standing alone, override the effect of the original language of the statute. 579 F.Supp. at 429 (EEOC regulation can not supercede language chosen by Congress).

Consequently, failure to timely file an administrative charge with the deferral agency under state law precludes the operative effect of a filing with the EEOC, even though it is within 300 days. Other U.S. District Courts in the Seventh Circuit have utilized this reasoning as well. *See Martinez v. Local 1373 UAW*, 722 F.2d 348, 351-52 (7th Cir. 1985)(dicta); *Proffit v. Keycom Elec. Publishing*, 625 F.supp. 400, 407 (N.D.

Ill. 1985); *Lowell v. Glidden-Durkee*, 529 F.Supp. 17, 23 (N.D. Ill. 1981).[4]

A U.S. District Court in Texas has applied the restrictive interpretation of the statute in the context of Title VII claims arising in both Arkansas and Texas. *See Adams v. Cal-Ark Int'l*, 159 F.Supp. 2d 402 (E.D. Tex. 2001). In *Adams*, because Arkansas is not a deferral state, the Court held that the 180 day deadline applied as to the claims arising from that state. 159 F. Supp. at 408.

In view of Plaintiff's failure to file a timely state law based charge, whether in the TCHR itself, or with the EEOC, within the 180 period contemplated by under both state law (§21.202, Tex. Labor Code) or Title VII (42 U.S.C. 2000e-5(e)(1)), CITY DEFENDANTS contend that the language of the federal statute itself supports a 180 day limitations defense on the Title VII claim in its entirety.[5]

---

[4] These cases are admittedly the minority view. *See Sere v Univ. of Illinios*, 628 F.Supp. 1543 (N.D. Ill. 1986)(canvassing cases).

[5] For a more thorough discussion of this issue please refer to Note, *Untimely Filing of State Charges & Title VII's Limitations Periods*, 56 U.Cin. L.Rev. 569 (1987), which is attached as an exhibit to this motion for the convenience of the Court.

## II. Plaintiff's Title VII Claims Are Limited to Events Within 300 Days of the Filing of His Administrative Charge and All Prior Incidents and Events Are Time Barred.

Alternatively, even if the Court should determine that Plaintiff is entitled to the benefit of the 300 day administrative filing period, it would be only those adverse actions contained within the 300 day period that would be actionable. *Webb v. Cardiothoracic Surgery*, 139 F.3d 532, 536-37 (5th Cir. 1998)("Congress intended the limitations period contained in §2000e-5(e)(1) to act as a statute of limitations); *see also Hall v. Bodine Electric*, 276 F.3d 345, 352-53 (7th Cir. 2002).

Here, the 300 day period would cover a time period of about ten months prior to September 29, 2000, when Plaintiff filed his charge with the EEOC. This would include Plaintiff's termination on January 6, 2000, but not any events prior that date, unless Plaintiff can demonstrate that the termination is the culmination of a "continuous violation." *Webb*, 139 F.3d at 537. The continuous violation doctrine does not apply where a plaintiff either knew, or should have known, that he had an actionable reason to complain. *See Huckabay v. Moore*, 142 F.3d 233, 238 (5th Cir. 1998); *see also Hall v. Bodine Electric*, 276

City Defendants' Motion For Summary
Judgment As To Plaintiff's Title VII Claim                                    Page 13

F.3d at 354 (plaintiff on notice of alleged discriminatory conduct well in advance of limitations period).

Plaintiff's live complaint alleges two distinct forms of discrimination based on his religious status. First Plaintiff complains that he was the victim of "religious harassment" through his tenure as City Manager. He contends that this began during his interview process in March 1997, when CITY COMMISSIONER HERNANDEZ asked him questions about his beard, which Plaintiff contends has religious significance for him. Rubinstein Depo at pp. 40, 49-50, MSJ Exh. A. Plaintiff was nevertheless hired as City Manager by a unanimous vote of the then CITY COMMISSIONERS. Rubinstein Depo at pp. 9, Exh. A.

Plaintiff contends that the next incident of harassment occurred at the hands of COMMISSIONER RICHARDS, in March 1998. This had to do with an alleged complaint by RICHARDS to Plaintiff over the traffic stop of a resident. The resident complained to RICHARDS about her treatment by the police officer, and RICHARDS took the matter up with Plaintiff as City Manager. It was in this verbal exchange that Plaintiff contends he found RICHARDS' use of the terms "Nazi" and "Hitler" offensive to him. Rubinstein Depo at pp. 40-41; 56-58, 74-79, Exhibit A.

Plaintiff testified in deposition that by this point in time, he was fully aware of a hostile environment against him as a Jew, at least by RICHARDS. Rubinstein Depo at pp. 166-67, Exhibit A. Further incidents motivated by alleged anti-Semitic bias continued at later times throughout 1998. Rubinstein Depo at pp. 41-44, MSJ Exh. A.

By Plaintiff's own admission, he was aware of the anti-Semitic bias against him as early as March 1998. Yet, at no time did Plaintiff institute or initiate a charge of hostile environment with either the TCHR or the EEOC; nor did he do so until September 29, 2000, over nine months after he had been terminated from his position.

**Hostile Environment vs. Disparate Treatment**

Plaintiff's live pleadings allege both a hostile environment religious discrimination claim, as well as an allegation that his termination was motivated by an anti-Semitic bias.

It does not appear that the U.S. Court of Appeals for the Fifth Circuit has yet to explicitly or implicitly recognizes a cause of action under Title VII for a hostile environment based on religion. This cause of action has been recognized in other U.S. Circuits, however, and so for purposes of this motion, the CITY will presume that this Court will recognize the cause of action for hostile environment based on religion as actionable.

The Third Circuit, in recognizing a cause of action for hostile work environment based on religion, has defined the elements of such a cause of action as consisting of five elements: 1) the employee suffered intentional discrimination because of religion; 2) the discrimination was pervasive and regular; 3) the discrimination detrimentally affected the plaintiff; 4) the discrimination would detrimentally affect a reasonable person of the same religion in that position; and 5) the existence of respondeat superior liability. *See Abramson v. William Patterson College of New Jersey*, 260 F.3d 265 (3rd Cir. 2001). With regard to the second element, the U.S. Supreme Court has articulated this required element as "severe or pervasive." *See Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993); *see also Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 78 (1998). In short, a hostile environment claim based on a protected category must be sufficiently severe so as to alter the terms and conditions of the job because of the anti-Semitic bias.

In the absence of a showing that the involuntary termination of January 6, 2000 is part of a "continuing violation," Plaintiff would have to show that the termination was motivated by an anti-Semitic bias as a disparate treatment claim, not a

City Defendants' Motion For Summary
Judgment As To Plaintiff's Title VII Claim                    Page 16

hostile environment claim. This is because it is only the involuntary termination that falls within the 300 day limitations period. The hostile environment claim is administratively barred by the 300 day period, and it should be dismissed on this basis.

### CONCLUSION & PRAYER

Therefore, based on any one or more of the foregoing reasons, CITY DEFENDANTS request and pray that the Court grant this dispositive motion and dismiss Plaintiff's Title VII claim in its entirety. Alternatively, CITY DEFENDANTS request that the hostile environment claim based on religion be dismissed as barred by limitations.

Further, CITY DEFENDANTS request that the portion of the Title VII claim based on Plaintiff's involuntary termination be dismissed based on Plaintiff's inability to create a material factual dispute regarding whether the termination itself was motivated by an anti-Semitic bias by a majority of the CITY COMMISSIONERS in violation of Title VII.

Finally, CITY DEFENDANTS request and pray for such further and additional relief to which they may be entitled, at law or in equity.

SIGNED on the _1st_ day of April, 2002.

City Defendants' Motion For Summary
Judgment As To Plaintiff's Title VII Claim                    Page 17

Respectfully Submitted,

**DENTON, NAVARRO & BERNAL**
A Professional Corporation
Bank of America Building
222 E. Van Buren, Suite 405
Harlingen, Texas 78550
956/421-4904
956/421-3621 (Fax)

By: _Ricardo J. Navarro_
RICARDO J. NAVARRO
Attorney In Charge
State Bar No. 14829100
So. Dist. ID No. 5953

### CERTIFICATE OF SERVICE

I certify that a true copy of this document has been sent by first class U.S. Mail, postage prepaid, unless otherwise indicated, to the persons listed below on the 1st day of April 2002.

Mr. Ed McAninch                **CMRRR NO 7001 1940 0007 8404 5949**
LAW OFFICES OF EDWIN L. MCANINCH, P.C.
507 Fall River Road
Houston, Texas 77024-5613
COUNSEL FOR PLAINTIFF

_Ricardo J. Navarro_
RICARDO NAVARRO

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CARLOS RUBINSTEIN | § | |
|     Plaintiff | § | |
| | § | |
| vs. | § | |
| | § | |
| CITY OF BROWNSVILLE, TEXAS | § | CIVIL ACTION NO.: B-00-169 |
| & CITY COMMISSIONERS | § | |
| ERNIE HERNANDEZ, CARLTON "BUD" | § | |
| RICHARDS, & HARRY MCNAIR, | § | |
| Individually & Officially | § | |
|     Defendants | § | |

ORDER ON
MOTION TO SUMMARY JUDGMENT
AS TO PLAINTIFF'S TITLE VII CLAIM
_____

On this day there came before the Court the Motion for Summary Judgment filed on behalf of the City Defendants with respect to Plaintiff's Title VII claim.

After due consideration of the motion, and the response thereto the Court finds that the Motion to Dismiss based on a statutory bar has merit and should be GRANTED.

It is, Therefore, ORDERED, that Plaintiff's cause of action brought under Title VII is hereby DISMISSED WITH PREJUDICED.

SIGNED on the _____ day of _____, 2002.

_____
HON. HILDA G. TAGLE
U.S. DISTRICT COURT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CARLOS RUBINSTEIN | § | |
|      Plaintiff | § | |
| | § | |
| vs. | § | |
| | § | |
| CITY OF BROWNSVILLE, TEXAS | § | CIVIL ACTION NO. B-00-169 |
| & CITY COMMISSIONERS | § | |
| ERNIE HERNANDEZ, CARLTON "BUD" | § | |
| RICHARDS, & HARRY MCNAIR, | § | |
| Individually & Officially | § | |
|      Defendants | § | |

**EXHIBITS IN SUPPORT OF DISPOSITIVE MOTION**

---

    The following authenticated exhibits are hereby submitted in support of this Motion:

A.    Relevant deposition testimony of Plaintiff Carlos Rubinstein;

    A.1.    Notice of Charge of Discrimination filed with EEOC dated September 29, 2000; and EEOC Right to Sue Notice issued October 31, 2000;

    A.2.    Personnel Action Form terminating employment effective January 6, 2000.

B.    Relevant Interrogatory Responses of Plaintiff Rubinstein;

C.    Note, *Untimely Filing of State Charges & Title VII's Limitations Periods,* 56 U.Cin.L.Rev. 569 (1987).

**END OF EXHIBIT INDEX**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CARLOS RUBINSTEIN          ) (
         Plaintiff          ) (
                            ) (
VS.                         ) (     CIVIL ACTION NO. B-00-169
                            ) (
CITY OF BROWNSVILLE,        ) (
ET. AL.                     ) (
         Defendants          ) (

---

ORAL DEPOSITION OF
CARLOS RUBINSTEIN
JANUARY 24, 2002



---

ORAL DEPOSITION OF CARLOS RUBINSTEIN, produced

as a witness at the instance of the DEFENDANTS, taken

in the above styled and numbered cause on JANUARY 24,

2002, reported by DONNA McCOWN, Certified Court

Reporter No. 6625, in and for the State of Texas, at

the offices of Denton, Navarro & Bernal, 222 East Van

Buren Street, Suite 405, Harlingen, Texas, pursuant to

the Federal Rules of Civil Procedure.

EXHIBIT" _A_ "

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

```
CARLOS RUBINSTEIN        ) (
        Plaintiff        ) (
                         ) (
VS.                      ) (   CIVIL ACTION NO. B-00-169
                         ) (
CITY OF BROWNSVILLE,     ) (
ET. AL.                  ) (
        Defendants       ) (
```

ORAL DEPOSITION OF
CARLOS RUBINSTEIN
JANUARY 24, 2002

ORAL DEPOSITION OF CARLOS RUBINSTEIN, produced as a witness at the instance of the DEFENDANTS, taken in the above styled and numbered cause on JANUARY 24, 2002, reported by DONNA McCOWN, Certified Court Reporter No. 6625, in and for the State of Texas, at the offices of Denton, Navarro & Bernal, 222 East Van Buren Street, Suite 405, Harlingen, Texas, pursuant to the Federal Rules of Civil Procedure.

---

**3**

EXHIBITS (Cont.)

| NUMBER | DESCRIPTION | PAGE IDEN. |
| --- | --- | --- |
| 6 | Personnel Policies, Revision, 1998 | 8 |
| 7 | Terms of Employment | 20 |
| 8 | Personnel Action Form, Raise | 21 |
| 9 | Personnel Action Form, Termination | 22 |
| 10 | Letter, 11-10-95, to City Manager Vega | 53 |
| 11 | Draft of Press Briefing | 73 |
| 12 | Letter, 9-9-98, Commissioner Hernandez | 101 |
| 13 | Grievance, 9-17-98 | 106 |
| 14 | Statement, 12-28-99 | 140 |
| 15 | Letter, 12-6-99, from Mayor Vela | 148 |
| 16 | Letter, 12-3-99, to Mayor Vela | 148 |
| 17 | Letter, 1-4-00, to Mayor Vela | 149 |
| 18 | Notice of Claim | 150 |
| 19 | Charge of Discrimination | 151 |
| 20 | Dismissal and Notice of Rights | 151 |

---

**2**

APPEARANCES

COUNSEL FOR PLAINTIFF:

EDWIN L. McANINCH
LAW OFFICE OF EDWIN L. McANINCH
507 Fall River Road
Houston, Texas  77024

COUNSEL FOR DEFENDANTS:

RICARDO J. NAVARRO
DENTON, NAVARRO & BERNAL
222 East Van Buren Street, Suite 405
Harlingen, Texas  78550

ALSO PRESENT:

Harry McNair
Carlton "Bud" Richards

INDEX

| | PAGE |
| --- | --- |
| Appearances | 2 |
| CARLOS RUBINSTEIN Examination by Mr. Navarro | 4 |
| Errata Sheet/Signature Page | 176 |
| Reporter's Certificate | 177 |

Attached to the end of the transcript: Stipulations

EXHIBITS

| NUMBER | DESCRIPTION | PAGE IDEN. |
| --- | --- | --- |
| 1 | Third Amended Complaint | 5 |
| 2 | Objections and Responses to Written Questions | 6 |
| 3 | Objections and Responses to Requests for Admissions | 6 |
| 4 | Portions of City Charter | 7 |
| 5 | Personnel Policies, 1978 | 8 |

---

**4**

1          CARLOS RUBINSTEIN,
2 having been duly sworn, testified as follows:
3          EXAMINATION
4 BY MR. NAVARRO:
5   Q. Good afternoon, Mr. Rubinstein.
6   A. Good afternoon.
7   Q. Your full name is Carlos Rubinstein?
8   A. That is correct.
9   Q. And you understand that we're here today in
10 connection with a lawsuit filed by you against the city
11 of Brownsville, Texas; is that correct?
12  A. That's correct.
13  Q. All right.  And you've been deposed before?
14  A. I have.
15  Q. All right.  And so you've been familiar with
16 the deposition process, correct?
17  A. I am.
18  Q. Okay.  I'm going to be asking you today a
19 series of questions about your lawsuit and about the
20 claims made in the legal pleadings prepared by your
21 attorney.  You understand that?
22  A. I do.
23  Q. And my questions are going to focus on the
24 factual aspects of your claims.  Okay?
25  A. Okay.

1 exhibits that are going to definite... be part of our
2 question and answer today.  Okay?
3    A. Understood.
4    Q. All right.  Now, the next thing I would like to
5 do with you is that, again, in going through the
6 complaint, it appeared to me that the chronological
7 scope of the controversy kind of encompasses a fairly
8 broad period of time.
9        And I would like to ask you some questions
10 about your understanding and at least get some
11 perimeters on that so that when we're talking about
12 facts and things that happened, we can kind of be
13 oriented as to what periods of time we're talking
14 about.  Okay?
15    A. Understood.
16    Q. It appears to me that you were hired by the
17 city commission as the city manager effective March 1
18 of 1997; is that correct?
19    A. That's correct.
20    Q. And then you were officially terminated by
21 action of the city commission on January 6th of the
22 year 2000.
23    A. Correct.
24    Q. All right.  So insofar as your complaints
25 involving your city manager tenure, that would be the

---

10

1 outer perimeters of that time period, correct?
2    A. I would agree.
3    Q. All right.  And for the benefit of the court
4 and the jury and just to make sure we have all the
5 context here, you actually were a city employee prior
6 to being the city manager.
7    A. That is correct.
8    Q. All right.  By several years I think; is that
9 right?
10    A. On two different occasions, yes, by several
11 years.
12    Q. Prior to being city manager, you were working
13 as a department head director?
14    A. That's correct.
15    Q. Okay.  For the health department?
16    A. Health and permitting, and just prior to the
17 appointment of city manager, I was the interim
18 operations manager for the city of Brownsville.
19    Q. Okay.  And so how many years were you -- how
20 many years of experience with the city of Brownsville
21 did you have prior to becoming city manager?
22    A. The first tenure started in 1983.  I was health
23 director from '83 to '89.  About '87 I also assumed the
24 responsibilities of EMS director.
25        I left city employment in late '89.  I

---

1 believe it was ... ember of '89.  I returned to the city
2 in 1995, late November, early December.  I served from
3 '95 to December of '96, I believe, as health and
4 permitting director and then operations manager and
5 then finally city manager.
6    Q. Okay.  In the capacities in which you worked
7 for the city prior to city manager then, it sounds to
8 me like you were at a department head level in
9 connection with your duties.
10    A. That is correct.
11    Q. And as a department head, you would have been
12 in the organizational chart, I guess, one level down
13 from the city manager.
14        MR. McANINCH:  Objection, form.
15    Q. Is that correct?
16    A. I would agree with that.
17    Q. Okay.  And again, just to make sure that we're
18 on the same page of this, would you agree with me that
19 for -- that the city of Brownsville is a home-rule city
20 under Texas law?
21        MR. McANINCH:  Objection, form.
22        THE WITNESS:  That's my understanding.
23    Q. Okay.  And that's all I want is your
24 understanding on these things.  And that the city is --
25 the policymakers consist of a mayor and commissioners

---

12

1 who form the governing board of the city.
2    A. Correct.
3    Q. All right.  And all of these individuals, the
4 mayor and commissioners, are placed in those positions
5 through elections.
6    A. That is correct.
7    Q. All right.  And so the citizens or residents of
8 the city of Brownsville elect their governing body.
9    A. That's correct.
10    Q. Now, is it also correct that the city of
11 Brownsville is a -- has a form of government that is a
12 city manager form of government?
13    A. That's correct.
14    Q. So that under the mayor and commissioners, you
15 have what amounts to an executive director or a general
16 manager or in the case of this municipality, a city
17 manager who is at the top of the organizational chart.
18    A. Correct.
19    Q. And is it correct that the city manager --
20 we're going to talk in more detail about what the city
21 manager's duties are, but generally speaking, the city
22 manager is a full-time employee of the city of
23 Brownsville, correct?
24    A. That is correct.
25    Q. And that city manager oversees the day-to-day

1 THE WITNESS: Throughout the entire
2 document, the city manager is referenced.
3 Q. Well, but we're talking about, you know, the
4 status of the city manager and the organizational
5 structure. What I'm trying to get is whether there's
6 any specific provisions in the '78 policy manual that
7 bear on that.
8 MR. McANINCH: I'm going to object that
9 that's overbroad, that the document speaks for itself.
10 I mean, is he just supposed to go through here and
11 every time the city manager is referenced to point that
12 out?
13 MR. NAVARRO: No. He's supposed to -- I'm
14 giving him an opportunity to go through, and if there's
15 a specific provision in there that he is aware of or
16 has relied upon or believes specifically applies to his
17 situation, I would like to know what that is.
18 If there's no specific provision that he's
19 aware of or that he believes applied, then that's fine
20 too.
21 MR. McANINCH: Well, off the record.
22 (Brief recess)
23 Q. Is there any other specific provision in the
24 '78 policy that you feel bears directly on the status
25 of the city manager position while you were in that --

1 vote of the members of the commission on 30 days notice
2 of their intention to remove him. Were you familiar
3 with that provision?
4 A. Yes, I was.
5 Q. Did you have any particular understanding one
6 way or the other insofar as what the effect of your
7 terms of employment or the personnel manual had on this
8 provision?
9 A. Can you rephrase that, please?
10 Q. Did you have any particular opinion or
11 understanding on whether the terms of employment
12 resolution under which you were hired or the personnel
13 manuals affected this charter provision?
14 A. I still don't understand your question.
15 Q. Well, did you believe that this charter
16 provision continued to apply to you during the time
17 that you were the city manager?
18 A. Yes.
19 Q. Did you believe -- if you had an opinion -- if
20 you didn't, just tell me -- but did you believe that
21 the terms of employment resolution overrode this
22 charter provision in some form or fashion?
23 A. The section that I referenced states that
24 whatever is not governed by the charter is governed by
25 the personnel policy manuals. That was my belief.

---

## 38

1 A. I guess, from the sections I referenced, I
2 think the city manager is clearly referred to as an
3 employee, and the applicability of it in Section 104
4 states that it applies to all city employees except a
5 person on retainer, and obviously city manager is not
6 on retainer.
7 Q. So does it -- was it your understanding then
8 that during the time that you were the city manager
9 that you would have been entitled to the same due
10 process that you were giving to employees under your
11 supervision?
12 A. Again, also making reference to the terms of
13 employment that says that, "Items not covered shall be
14 governed by the personnel policy manual," yes.
15 Q. Okay. So the answer to my question that, yes,
16 that was your understanding.
17 A. Yes.
18 MR. McANINCH: Objection, form.
19 Q. Did you ever have occasion to look at the
20 provisions in the Code of Ordinances, Exhibit 4, that
21 addressed the -- look at page CH-62 at the top of the
22 page.
23 That provides in the middle of that
24 paragraph that the city manager shall be appointed for
25 an indefinite term, but he may be removed by a majority

## 40

1 Q. All right. Okay. Now, let me kind of frame
2 out in broad outline form what appeared to me to be
3 some of the main points of controversy, and then we can
4 go back and cover those.
5 It's my understanding that you have a
6 complaint about some comments that were made during the
7 interview or hiring process while you were city
8 manager; is that correct?
9 A. Correct.
10 Q. All right. And then when would have been the
11 next issue or controversy involving the mayor or
12 commissioners that you believe was significant?
13 A. March 30th, 1998, I believe.
14 Q. Okay. And what happened then?
15 A. Conversation that I had with Commissioner
16 Richards.
17 Q. Regarding what?
18 A. His objection to some actions that the police
19 department had undertaken.
20 Q. Is that the gestapo remark?
21 A. Among others.
22 Q. All right. Okay. So the first incident that
23 is of significance for purposes of this lawsuit would
24 have been comments that were made at or around the time
25 you were interviewed and hired?

1    A. Correct.
2    Q. All right. Which would have been in March or
3 February of '97?
4    A. Correct.
5    Q. The next significant one would have been the
6 conversation with Commissioner Richards in March 30th,
7 '98?
8    A. There would have been some intervening comments
9 particularly about my choice to keep my beard.
10    Q. Between '97 and '98?
11    A. And even after '98.
12    Q. Okay. Yeah. And I understand there are a lot
13 of things that are sprinkled through this in going
14 through your interrogatory responses, but I'd kind of
15 like to frame out the major events for the benefit of
16 the court and jury, and then we'll go back and cover
17 them. Okay?
18    A. Okay.
19    Q. All right. So the next significant one that I
20 understood was the conversation with Commissioner
21 Richards in March 30th of '98.
22    A. Correct.
23    Q. And then after that, what would have been the
24 next one?
25    A. The next significant would have been May of

---

1    A. And then ⌐iously my termination.
2    Q. What was August of '98?
3    A. The press conference I was asked to hold
4 regarding BPOA, Brownsville Police Officer Association.
5    Q. Otherwise commonly referred to as BPOA?
6    A. Correct.
7    Q. All right. Then in November of '99, issues
8 involved what?
9    A. The purchase of a vehicle for EMS.
10    Q. Okay. And then what after that? The
11 termination?
12    A. Correct.
13    Q. January?
14    A. Uh-huh.
15    Q. 2000, correct?
16    A. Correct.
17    Q. In fact, you had been, I think, put on notice
18 of the intent to terminate you in December of '99,
19 correct?
20    A. Correct.
21    Q. And there was a city commission meeting at
22 which this was raised?
23    A. Correct.
24    Q. Was that closed or open?
25    A. December 7th?

---

## 42

1 '98. I believe it was May 12th, executive session to
2 evaluate the city manager.
3    Q. All right. And after that, when would have
4 been the next one?
5    A. September of '98.
6    Q. Involving what?
7    A. A letter that I received from Commissioner
8 Hernandez with an attachment from Commissioner
9 Richards, a fax.
10    Q. Regarding what?
11    A. My religious beliefs and sensibilities.
12    Q. Okay. And after September of '98, what would
13 have been the next?
14    A. Actions in '99 that I was trying to ensure that
15 followed applicable law, particularly around November
16 of '99.
17    Q. Okay. Is there anything significant going on
18 between September of '98 and November of '99 that we're
19 going to need to talk about?
20    A. Also -- I'm sorry. Also August, early August
21 of '98.
22    Q. All right.
23    A. In the terms of your phrase, sprinkled
24 throughout the whole period.
25    Q. Okay.

---

## 44

1    Q. The December '99 action, yes.
2    A. I remember it as an open meeting.
3    Q. It was an open meeting?
4    A. The action that I recall was in open session.
5    Q. The action was in open. Was there a closed
6 session evaluation?
7    A. Not that I recall.
8    Q. Did you have counsel present at that December
9 '99?
10    A. Yes, I believe I did.
11    Q. Who was that?
12    A. Victor Quintanilla. Maybe Mr. Gamez was also
13 present.
14    Q. All right. And it's my understanding from
15 reviewing documents that at that December 6th or 7th
16 meeting of '99 you were basically put on notice of the
17 commission's intent to terminate your contract or your
18 employment relationship, excuse me.
19    A. With a review to take place 30 days after, yes.
20    Q. There's a 30-day period.
21    A. Correct.
22    Q. And then you were placed on suspension with
23 pay?
24    A. Correct.
25    Q. All right. So during that 30-day period, you

1 were still receiving your pay?
2    A. Correct.
3    Q. And then the final action was on January 6th of
4 2000?
5    A. Correct.
6    Q. Would the January 6th, 2000, action have been
7 the final action at issue in this lawsuit?
8    A. What represents my termination with the city of
9 Brownsville, yes.
10    Q. Is there anything beyond January 6th of 2000
11 that is part of the lawsuit?
12    A. I don't think so.
13    Q. Okay.  So just let me go through real briefly
14 each of these events and just kind of flesh it out a
15 little bit more and see if I can get a better
16 understanding of what it involved and how we're going
17 to tie it all together or how you see it fitting
18 together.  Okay?
19    A. Okay.
20    Q. All right.  The February-March '97, was it an
21 interview or a meeting, or what was that?
22    A. It was during the interview.
23    Q. All right.  And what was it at the interview
24 that you found improper or offensive?
25    A. Commissioner Hernandez specifically asked me to

1    What church c[...]ligious organizations do you belong
2 to?"
3    Q. Okay.
4    A. And the issue came up also at that point about
5 my beard.
6    Q. Okay.  Brought up by who?  Commissioner
7 Hernandez?
8    A. Yes.
9    Q. All right.  Now, in looking at the resolution
10 hiring you, it appears to me that the mayor and
11 commissioners at that time consisted of Mayor Henry
12 Gonzalez, correct?
13    A. Correct.
14    Q. Jackie Lockett in Place 1?
15    A. Correct.
16    Q. Ernie Hernandez in Place 2?
17    A. Correct.
18    Q. Harry McNair in Place 3?
19    A. Correct.
20    Q. John Wood in Place 4?
21    A. Correct.
22    Q. And that was it at that time.
23    A. That was it.
24    Q. Okay.  So Bud Richards was not in office at
25 that time.

## 46

1 disclose my religious affiliation beliefs.
2    Q. Was this in an open meeting or closed meeting,
3 or what was the context?
4    A. I remember all interviews for the applicants
5 were held in the chambers behind closed doors, so I
6 would think it was a closed meeting.
7    Q. Closed meeting?
8    A. I would believe so.  That's what I recall.
9    Q. And this had to do with the selection of the
10 city manager?
11    A. Correct.
12    Q. And who was the prior city manager?
13    A. Mr. Andres Vega.
14    Q. And he had resigned or retired or been fired or
15 what?
16    A. He was to retire February of '97 or at the end
17 of February.
18    Q. Okay.  Were you one of several applicants?
19    A. Yes.
20    Q. Or persons being considered?
21    A. Yes.
22    Q. Okay.  And what was it that Commissioner
23 Hernandez said to you at that time?
24    A. Towards the end of the interview, he just
25 clearly asked, "Well, what are your religious beliefs?

## 48

1    A. That is correct.
2    Q. And Bud Richards had no involvement in the
3 actions hiring you?
4    A. That is correct.
5    Q. In fact, Bud Richards did not come onboard to
6 the commission until when?
7    A. I believe May of '97.
8    Q. And it was after your --
9    A. May or April after runoff -- I mean, May or
10 June.
11    Q. Okay.  And he replaced who?
12    A. Jackie Lockett.
13    Q. Okay.  But there's no question that he would
14 not have had any involvement in the interview process
15 getting you onboard?
16    A. No.
17    Q. Okay.  What about -- okay.  Tell me about the
18 comments regarding the beard.  What was that?
19    A. Repeated comments where he requested that I
20 shave off my beard.
21    Q. And what was the context of the conversation?
22    A. It occurred over several periods of time
23 starting during the interview process that I shave off
24 my beard.
25        I explained that it's something that I

1 couldn't do.  The reasons why is . .gious preference,
2 and I continued to receive that request.
3    Q.Okay.  Was it -- what was your understanding of
4 Hernandez's, you know, reasons for that request?
5        MR. McANINCH:  Objection, form.
6        THE WITNESS:  I don't know what his reason
7 for asking that was.
8    Q.Okay.  Did you take it as an affront to your
9 religious views?
10   A.I did after I made it clear why I chose to have
11 a beard and then continued to receive those requests.
12   Q.Had he raised this subject about your beard at
13 the -- during the interview phase for the city manager
14 position?
15   A.He raised the issue of my religious
16 affiliation.  I seem to recall he also raised the issue
17 of the beard then too.
18   Q.So this was prior to you actually being named
19 as the city manager?
20   A.Correct.
21   Q.Do you recall that if Mr. Hernandez dissented
22 or voted against you being named the city manager?
23   A.He voted for me.
24   Q.Are there any comments by any other
25 commissioners at that time, mayor or commissioners at

---

## 50

1 that time that are at issue in this lawsuit?  That time
2 being when you were being interviewed and named as the
3 city manager.
4    A.Yes.  The day after, Commissioner McNair stated
5 that Commissioner Hernandez had asked him to ask me
6 again to shave off my beard.
7    Q.The day after you were named, or the day
8 after --
9    A.The day after the -- it may have been the day
10 after the interview or the day after the vote took
11 place.
12   Q.Okay.  All right.  So Commissioner McNair again
13 approached you about the beard?
14   A.Correct.
15   Q.All right.  And purportedly in furtherance of
16 Commissioner Hernandez's wishes?
17   A.That's correct.
18   Q.Okay.  And what was your response to him?
19   A.Same thing, that I couldn't do it.  And in
20 fact, in this instance, I made a copy of the text
21 within the Bible that I wanted to express to them was
22 why I was choosing to keep my beard.
23   Q.Now, did you know Commissioner Hernandez
24 before?
25   A.Yes.

---

## 51

1    Q.Okay.  How long have you known him?
2    A.Early '80s.
3    Q.In connection with working with the city?
4    A.Even before he was elected.
5    Q.Okay.  So did y'all go to school together, or
6 did you know each other from --
7    A.No.
8    Q.-- other activities in the past or --
9    A.I knew him principally because when I was
10 health director and EMS director in the '80s, he was
11 the mayor's nephew, still is the former mayor's nephew,
12 and I got to know him in that context.
13   Q.And when you say he was the mayor's nephew,
14 there was a Mayor Hernandez?
15   A.Correct.
16   Q.And was Ernie Hernandez in the city at the
17 time, or how is it that you knew him?
18   A.No.  Through Mayor Hernandez principally.
19   Q.But Ernie Hernandez was not at that time
20 connected to the city of Brownsville?
21   A.That is correct.
22   Q.So your -- your knowledge of him was just on a
23 social basis through the then Mayor Hernandez?
24   A.Correct.
25   Q.When was -- was the first time that you had

---

## 52

1 dealings with Ernie Hernandez in an official capacity
2 with the city after he was elected?
3    A.No.
4    Q.When would have been the first time you dealt
5 with him officially?
6    A.When I was health director in mid to late '80s.
7 I was also given the task of doing code enforcement.
8    Q.Okay.
9    A.And Commissioner Hernandez had several
10 businesses that fell under the purview of the health
11 department.  Some we regulated simply because he was
12 serving food, and some issues came up regarding code
13 enforcements.  I can't recall what the specific issue
14 was, but those kinds of activities.
15   Q.But in that relationship, the context was one
16 that you were a department head and he was a citizen,
17 and some of his activities were regulated by the city?
18   A.That's correct.
19   Q.So you dealt with him in that capacity?
20   A.That's correct.
21   Q.Did you ever have any kind of exchange with him
22 that you found to be offensive or improper or that
23 demonstrated some kind of bias by him?
24   A.Well, other than that he was objecting at that
25 time for our enforcement of our regulations.

### 53

1   Q. I understand.
2   A. But other than that, no.
3   Q. But in the context of where he's being
4 regulated and you're the person doing the regulating or
5 the enforcing, did you ever have any exchange with him
6 that was -- that revealed or reflected some kind of a
7 discriminatory bias towards you based on your religion?
8   A. No.
9   Q. So in that context, other than just the usual
10 objections of citizens who have to -- who their
11 attention is called to enforcement issues, there was
12 nothing that stands out?
13   A. No, not really.
14   Q. All right.  What about Commissioner McNair?
15 How long have you known him?
16   A. Since early to mid '80s.  I believe he was
17 elected to the commission in '85.
18   Q. Okay.  I noted that you had actually even put
19 him down as a reference when you were applying for, I
20 believe, the health department position.  Do you recall
21 that?
22   A. May I see the document?
23   Q. Sure.  Let me go ahead and mark it.  I show you
24 what is marked as Exhibit 10.  It appears to be a
25 letter from you to the then City Manager Vega dated

### 55

1   Q. Did y'all go to school together?
2   A. No.
3   Q. When was the first time you dealt with Harry
4 McNair in any kind of an official capacity?
5   A. When he got elected to the city commission.
6   Q. And you were what?  Health department director?
7   A. Health and EMS.
8   Q. Okay.  Did you ever have -- prior to you being
9 city manager and Harry McNair being on the city
10 commission, did you ever have any kind of exchange with
11 him that you -- that bothered you that you felt to be
12 offensive?
13   A. Can you rephrase that?
14   Q. Prior to you becoming city manager and in
15 connection with your relationship with Harry McNair,
16 did you ever have any exchange or communication with
17 him in which -- that left you with the belief that he
18 had a bias or discriminatory attitude towards you?
19   A. No.
20   Q. During the time that you were being interviewed
21 for the position, did Harry McNair say anything in the
22 context of that interview that you found to be
23 offensive?
24   A. No.
25   Q. The first comment that stands out in your mind

### 54

1 November 10th, '95.
2   A. That's correct.
3   Q. And in that letter, you cite as a professional
4 reference three individuals.  One of them was Harry
5 McNair.
6   A. That is correct.
7   Q. And you indicate in this Exhibit 10 that each
8 of the individuals listed you consider to be a close
9 personal friend who share the same personal and family
10 values as you do.
11   A. No.  I think you're misreading that.
12   Q. Okay.
13   A. The personal references are Sam Fruia and Kary
14 Richardson.
15   Q. Okay.  Below that?
16   A. That's correct.
17   Q. Okay.  I see.  And the professional references,
18 you're referring to the three individuals as people who
19 know you and can attest to your qualifications?
20   A. That's correct.
21   Q. And one of those is Harry McNair?
22   A. That's correct.
23   Q. How long had you known Harry McNair before the
24 writing of this letter?
25   A. Probably ten years or a little over ten years.

### 56

1 would have been when we followed up on Ernie
2 Hernandez's comments after the interview?
3   A. Correct.
4   Q. All right.  Are there any other comments by any
5 of the commissioners, mayor or commissioners at the
6 time of your interview that bear on your
7 discrimination -- religious discrimination claims?
8   A. No.
9   Q. Okay.  The next significant event -- and if we
10 need to tie in things before or after, we can do that,
11 but the next one is the March 30, '98.  That's a
12 conversation with Bud Richards?
13   A. Correct.
14   Q. All right.  Tell me -- that involved what?  A
15 telephone communication with him?
16   A. That's correct.
17   Q. In which he was complaining about what?
18   A. He contacted the office and was complaining
19 about activities that he was objecting to by the police
20 department.
21   Q. Okay.  Do you recall specifically what those
22 activities were?
23   A. The citation being issued to the girlfriend of
24 the then prosecuting attorney for the city who also
25 happened to be a close personal friend or family friend

59

1 of Mr. Richards.

2    Q. Would that have been Joseph Graham?

3    A. Yes, that would have been Joseph Graham.

4    Q. Okay.  That's an incident involving a traffic

5 stop of a girlfriend of the then prosecuting attorney

6 Joseph Graham?

7    A. That's correct.

8    Q. And it's my understanding that the nature of

9 that complaint was that the treatment of this young

10 lady was somehow improper or inappropriate by the

11 police officer at the scene.

12    A. Can you rephrase or restate it?

13    Q. My understanding is that Mr. Richards'

14 complaint had to do with the treatment of the -- by the

15 young woman -- of the woman, the girlfriend, of the way

16 in which she was treated by the police officer.  That's

17 my understanding.  Do you have a different

18 understanding?

19    A. It may have also included how the case was

20 disposed of in court.

21    Q. Okay.  What is your recollection of what he

22 told you about that?

23    A. Well, that's when he made the reference that

24 the police department was a gestapo.

25    Q. What was it that Mr. Richards, in your view,

1    Commissioner    .hards would have used that term to you?

2    A. It was discussed in the May meeting.  I believe

3 it was May 12th.

4    Q. Okay.  Of '98?

5    A. Right.

6    Q. All right.  I'm talking about within the time

7 period you were hired in March of '97 --

8    A. Oh, I'm sorry.  Okay.

9    Q. -- through March of '98, with this issue about

10 the prosecutor's girlfriend, would he have said -- used

11 this term "Jewboy" to you at any other occasion prior

12 to then?

13    A. None that I recall.

14    Q. Would that have been the first time then that

15 that term was used to you?

16    A. By him, yes.

17    Q. By him.  Okay.  Were there times after this

18 date of March 30th, on or about March 30th of 1998, in

19 which that term was used to you?

20    A. Again, it was discussed in the May meeting.

21    Q. The May 17th, '98, meeting?

22    A. It think it was May 12th.

23    Q. May 12th?  That meeting, it's my understanding,

24 was a city manager personnel evaluation meeting.

25    A. That's how it was posted.

58

1 was trying to communicate with you in connection with

2 this phone call?

3        MR. McANINCH: Objection, form.

4        THE WITNESS:  The conversation itself was

5 very troubling.

6    Q. In what way?

7    A. As soon as the -- when the phone conversation

8 started, the very first comments from Commissioner

9 Richards were, "What is a Jewboy like you doing driving

10 the mayor and Wood to Edinburg?"

11    Q. Okay.  And that's a conversation that would

12 have occurred March of '98?

13    A. That is the conversation.

14    Q. Okay.

15    A. I found that very troubling, very

16 disheartening.  I questioned him on it.  He repeated

17 the statement, and then he started the comments about

18 his objections as to how the police department were

19 acting, and that's when he made the reference to them

20 as a gestapo.

21    Q. Would this have been the first time that

22 Commissioner Richards used the term "Jewboy" to you?

23    A. Yes.

24    Q. Are there any times between March of '97 and

25 March of '98, any other times in that time period when

60

1    Q. Okay.  And it was a meeting that would have

2 been between the mayor and commissioners and you to

3 evaluate your performance as city manager.

4    A. Again, that's how the meeting was posted.

5    Q. Okay.  And what you're saying is that the

6 comments made by Commissioner Richards to you were the

7 subject of that meeting?

8    A. They were part of what was discussed.

9    Q. They were part of the subject of that meeting?

10    A. Yes.

11    Q. And as I understand it, that would have been

12 because you also had brought these conversations to the

13 attention of some other -- the mayor and other

14 commissioners.

15    A. Correct.

16    Q. All right.  And that would have happened in the

17 interim between March 30th of '98 and May 12th of '98?

18    A. Correct.

19    Q. And so I believe that we have disclosed and

20 exchanged some correspondence back and forth between us

21 related to those conversations.  Have you seen those?

22    A. Have I -- can you --

23    Q. Have you seen -- it sounds like you're aware

24 that there's some correspondence that involves the

25 comments by Commissioner Richards.

61

1  A. Yes.
2  Q. Okay. And that I believe whatever you have has
3  been provided to us and that whatever we have has been
4  provided back to you in that correspondence.
5  A. That's my understanding.
6  Q. And we may go back over that in more detail in
7  a little bit, but I kind of want to just capture these
8  events.
9      Is there anything else, any other
10 involvement by any other mayor or commissioner in the
11 March 30th, '98, incident?
12 A. How so?
13 Q. Other than your conversation with Commissioner
14 Richards.
15 A. After the conversation with Commissioner
16 Richards, I had a discussion with Commissioner McNair,
17 Commissioner Wood, and Mayor Gonzalez.
18 Q. About the same comments?
19 A. Yes.
20 Q. All right. And what were -- well, let's take
21 them one by one. What was Commissioner McNair's
22 response to you about that?
23 A. I think he was in shock and disbelief that it
24 had been made. In fact, I remember that he made a
25 statement stating that he could understand why I would

63

1  McNair reque.    a it?
2  A. They wanted to conduct an evaluation. In fact,
3  I think he requested that the city secretary provide
4  the members of the commission with evaluation forms
5  that could be used, and certainly, as it turned out, to
6  discuss the conversation of March 30th.
7  Q. Okay. Do you know or do you have an opinion
8  about whether the evaluation was a coincidental setup
9  to do the evaluation and then it also served to discuss
10 the comment, or was the meeting set up for the specific
11 purpose of discussing this comment?
12 A. I think the intention was to discuss the
13 comment.
14 Q. All right. Now, in terms of the evaluation of
15 the city manager, you don't -- you're not taking issue
16 with the mayor and commissioners' authority to conduct
17 evaluations of the city manager, correct?
18 A. Absolutely not.
19 Q. Okay. And is it -- would you agree with me
20 that the mayor and commissioners have the authority to
21 conduct evaluations of the city manager pretty much at
22 any time?
23 A. Yes.
24 Q. Okay. Because the city manager obviously
25 answers to the mayor and commissioners, correct?

62

1  find that so troubling, so disheartening. And I
2  believe he stated he was going to be talking to
3  Commissioner Richards about it.
4  Q. Okay. You say you also talked to then
5  Commissioner Wood?
6  A. Correct.
7  Q. And what was the substance of that
8  conversation?
9  A. He offered apologies. He stated that an
10 employee should certainly not be treated that way and
11 that comments like that had no bearing on the
12 workplace.
13 Q. Okay. Anybody else that you talked to? Mayor
14 Gonzalez?
15 A. Mayor Gonzalez. I got the same sentiments.
16 Q. All right. What is your knowledge of the
17 meeting of May 12th? Is that something that you
18 requested, or was that something that was put on the
19 agenda by the mayor, or how did that come about?
20 A. It was requested by Commissioner McNair.
21 Q. Is that your best recollection of that?
22 A. Yes.
23 Q. Did you ask him to set up that meeting?
24 A. I don't recall that I did.
25 Q. Do you have an understanding of why Commissioner

64

1  A. Correct.
2  Q. All right. What was the outcome -- by the way,
3  where was this evaluation held?
4  A. Two locations. It started at the Sheraton in
5  Brownsville. I believe it was the Vera Cruz room. It
6  adjourned and moved to city hall.
7  Q. Were all of the -- was the mayor and all the
8  commissioners present?
9  A. Yes.
10 Q. At both locations?
11 A. Yes.
12 Q. Do you know what was the reason for the move?
13 A. I seem to recall that there was an action, a
14 separate action unrelated that needed to take place,
15 and those actions almost exclusively always take place
16 at city hall. I just can't recall what that city
17 business was at the time. There was a reason to move
18 to city hall.
19 Q. Okay. And the move from the Sheraton to city
20 hall, that's not part of your lawsuit, is it? The fact
21 that it was moved from one place to the other, is that
22 part of this controversy?
23 A. No.
24 Q. What about -- is there anything -- tell me just
25 generally what was the outcome of the meeting, the

1 outcome of the evaluation.
2    A. It was a very lengthy discussion both at the
3 Sheraton and at city hall.  It centered about the
4 comments that Commissioner Richards had made, the
5 sentiments that it invoked, the comments again
6 themselves being reiterated, negative comments about
7 why I even objected to them.
8    Q. Negative comments?
9    A. Yes.
10    Q. By who?
11    A. Particularly by Commissioner Richards.
12    Q. All right.  But who else?
13    A. I seem to recall Commissioner Richards.
14    Q. Okay.  Commissioner McNair, did he make
15 negative comments about --
16    A. He made comments about the situation in general
17 and about it needing to be resolved.
18    Q. Okay.  Would it be fair to say that
19 Commissioner McNair was trying to take a mediating
20 role?
21        MR. McANINCH:  Objection, form.
22        THE WITNESS:  He was trying to find
23 resolution.
24    Q. A resolution to the controversy?
25    A. Yes.

1 talking about i. e response in that meeting of
2 Commissioner Richards mainly.
3    A. And just associated comments from all the other
4 members.  They contributed to the discussion.
5    Q. Okay.  I'm talking about -- you earlier
6 characterized the comments of Commissioner Richards
7 towards your complaints as being negative.
8    A. Yes.
9    Q. All right.  I thought I heard you say that the
10 comments of the others were more conciliatory trying to
11 seek a resolution of the controversy -- Mayor Gonzalez,
12 Harry McNair, and Ernie Hernandez.
13    A. Particularly Mayor Gonzalez, Commissioner Wood,
14 and to a great degree, Commissioner McNair.
15    Q. All right.  So what I'm hearing you say is that
16 the negative comments that continued in that meeting
17 would have been limited mainly to Commissioner
18 Richards.
19    A. Correct.
20    Q. Is there anything else about that meeting that
21 bears on your religious discrimination complaint?
22    A. Well, just that the harassment continued
23 afterwards.
24    Q. The harassment by who?
25    A. Particularly Commissioner Richards.

66

1    Q. All right.  What about Commissioner Hernandez?
2    A. Commissioner Hernandez actually initiated the
3 evaluation process.  He actually centered on making
4 comments relative to my work performance at the time.
5        And since he was recording the
6 proceedings, he was also taking care of the recorder,
7 and I don't really recall other comments by him other
8 than again expressing that it needs to be resolved and
9 put behind us.
10    Q. Okay.  What about Mayor Gonzalez?
11    A. Same.
12    Q. Same?
13    A. That the comments are improper, they don't have
14 any place in the workplace, and an employee shouldn't
15 be subjected to those comments.
16    Q. Okay.  So what I'm hearing you say -- and tell
17 me if this is right -- but that the negative comments
18 that you feel occurred at that meeting were restricted
19 to those of Commissioner Richards.
20    A. He objected severely about the fact that I had
21 reduced my complaint to writing.
22    Q. Okay.  Which is a negative response to your
23 complaints.
24    A. Correct.
25    Q. All right.  But I mean, what we're really

68

1    Q. All right.  And the harassment continued in the
2 form of what?
3    A. His demeanor towards me at meetings, in front
4 of staff, in requesting and receiving information, just
5 in general his total demeanor towards me.
6    Q. Okay.  So are you saying then that Commissioner
7 Richards' demeanor towards you at least from March 30th
8 forward definitely took a negative turn and stayed that
9 way?
10    A. Followed then by Commissioner Hernandez.
11    Q. Okay.  At what point did Commissioner
12 Hernandez's demeanor towards you turn sufficiently
13 negative that you felt it became an issue?
14    A. August of '98.
15    Q. All right.  So that leads us to the next
16 significant event.  Okay.  Well, it sounds like up
17 through at least August of '98 then, Commissioner
18 Hernandez, other than the comments he had made at the
19 beginning of your tenure, there really hadn't be any
20 other encounters with him.
21    A. Every now and then I would still get the
22 request on the beard, but other than those, no.
23    Q. All right.  So is it fair to say then that the
24 issues with Commissioner Hernandez then kind of reared
25 up again in August of '98?

1    A. Correct.

2    Q. And that involved a BPOA press conference?

3    A. No.  It involved a press conference that I was
4 asked to hold.

5    Q. Okay.  Tell me -- give me some context.  What
6 was the incident that occurred?

7    A. Ads had been placed on the radio criticizing
8 the commissioners -- Commissioner McNair, I believe
9 also Commissioner Richards and Commissioner
10 Hernandez -- by BPOA.

11    Q. Regarding what?

12    A. They were alleging improprieties, secret
13 dealings within their capacity in the city.

14    Q. Okay.  Anything more specific than that, if you
15 recall?

16    A. I recall that that was the center of it.  There
17 were secret dealings in which they were taking place in
18 and alleging that they were benefitting from the
19 position they were holding as commissioners.

20    Q. And the police union was the one behind this?

21    A. That is correct.

22    Q. All right.  So tell me -- so then what happens
23 next as far as your role in this?

24    A. The ads, the radio ads ran several times during
25 the day.  Commissioner McNair was able to record one of

1 then kind of m⌐⌐it into the public domain by this
2 point in time?

3    A. Apparently so.

4    Q. All right.  And so your understanding was that
5 some of the public airings by BPOA was in response to
6 those gestapo comments.

7    A. That was my understanding.

8    Q. Or the use of the gestapo term by Commissioner
9 Richards.

10    A. That's correct.

11    Q. Okay.  Do you know who specifically with the
12 BPOA was driving or motivating the ads?

13    A. There were, I remember, three maybe four
14 individuals involved.  The names that come to mind or
15 Kurt Massey, Ray Rosas, and the third gentleman's
16 name -- I can't remember his first name, but I believe
17 his last name is Tyler.

18    Q. Okay.  Had you had any conversations with them
19 about the gestapo remark?

20    A. No.

21    Q. Did you have any kind of meetings with them
22 about the gestapo remark?

23    A. No, I did not.

24    Q. Did you have any kind of press conference or
25 press briefing regarding the gestapo remark?

---

70

1 them, called me over to his office.  I believe it was
2 on a Saturday or Sunday.

3          He played the recording for me.  And
4 shortly thereafter, I received a fax request at my home
5 asking that I hold a press conference denouncing the
6 actions of the union and categorically stating that
7 Commissioner Hernandez and McNair specifically had no
8 secret dealings with the city of Brownsville.

9    Q. Okay.  Do you recall anything more detailed
10 about what these secret dealings were other than this
11 kind of general reference to secret dealings?

12    A. Whether they were mentioned on the radio or
13 not, it seemed that they were alleging secret dealings
14 on the placement of vending machines purportedly owned
15 by Commissioner McNair and the wrecker service by
16 Commissioner Hernandez.

17    Q. Did you have an understanding or did you
18 acquire an understanding at that time as to what was
19 BPOA's motive behind the ads or what was driving the
20 ads?

21          MR. McANINCH: Objection, form.

22          THE WITNESS: My understanding is they
23 were upset in general to the comments and them being
24 referenced as gestapo.

25    Q. Okay.  Had the issue about the gestapo comments

---

72

1    A. No.

2    Q. Were you approached at any time after this
3 remark was made to you by members of the press or media
4 inquiring about the remark?

5    A. Yes.  After the May meeting.

6    Q. The May closed session?

7    A. The May closed session.

8    Q. All right.

9    A. I was asked about the statements in general.

10    Q. Who?

11    A. The Brownsville Herald reporter.

12    Q. Do you know who that was?

13    A. I believe it was Lisa Marie Gomez.

14    Q. And she approached you?

15    A. Right.  And she ran a story where several of us
16 were quoted, several of us being myself and members of
17 the commission.

18    Q. Regarding the remarks?

19    A. Regarding the remarks.

20    Q. So the issue of the remarks made it into the
21 public arena?

22    A. Yes.

23    Q. And actually got into the press?

24    A. Yes.

25    Q. All right.  And your testimony is that the

1  press approached you about it?
2  A. Yes.
3  Q. All right. Okay. So we were talking about the
4  press briefing with the BPOA. And you were asked to
5  give a press conference.
6  A. Correct.
7  Q. By Commissioner Hernandez?
8  A. No. Commissioner McNair.
9  Q. Commissioner McNair. And did you do so?
10 A. Yes, I did.
11 Q. Okay. Did you actually write out or draft a
12 press briefing?
13 A. The first draft came from Commissioner McNair.
14 Q. All right.
15 A. And then we exchanged versions.
16 Q. Let me show you what -- I have a document
17 that's two pages entitled Press Briefing August 4, '98.
18 Do you recognize that document?
19 A. Yes, I do.
20 Q. Is that the final version of the draft?
21 A. I believe it is.
22 Q. Okay. I'm going to go ahead and mark that as
23 Exhibit 11. So is Exhibit 11 then the outcome of the
24 drafts that were initially drafted by Commissioner
25 McNair and then worked on by you?

74

1  A. Yes.
2  Q. Okay. And are those your initials at the top
3  of that document?
4  A. Yes, they are.
5  Q. It sounds like me like from what you're telling
6  me and as best you can tell that there was kind of a
7  snowball effect happening here from the comments -- the
8  conversation that you had with Commissioner Richards in
9  March had evolved into another -- the meeting in May
10 involving your evaluation, and now this was another
11 spin-off of that controversy.
12     MR. McANINCH: Objection, form.
13 Q. Is that your understanding of it, or is that
14 how you saw things evolving?
15     MR. McANINCH: Objection, form.
16     THE WITNESS: Coupled with what was
17 clearly evident to my staff, Commissioner Richards'
18 demeanor towards me, yes.
19 Q. What you had previously said had turned very
20 negative towards you.
21 A. Correct.
22 Q. Did you feel that that demeanor was that way
23 just towards you and not anyone else?
24 A. Clearly.
25 Q. Okay. So you feel and your testimony to the

1  jury is that Commissioner Richards' demeanor towards
2  you was significantly and noticeably different than it
3  would be to any other city employee or official?
4  A. Absolutely.
5  Q. And is it your testimony that that demeanor and
6  attitude toward you is motivated by an anti-Semitic
7  bias?
8  A. Can you rephrase?
9  Q. Is it your testimony that Commissioner
10 Richards' attitude and demeanor towards you, which you
11 have described as negative, correct?
12 A. Correct.
13 Q. And significantly different from other city
14 employees, correct?
15 A. Correct.
16 Q. Was motivated by an anti-Semitic bias towards
17 you?
18 A. And retaliatory of me objecting about the
19 comments he made to me, which would have -- which
20 obviously referenced my heritage, my religious beliefs,
21 the fact that I'm Jewish.
22 Q. So the answer to my question is yes?
23 A. Yes.
24 Q. And including retaliatory motives?
25 A. Correct.

76

1  Q. And retaliation for what?
2  A. Objecting to the comments he made to me on
3  March 30th.
4  Q. Okay. So you're saying -- your testimony to
5  the court and the jury is that it's motivated by an
6  anti-Semitic bias that he has, correct?
7  A. Correct.
8  Q. And in addition to that, in retaliation for you
9  objecting to his manifestation of his attitudes?
10 A. Correct.
11 Q. And it's your testimony that that basically
12 continued throughout the rest of your tenure as city
13 manager insofar as Commissioner Richards is concerned?
14 A. And then followed also an attitude by
15 Commissioner Hernandez.
16 Q. Okay. And we're going to get to him. Let's
17 kind of take it a piece at a time here. It's your
18 position that this continued throughout the rest of
19 Commissioner -- Commissioner Richards' attitudes toward
20 you throughout the rest of your tenure as city manager?
21 A. Clearly.
22 Q. All right. And it sounds to me like in your
23 view, his biases towards you had already manifested
24 themselves by -- certainly by May of '98 when you had
25 the personnel evaluation.

77

1    MR. McANINCH: Objection, form.
2    THE WITNESS: Certainly by March when the
3 statements were made.
4    Q. Okay. Well, all right. Certainly by March of
5 '98 when the statements were made, correct?
6    A. Correct.
7    Q. And even though there were no incidents that
8 are -- that we've put on the record prior to March of
9 '98, you believe that that incident reflects a bias
10 that existed even prior to March of '98?
11   A. Correct.
12   Q. All right. And so by March of '98, you were
13 starting to become aware that, in your testimony,
14 Commissioner Richards had this bias towards you?
15   A. Clearly.
16   Q. And then manifested itself again in May of '98,
17 correct?
18   A. It continued to manifest itself.
19   Q. And it continued to manifest itself until he
20 voted to terminate your relationship with the city as
21 city manager later on?
22   A. Correct.
23   Q. All right. Now, by the time that -- that we
24 get to the press conference issue, you're saying that
25 now the same thing is becoming apparent with

79

1    A. Correct.
2    Q. All right. So to that extent, you feel that
3 that reflects a bias?
4    A. Yes.
5    Q. Now, aside from that, up until August of '98,
6 it doesn't sound like there's any other significant
7 incidents or events with Commissioner Hernandez.
8    A. Until August of '98, no.
9    Q. All right. And then in August of '98, we get
10 into this question about the press conference.
11   A. Correct.
12   Q. And so the exhibit that we just marked as 11,
13 that's -- did you in fact hold a press conference?
14   A. Yes, I did.
15   Q. And it's along the lines or to the effect of
16 this document?
17   A. Word for word.
18   Q. Okay. So what happened after you did that? I
19 mean, what is it beyond the giving of this press
20 conference that leads you to say that at this point
21 Commissioner Hernandez is kind of onboard with
22 Commissioner Richards in their negative attitude
23 towards you?
24   A. The press briefing was held on August 4th. The
25 press briefing identifies the individuals that were

78

1 Commissioner Hernandez.
2    A. Yes.
3    Q. Okay. Now, are you telling me that -- and are
4 you telling the court and the jury that you believe as
5 you sit there today that Commissioner Hernandez also
6 has an anti-Semitic bias towards you?
7    A. I think he clearly had a problem with the fact
8 that I had found the comments that were made to me by
9 Commissioner Richards offensive and that I had objected
10 to them.
11   Q. Okay. Your answer sounds like to me that
12 you're saying that he had a problem as far as in that
13 he retaliated against you because of your objections.
14   A. Correct.
15   Q. All right. My question, though, is really
16 more, do you, you know -- do you feel that Commissioner
17 Hernandez developed or had an anti-Semitic bias towards
18 you? Not the retaliation. I'm talking about the bias.
19   A. To the extent that he continued to request I
20 shave off my beard knowing why I wouldn't, yes, and
21 then it developed into something larger.
22   Q. Okay. So you feel that his continued request
23 to you about being clean-shaven were -- reflected a
24 bias on his part and that he did not, I guess, honor
25 your explanation of why you couldn't do that?

80

1 there. The day after, I was in Austin. I received a
2 phone call from Chief Reyna who informed me -- or made
3 me aware of some issues that had just -- he had just
4 become aware of where it appeared that some secret
5 dealings in fact had taken place or there was a
6 relationship, not secret dealings, a relationship
7 between Commissioner Hernandez and entities of the city
8 of Brownsville.
9    Q. This is Police Chief Reyna?
10   A. Correct.
11   Q. All right.
12   A. And on August 7th, Commissioner Hernandez
13 called my office and requested that I go to his place
14 of business the following day -- I believe it would
15 have been August the 8th -- to discuss city business.
16   Q. Okay.
17   A. And I obviously complied.
18   Q. Okay.
19   A. Upon arrival there, Commissioner McNair arrived
20 shortly thereafter, and Commissioner Hernandez objected
21 to the demeanor and the forcefulness that I had
22 exhibited in defending him in this press conference,
23 that I hadn't been forceful enough in defending him and
24 Commissioner McNair and that I should actually take
25 action as city manager against the members of the BPOA

101

1   Q. Okay.  Regarding what again.
2   A. Questioning my religious beliefs and
3   sensibilities.
4   Q. So you received a letter from him --
5   A. A fax.
6   Q. -- around September of '98 questioning your
7   religious beliefs?
8   A. And sensibilities.
9   Q. Okay.  Let me see --
10      MR. McANINCH:  911.
11      THE WITNESS:  Yes, that's right.
12   Q. Would that happen to be the letter in which --
13   involving a comment that had been made also by Mayor
14   Gonzalez?
15   A. That's correct.
16   Q. Okay.  Let me show you what I'll mark as
17   Rubinstein Exhibit 12.
18   A. Okay.
19   Q. Is that the letter you're talking about?
20   A. Correct, and it references attachments.
21   Q. Okay.  What were the -- that appears to involve
22   a separate incident than the one that we've been
23   discussing as far as your meeting with McNair and
24   Hernandez at Hernandez's business.
25   A. Correct.

102

1   Q. All right.  And this involves what?  A comment
2   that was made by Mayor Hernandez that --
3   A. Mayor Gonzalez.
4   Q. Mayor Gonzalez that Commissioner Hernandez felt
5   should have been offensive to you but wasn't or what?
6   A. I think the letter goes further than that.
7   Q. Okay.
8   A. I think the letter highlights to the degree
9   that a hostile work environment had been established
10   for me.  It brings into question my religious beliefs
11   and sensibilities and what I will and will not find
12   offensive.
13      In fact, it directly challenges that.  In
14   many respects it challenges my credibility not only to
15   my religious beliefs but in general.
16   Q. Okay.  Now, had Mayor Gonzalez in fact made a
17   comment that at least on the surface of it could be
18   interpreted as being anti-Semitic?
19   A. Yes.
20   Q. Were you present when the comment was made?
21   A. Yes.
22   Q. What were the circumstances?
23   A. The commission was in executive session
24   discussing land acquisition.  From what I recall,
25   Commissioner McNair was principal or center in leading

103

1   the purchase o.  property.
2      I can't remember which property it was.
3   The purchase price was being discussed.  Mayor Gonzalez
4   turned around to Commissioner McNair and said, "Well,
5   Harry, get a better price.  You're good at Jewing
6   people down," or words to that effect.
7   Q. Okay.  And basically meaning, "You're good at
8   negotiating these prices down."
9      MR. McANINCH:  Objection, form.
10   Q. And he used the term "Jewing people down"?
11      MR. McANINCH:  Objection, form.
12      THE WITNESS:  That's the statement he
13   made.
14   Q. Okay.  Did you find the statement offensive?
15   A. Yes.
16   Q. Did you talk to Mayor Gonzalez about it?
17   A. Immediately after the meeting.
18   Q. In private?
19   A. Yes.
20   Q. And outside of the meeting?
21   A. Yes.
22   Q. All right.  What was his response?
23   A. He apologized immediately.  He actually called
24   me back at my home later on and apologized again, and
25   the following week at a public meeting, he offered a

104

1   public apology in an open session to all the members
2   that were present when the statement was made and for
3   having made the statement in and of itself.
4   Q. Okay.  Beyond his making the comment in the
5   meeting, was there any further discussion about it at
6   that time?
7   A. I don't understand your question.
8   Q. Beyond him making the comment to McNair about
9   Jewing people down, did it trigger any kind of response
10   or reply in the meeting at that time?
11   A. No.
12   Q. Did the focus of the meeting stay on the
13   purpose of that session, which was the land
14   acquisition?
15   A. Yes.
16   Q. So there was no further spin or discussion of
17   the comment at that time?
18   A. No.
19   Q. At least there was none verbalized?
20   A. Correct.
21   Q. And so you're saying the next thing that -- and
22   that you dealt with it privately with Mayor Gonzalez
23   after the meeting?
24   A. Correct.
25   Q. And that he then followed up with a public -- a

117

1    A. He did not vote.
2    Q. Were you under the impression at the time that
3 he did not support you?
4    A. I'm not sure.
5    Q. Did there come a time when you felt that
6 Commissioner McNair also became hostile towards you?
7    A. When I got fired.
8    Q. Okay. Well, earlier, you had told me, you
9 know -- you had started with Commissioner Richards back
10 in March of '98, and then we talked about how things
11 had sort of crystallized with Commissioner Hernandez in
12 August, September of '98, correct?
13   A. Correct.
14   Q. And so my question is sort of along those lines
15 with Commissioner McNair. Is there a point in time
16 when you felt that he had negative feelings about you
17 which manifested themselves at some certain point in
18 time?
19   A. He was upset about the fact that a grievance
20 had been filed and then leading to the actions that
21 resulted in my termination.
22   Q. So in September of '98 -- excuse me, in October
23 5th of '98, then the votes to terminate your position
24 were not there?
25   A. Correct.

119

1    Q. Okay. So anca Vela became the mayor in May
2 of '99?
3    A. Correct.
4    Q. And Henry Gonzalez lost that election bid at
5 that time?
6    A. Correct.
7    Q. So now the composition of the commission has
8 changed --
9    A. Correct.
10   Q. -- in May?
11   A. Correct.
12   Q. All right. And aside from that election, it
13 sounds like -- and I understand the continuing comments
14 that you're alluding to, but from October until
15 November until we get to the EMS vehicle, there's
16 really no -- there's no other events that we need to
17 cover?
18   A. None that I recall at this time.
19   Q. And you continued to fulfill your duties as the
20 city manager as you saw fit?
21   A. Correct.
22   Q. As you understood the position to be?
23   A. Correct.
24   Q. All right. In November of '99, I have in -- my
25 notes indicate the EMS vehicle issue kind of came to

118

1    Q. So you continued as city manager?
2    A. Correct.
3    Q. But under a split counsel?
4    A. Correct.
5    Q. Split commission. Okay. You had indicated
6 earlier that the next significant event as November --
7 around November of '99 involving the EMS vehicle.
8    A. Correct.
9    Q. Okay. So between October of '98 and October,
10 November of '99, are there any other significant events
11 that we ought to jot down here in this chronology?
12   A. Continued development and increasing of the
13 hostile work environment.
14   Q. All right.
15   A. Comments and actions specifically by
16 Commissioner Richards and Commissioner Hernandez.
17   Q. Primarily Richards and Hernandez?
18   A. Right.
19   Q. McNair?
20   A. No.
21   Q. Would you agree with me that another
22 significant event that probably ought to go in this
23 time period is that in May of '99 you got a new mayor;
24 is that right?
25   A. I would agree.

120

1 light.
2    A. Correct.
3    Q. What is that about?
4    A. We had developed a capital improvement plan
5 that called for certain expenditures year by year. It
6 identified certain needs by departments. Those were
7 bid out with authorization by the commission.
8         The bids were brought to the commission
9 for award of contract to the purchase, and the
10 purchases were made. One of those such purchases was
11 for a 4 x 4 special utility vehicle for emergency
12 rescue operations by EMS.
13   Q. Okay. What was the controversy surrounding
14 that?
15   A. The contract was awarded. On November 8th, I
16 was informed by assistant city manager Ivan Welker that
17 Commissioner Richards had called him and told him that
18 he wanted the 4 x 4 vehicle cancelled and replaced with
19 a 15-passenger van, that he had talked to two other
20 commissioners and they were in favor of it and for Ivan
21 to make it happen, Ivan Welker.
22   Q. Okay. And what is controversial about that?
23   A. What is controversial about that is that this
24 is a competitive bid process where the items that
25 you're going to purchase have to be bid out.

1  A.Okay.
2  Q.Okay. And some of this we've already covered
3 verbally in terms of my questions and answers to you.
4 Okay? You understand that?
5  A.Yes.
6  Q.Is the material that we have covered that you
7 answered in your interrogatory No. 6, do you feel today
8 that that's pretty complete in terms of identifying and
9 listing all of the things that matter as far as your
10 claims?
11  A.Let me go back and read them.
12    (Brief recess)
13  Q.I just wanted to give you a chance to satisfy
14 yourself that the answer, the chronology of events
15 outline in response to question 6 was complete.
16  A.Yes.
17  Q.Okay.
18  A.Pretty complete.
19  Q.And then we've supplemented, of course, by the
20 questions that I've been asking you today going into
21 more detail, on some of the things at least.
22  A.Correct.
23  Q.The subsequent questions there -- and I'm just
24 trying to find out some specific information. And it
25 kind of alludes to the response to question 6, but for

1  Q.You're no[t] making any kind of claims about a
2 hostile work environment as far as sex or gender
3 discrimination?
4  A.No.
5  Q.All right. You're making a hostile work
6 environment in the context of anti-Semitism or an
7 anti-Semitic, I guess, environment?
8  A.And retaliatory for complaining about it.
9  Q.And retaliatory for complaining about it.
10 That's the other adverse action that you're complaining
11 about.
12  A.Correct.
13  Q.Okay. Is there any other adverse action that
14 you are complaining about, for example, such as you got
15 a reduction in pay or that you lost certain benefits or
16 things like that?
17  A.Within the city or after I left the city?
18  Q.No. Within the city.
19  A.Well, I got fired.
20  Q.Well, we've covered that one.
21  A.Yes.
22  Q.Are there any other adverse actions besides
23 these two that are at issue in the lawsuit?
24  A.None that I can think of.
25  Q.Okay. Because in going through your personnel

134

1 example, in question 7, what I'm trying to -- what I
2 would like to know is, what are the adverse actions
3 that you are complaining about in your lawsuit?
4    Based on the petition and based on your
5 answers here and based on your answers to my questions
6 today, it sounds to me like there are basically two
7 things. One is, of course, the termination, which
8 occurred officially on January 6th of the year 2000; is
9 that correct?
10  A.That's one of them.
11  Q.And then the other one in terms of an adverse
12 action is that you're saying that you were working in a
13 hostile environment at the workplace in terms of, I
14 guess, a religious or anti-religious or anti-Semitic
15 hostile environment; is that correct?
16  A.The hostile work environment was correct.
17  Q.So you're saying that you were in a hostile
18 work environment as the city manager at the city of
19 Brownsville?
20  A.Correct.
21  Q.And that that hostile environment as hostile --
22 usually, hostile environment is in the context of
23 gender or sex claims, but are you saying that this is
24 hostile in that sense or hostile in a different sense?
25  A.Can you rephrase that?

136

1 file, I couldn't find any other losses that you
2 suffered in terms of pay and benefits while you were
3 the city manager, correct?
4  A.Correct.
5  Q.Okay. In fact, I thought that in June of '99
6 you actually got a pay increase, correct?
7  A.Correct.
8  Q.Okay. And so you would have gotten that pay
9 increase after Blanca Vela became mayor, correct?
10  A.Correct.
11  Q.And after Commissioner -- well, and the
12 commissioners would have been Richards, Hernandez,
13 McNair, and Wood.
14  A.Richards was not present when this action was
15 taken.
16  Q.Okay. Was there actual city commission action
17 to increase this pay?
18  A.Absolutely.
19  Q.All right. And who voted on it? Everybody
20 except Commissioner Richards?
21  A.Correct.
22  Q.All right. And was the vote -- what was the
23 vote?
24  A.I believe it was 4-0.
25  Q.Okay. So Commissioner Richards was not

1 letter to Mayor Vela.

2    Q. Okay. Exhibit -- I kind of got a little out of

3 order here, but Exhibit 16 is a letter dated 12-3-99

4 from you to Blanca Vela, correct?

5    A. Correct. And Commissioner Richards, Hernandez,

6 and McNair.

7    Q. And it basically appears to be in response to

8 the request that you resign.

9    A. Correct.

10    Q. So this is your response to them regarding that

11 request?

12    A. Correct.

13    Q. All right. Then Exhibit 15 is Blanca Vela's

14 response to your response.

15    A. Correct.

16    Q. All right. In which she takes issue with your

17 characterization of certain things.

18    A. Correct.

19    Q. Okay. And that letter is dated around the time

20 that you were put on the administrative -- or the

21 30-day leave.

22    A. Correct.

23    Q. All right. Marked as Exhibit 17 is another

24 letter apparently authored by you with some exhibits

25 which I've marked Exhibit 17. Tell me whether that's a

---

1    A. Correct.

2    Q. All right. The first written notice to the

3 city that you might sue based on the termination.

4    A. Correct.

5    Q. All right. Exhibit 19 is the charge of

6 discrimination dated September 29th, 2000?

7    A. Correct.

8    Q. Okay. And that's about the time -- that's your

9 signature at the bottom of that page, correct?

10    A. That is my signature.

11    Q. Okay. And then Exhibit No. 20, which would

12 have been the dismissal and notice of right to sue

13 issued by the EEOC?

14    A. Correct.

15    Q. Okay. Let me see if I have anymore questions

16 about this. You had indicated earlier at the December

17 6th meeting, I thought I heard you say that you had

18 addressed the city commission at the time that you were

19 placed on leave.

20    A. No.

21    Q. Did your counsel address or speak to the

22 commission at that meeting?

23    A. No.

24    Q. What about at the meeting of January?

25    A. No.

---

150

1 correct copy of that.

2       MR. McANINCH: I think these pages are

3 duplicates.

4       MR. NAVARRO: You think they are what?

5       MR. McANINCH: These, it looks like

6 they've copied the same eight pages again. You might

7 want to take that off.

8       MR. NAVARRO: It was copied twice, in

9 other words?

10       MR. McANINCH: That's all I meant.

11    Q. On this Exhibit 17, it has some attachments.

12 Do you recall the letter having those attachments?

13    A. Yes, I do.

14    Q. And that's an accurate copy of that letter from

15 you, correct?

16    A. Correct.

17    Q. Okay. And on Exhibit 18, a letter from you

18 reflecting it as a notice of claim letter dated June

19 23, 2000, correct?

20    A. Correct.

21    Q. Okay. Basically putting the city on notice of

22 your intent to possibly sue on this matter.

23    A. Correct.

24    Q. All right. And that's the first time that you

25 would have tendered that document, correct?

---

152

1    Q. Did you address the commission at that meeting?

2    A. No.

3    Q. Was there any other commission meeting in

4 November in which you addressed the commission?

5    A. The regular commission meetings.

6    Q. Regarding your employment status.

7    A. In November?

8    Q. Yes.

9    A. No.

10    Q. After you were terminated, did you -- how long

11 were you out of work?

12    A. About a month.

13    Q. About 30 days?

14    A. About.

15    Q. Okay. And it's my understanding that you are

16 currently working as the regional water master for the

17 TNRCC?

18    A. The Rio Grande water master.

19    Q. And that covers what area?

20    A. From Fort Quitman, Texas, to the Gulf of

21 Mexico.

22    Q. Okay. And you are -- are you like the highest

23 ranking official for that agency in this area?

24    A. As it relates to water rights.

25    Q. Yes.

1    Q. Of the individuals that are a   ue here in
2  this lawsuit, who would spend more time at city hall?
3    A. Commissioner McNair.
4    Q. And after him?
5    A. The individuals in the complaint?
6    Q. Yes.  Of the commissioners -- of the mayor and
7  commissioners, who, as best you recall, would spend the
8  most amount of time at city hall?
9    A. Commissioner Richards.
10   Q. Would you put Richards first?
11   A. No.
12   Q. McNair first?
13   A. Yes.
14   Q. McNair then Richards?
15   A. Right.
16   Q. Then?
17   A. Mayor Vela almost equal as Commissioner
18 Richards, maybe a little more, maybe a little less.
19   Q. Okay.  Then?
20   A. Very little, if any, by Commissioner Wood or
21 Commissioner Hernandez.
22   Q. Okay.  In connection with the creation of the
23 hostile environment, are you saying that Commissioner
24 McNair contributed to that hostile environment?
25   A. Not directly.

1  felt that Comm     oner McNair ought to be doing
2  something about that.
3    A. I believe the entire commission should have
4  done something about it.
5    Q. Well, what did you believe Commissioner McNair
6  should be doing something about it?  What would you
7  have had him do?
8    A. Live up to the same responsibilities as an
9  employer has to his employees and not allow a hostile
10 work environment and retaliatory actions to be taken
11 against employees under his purview.
12   Q. Okay.  What other -- we've talked about the
13 adverse actions.
14   A. Yes.
15   Q. What other retaliatory actions besides what
16 we've talked about are you alluding to?  Is there
17 anything specific?
18   A. Continuous harassment particularly by
19 Commissioner Richards.
20   Q. Okay.  And you feel that Commissioner McNair
21 had some duty to make Commissioner Richards behave
22 differently towards you?
23   A. I believe the entire commission had a
24 responsibility to make sure that their employees are
25 treated in a proper manner and not allow hostile

---

162

1    Q. Okay.  And is that to say indirectly?
2    A. Possibly.
3    Q. Well, what do you -- does Commissioner
4  McNair -- is it your position that Commissioner McNair
5  also had an anti-Semitic bias towards you or developed
6  one?
7    A. No.
8    Q. Is it your position that he contributed to the
9  hostile environment?
10   A. Possibly, yes.
11   Q. And possibly in what way?
12   A. Knowing the comments and treatment that I was
13 being subjected to --
14   Q. By?
15   A. By Commissioner Richards specifically. -- as
16 an elected official, allowing it to continue to take
17 place, knowing about the objections that I had about
18 being asked to, for example, remove my beard and
19 continuing to communicate those requests.
20   Q. To him?
21   A. To me.
22   Q. Oh, okay.  Oh, I see, by Commissioner
23 Hernandez?
24   A. Yes.
25   Q. Well, did you -- it sounds like you believed or

164

1  environment and retaliatory actions to be taken against
2  any of them.
3        MR. NAVARRO:  Let's take a real short
4  break, and let me look at my notes.  I'm almost done.
5        (Brief recess)
6    Q. In connection with the hostile environment
7  claims, it sounds like the persons that you contend are
8  responsible for that are primarily the elected
9  officials; is that correct?
10   A. Exclusively the elected officials.
11   Q. And my question -- and I just wanted to be
12 clear whether there were any city employees who you
13 believe or felt are part of the hostile environment
14 claim that you have.
15   A. The former city attorney.
16   Q. The former city attorney?  Geoff Warburton?
17   A. Yes, sir.
18   Q. And you believe he's part of that?
19   A. I think he contributed to it.
20   Q. Okay.  How so?
21   A. In the opinions that he would or wouldn't offer
22 relative to the questions we would have about, for
23 example, the EMS vehicle, the offering of the letter to
24 cancel it knowing that I didn't have authorization to
25 cancel the contract, the opinion on his behalf that I

1 had no rights whatsoever to file a grievance.
2  Q. Okay.
3  A. Issues of that like.
4  Q. Okay.  Well, it sounds like what you're saying
5 is that he wasn't of any assistant in remedying it, but
6 are you also saying that he was affirmatively involved
7 in it?
8  A. Expand on your characterization of
9 affirmatively involved.
10  Q. Well, did he ever walk into your office and
11 say, you know, "I basically hate Jewish people"?
12  A. No.
13  Q. And that's the kind of thing I'm talking about.
14  A. No.
15  Q. Did he ever say or do anything that was that
16 obvious or that blatant?
17  A. Relative to my Jewish faith?
18  Q. Yeah.
19  A. No.
20  Q. I mean, that's the kind of thing I'm talking
21 about.  Did you ever have any kind of that kind of
22 conduct from Geoff Warburton or any hate notes or hate
23 mail on your desk, things like that?
24  A. No.
25  Q. All right.  Anybody else other than Geoff

---

### 166

1 Warburton?
2  A. None that come to mind.
3  Q. So we're really talking about the elected
4 officials and then the city attorney.  As far as
5 Commissioner Richards, did you have any -- you
6 indicated that his attitude and demeanor towards you
7 was very different.  Did he make it a practice of
8 coming into your office and confronting you about
9 different issues?
10  A. He did at times.
11  Q. Okay.  How often would you say that
12 Commissioner Richards would address you face to face?
13  A. If at all, during commission meetings, and once
14 when he came into the office when I was having a
15 meeting with the mayor --
16  Q. Mayor Vela?
17  A. Vela.  -- extremely upset about his parking
18 space.
19  Q. Okay.  Did you ever have any -- after the March
20 '98 telephone conference in which the gestapo word was
21 used, did you ever have any other conversations with
22 him in which there were specific references to
23 anti-Semitic remarks or anti-Jewish comments by
24 Commissioner Richards?
25  A. Well, the May '98 evaluation meeting at the

---

1 Sheraton and c   all.  The issue was discussed there.
2  Q. Okay.  The issue about what was said and what
3 was meant and who meant what and what it all meant,
4 that was discussed at the May '98 meeting?
5  A. Correct.
6  Q. Okay.  Beyond that, were there any other
7 incidents with Commissioner Richards?
8  A. Well, just his demeanor towards me and his
9 actions outwardly, confrontational --
10  Q. But the context for those would have been
11 necessarily the city commission meetings, correct?
12  A. Some, yes.
13  Q. Some of the city commission meetings in which
14 you-all are in the same room together.
15  A. Correct.
16  Q. Are there any other specific incidents in which
17 there's -- his demeanor towards you is witnessed by you
18 face to face?
19  A. Oh, various.  When we had meetings --
20  Q. What are some of those?
21  A. When we had meetings of various committees for
22 which both he and I needed to attend witnessed by my
23 staff, witnessed by other directors, witnessed by other
24 elected officials.
25  Q. Okay.  Give me an -- what meetings?  What kind

---

### 168

1 of meetings?
2  A. For example, meetings with the finance director
3 to discuss expenditures or meetings of the internal
4 audit committee, as examples.
5  Q. Okay.  In which you're saying that his comments
6 and attitudes towards you are manifested at those
7 meetings?
8  A. Absolutely.
9  Q. All right.  What other meetings?
10  A. Various of that matter.
11  Q. How often would you say that you were in a
12 situation where you and he would be in the same room
13 either alone or with other people in connection with
14 city business?
15  A. Probably weekly.
16  Q. Weekly, meaning once a week or weekly
17 meaning --
18  A. At least once a week.
19  Q. And it's your contention that at each of these
20 meetings he displayed this attitude towards you?
21  A. Not at each meeting.
22  Q. Okay.  Not at every meeting?
23  A. No.
24  Q. All right.  At certain meetings?
25  A. Yes.

1   Q.Okay.  Were you able to -- \  , strike that.
2 Are you able to tell me what it was about certain
3 meetings where he would behave this way towards you
4 whereas at others he wouldn't?
5   A.I have no idea what caused him to act that way
6 towards me other than continued retaliatory actions.
7   Q.Did it appear to you to be random?
8   A.No.
9   Q.Okay.  Did it appear to you to be intentional?
10   A.Absolutely.
11   Q.But you're saying that the attitude was not
12 necessarily the same at every meeting?
13   A.Correct.
14   Q.Would there be times when you noticed that he
15 was in a good -- generally in a good mood versus being
16 in a bad mood?
17   A.I wouldn't characterize it as a good mood or a
18 bad mood.
19   Q.How would you characterize it?
20   A.In the context that you're asking the questions
21 acting in retaliatory manner towards me or not?
22   Q.Yes.
23   A.Better when Commissioner Hernandez was up for
24 election, worse when the election was over.
25   Q.Better when Commissioner Hernandez was up for

---

1 attitude toward  bu, outwardly at least.
2   A.Outwardly at least.
3   Q.Okay.  And you believe that to be a function of
4 his desire to assist Hernandez or what?
5   A.It occurred in that period of time.  What other
6 motivating factors he had, I don't know.
7   Q.And then you're also saying -- what I hear you
8 saying is that after the election when Commissioner
9 Hernandez was re-elected, things went back to how they
10 had been before?
11   A.And worse.
12   Q.Are you seeking reinstatement?
13   A.No.
14   Q.Do you have an idea of what kind of monetary
15 damages you want -- you're asking the jury to award
16 you?
17   A.I haven't given that any thought.
18   Q.Okay.  Well, I'm just going by the petition,
19 and the petition says that you're asking for monetary
20 damages.
21       MR. McANINCH:  So read the petition.
22   Q."Judgment against defendants, jointly and
23 severally, for actual damages in a sum in excess of the
24 minimum jurisdictional limits of this court."
25       MR. McANINCH:  That's the prayer.

---

170

1 re-election?
2   A.Yes, sir.
3   Q.Okay.  What do you mean by that?  Why would
4 that matter?
5   A.To draw less attention, less criticism to the
6 hostile work environment that had been created, to -- I
7 guess in some way suppressing it from trying to become
8 an issue that is outwardly noted.
9   Q.When was Commissioner Hernandez up for
10 re-election?
11   A.I believe '99.  It was '99.
12   Q.Same as the mayor?
13   A.Correct.
14   Q.Okay.  So what I hear you saying is that during
15 the campaign period leading up to the election that
16 Commissioner Richards' attitude towards you appeared to
17 improve.
18   A.Particularly when we were being witnessed by
19 other individuals and as it related to also
20 Commissioner Hernandez being there.
21   Q.Okay.  So is the answer to my question yes?
22   A.Yes.
23   Q.Okay.  So that -- because you've indicated that
24 in connection with Hernandez's re-election efforts that
25 you noticed an improvement in Commissioner Richards'

---

172

1       MR. NAVARRO:  The prayer is what I --
2       THE WITNESS:  Well, we have the attorney's
3 fees, punitive damages, exemplary damages, damages for
4 lost wages and benefits.
5       MR. McANINCH:  I think we also answered it
6 in interrogatories.
7       MR. NAVARRO:  Well, I don't get what
8 you're saying.  Are you saying that he's not asking for
9 emotional injury damages?
10       MR. McANINCH:  No.  That would be a wrong
11 assumption.  That would be erroneous.  That would be a
12 misrepresentation.
13   Q.Okay.  Past and future mental anguish.  Okay.
14 Have you given -- I think we've covered in your
15 petition lost wages and benefits.  Okay.  I asked you a
16 series of questions about that.
17       On 25, I see past and future mental
18 anguish.  What kind of mental anguish monetary damages
19 are you seeking?
20   A.I'm not sure I understand your question.  I'm
21 not sure whether you're asking me for a figure.
22   Q.Yeah, a figure.  A figure of what kind of money
23 are you asking for your emotional mental anguish and
24 emotional --
25       MR. McANINCH:  He's asking for all the

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION
    CARLOS RUBINSTEIN          ) (
 3          Plaintiff          ) (
                               ) (
 4    VS.                      ) (   CIVIL ACTION NO. B-00-169
                               ) (
 5    CITY OF BROWNSVILLE,      ) (
      ET. AL.                   ) (
 6          Defendants         ) (
```

7                    REPORTER'S CERTIFICATE

8       I, Donna McCown, Certified Court Reporter, certify

9   that the witness, CARLOS RUBINSTEIN, was duly sworn by

10  me, and that the deposition is a true and correct

11  record of the testimony given by the witness on JANUARY

12  24, 2002; that the deposition was reported by me in

13  stenograph and was subsequently transcribed under my

14  supervision.

15      I FURTHER CERTIFY that I am not a relative,

16  employee, attorney or counsel of any of the parties,

17  nor a relative or employee of such attorney or counsel,

18  nor am I financially interested in the action.

19            WITNESS MY HAND on this the 30th day of

20  January _____, 2002.

21

22            _____
              DONNA McCOWN, CSR NO. 6625
23            Expiration Date: 12/31/03
              Bryant & Stingley, Inc.
24            2010 East Harrison
              Harlingen, Texas  78550
25

CITY OF BROWNSVILLE
PERSONNEL ACTION NOTICE

| Employee's Name | Employee No. | Social Security Number | Effective Date |
|---|---|---|---|
| CARLOS RUBINSTEIN | 4181 | 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 | 1/6/2000 |

| TYPE OF ACTION | EXPLANATION OF TERMINATION CODES |
|---|---|

| | | |
|---|---|---|
| | New Employee | 1. Resignation (Explain) | 7. Reorganization |
| | Re-hire | 2. Failure to Qualify | 8. Temporary Hire |
| | Change of Funding Source | 3. Disciplinary Action | 9. Disability |
| | Name Change | 4. Abandonment of Duties | 10. Retirement |
| | Salary/Wage Change | 5. Reduction in Force | 11. Death |
| | Promotion | 6. Work Performance | 12. Other (Explain) |
| | Transfer | |
| | Suspension | EMPLOYMENT CATEGORY (Circle one) |
| | Demotion | 01 - Management/Supervision |
| | Incentive Pay | 02 - Clerical |
| | Out-of-Classification Pay | 03 - Labor Force |
| | Standby Pay | [12] | 04 - Part-time |
| XX | Termination | 05 - Temporary |
| | Other (Explain) | |

EXHIBIT NO. 7
*Rubinstein*
1-3-02
Bryant & Slingley, Inc.

DETAILS OF ACTION (Fill in only items affected)

| | CHANGE FROM (or new hires) | CHANGE TO (or terminations) |
|---|---|---|
| NAME | | CARLOS RUBINSTEIN |
| HOME/ADDRESS/PHONE NUMBER | 6617.16 = 7287.23 | 1870 CAPISTRANO DR<br>BROWNSVILLE, TX 78520<br>546-2006L |
| JOB TITLE | 20% | CITY MANAGER |

| SALARY/WAGE INFORMATION | Annual | Bi-Weekly | Annual | Bi-Weekly |
|---|---|---|---|---|
| | | | 87,500 | 3365.00 |
| | Hourly | Grade/Step | Hourly | Grade/Step |
| | | | 42.0673 | 0/0 |

| EMPLOYMENT STATUS (Check one √) | Regular | Probationary | Regular | Probationary |
|---|---|---|---|---|
| | | | X | |
| | Full Time | Temporary | Part-Time | Full Time | Temporary | Part-Time |
| | | | | X | | |

| DEPARTMENT/DIVISION | | 01-130 CITY MANAGER |
|---|---|---|

Explanation/Remarks:
TERMINATION AS PER COMMISSION ACTION ON 1/6/2000.  ADDITIONAL
30 DAYS PAY AS SET FORTH IN THE ADDITIONAL ACCREDITED LEAVE PACKAGE.

| Credit Union: | 30 X8 = 250 hrs | Safety & Risk: |
|---|---|---|

Date received at Human Resource Department _____
Date sent to C.M. _____
Date received from C.M. _____
Date sent to finance _____

| Sick Leave Accrued Days | 20 X8 hr = Total 160 hrs | Employee Signature | Date |
|---|---|---|---|
| Annual Leave Accrued Days | 8 X8 = Total 64 hrs | Department Head Signature<br>EXHIBIT " A.2 " | Date |
| | | Authorized Signature | Date |

DISTRIBUTION WILL BE MADE BY PERSONNEL DEPARTMENT.
WHITE: Personnel File.      YELLOW: Reporting Dept.      PINK: Finance Dept.      GOLDEN ROD: Credit Union

0091

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CARLOS RUBINSTEIN                        §
                                         §
VS.                                      §        CAUSE NO.: B-00-169
                                         §
CITY OF BROWNSVILLE, TEXAS & CITY        §
COMMISSIONERS ERNIE HERNANDEZ,           §
CARLTON "BUD" RICHARDS, & HARRY          §
MCNAIR, Individually & Officially        §

### PLAINTIFF'S ANSWERS AND OBJECTIONS TO DEFENDANTS' FIRST INTERROGATORIES

TO:   CITY OF BROWNSVILLE, TEXAS & CITY COMMISSIONERS ERNIE
      HERNANDEZ, CARLTON "BUD" RICHARDS, & HARRY MCNAIR,
      Individually & Officially, Defendants, by and through their attorney of record, Hon.
      Ricardo J Navarro, DENTON & NAVARRO, P.C., Bank of America Building, 222
      East Van Buren, Suite 405, Harlingen, Texas 78550.

COMES NOW, CARLOS RUBINSTEIN, Plaintiff in the above-styled and numbered civil

action and, pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, serves these his

Answers and Objections to Defendants' First Interrogatories on Defendants' counsel of record

Respectfully submitted,

*LAW OFFICE OF*
*ED MCANINCH*
507 Fall River Road
Houston, Texas 77024
Telephone No : (713) 461-8619
Facsimile No. : (713) 827-8920

BY:   *Ed McAninch*
      **ED MCANINCH**
      State Bar No. 13325050
      Federal Id. No. 4892

      Attorney for Plaintiff
      **CARLOS RUBINSTEIN**

**EXHIBIT" B "**

## CERTIFICATE OF SERVICE

I, ED MCANINCH, hereby certify that on this 14th day of June 2001, the original of Plaintiff's Answers and Objections to Defendants' First Interrogatories was served **VIA CM RRR # 7099 3220 0006 2779 6696** on Defendants' counsel of record, Hon. Ricardo J. Navarro, DENTON & NAVARRO, P.C., Bank of America Building, 222 East Van Buren, Suite 405, Harlingen, Texas 78550.

Ed McAninch

**ED MCANINCH**

2

    c.      All facts known to the expert which relate or form the basis of the expert's mental impressions or opinions;

    d.      The identity of all documents, communications, and other tangible things that have been submitted to, used by, prepared by, prepared for, or furnished an expert in anticipation of the expert's trial or deposition testimony, including all tests and calculations done by the expert or reviewed by him, whether or not such tests or calculations form the basis of his opinion; and

    e.      If no report has been prepared, please state whether or not you will request that a report be prepared without the necessity of a motion and order.

**ANSWER:**    A determination as to expert witnesses has not yet been made. I will supplement my answer accordingly once this determination is made.

6.    Identify each and every "adverse action" that you allegedly suffered and which is contained as part of your complaint. With regard to each adverse action provide the following information: (1) the nature of the adverse action of which you are complaining; (2) the date, time and place in which the action occurred; (3) the person(s) involved in the action; (4) the reasons or motives that you believe led to or caused the adverse action; (5) the impact or effect of the adverse action on you; and (6) the steps you took to mitigate the effects, if any, of the adverse action.

**ANSWER:**    During my tenure as City Manager I was subjected, by certain **Elected Officials** of the City of Brownsville - <u>**who also were my direct supervisors**</u>, to offensive, insensitive and anti-Semitic comments and actions, as well as retaliatory harassment leading to termination for complaining about these actions. The discriminatory actions began shortly after my appointment as City Manager, escalated after the election of Carlton J. "Bud" Richards as City Commissioner, established a hostile work environment and led to my termination as City Manager. I was punished and terminated for reporting illegal activities and failing to perform illegal activities at the behest of my immediate, direct supervisors, elected officials, and the City of Brownsville.

I was hired as City Manager for the City of Brownsville on **March 1, 1997.** Commissioner Hernandez asked me about my religious affiliation and beliefs. **(Witnesses - Former Commissioner Jackie Lockett 956-546-2377, Commissioner John Wood 956-778-7175, Commissioner McNair 956-541-5276 (who also asked later for me to shave off my beard against my religious beliefs), and Former Mayor Henry Gonzalez - 956-544-0341).** Immediately after being hired as City Manager, and continuing repeatedly for some time thereafter I was asked by

23

Commissioner Hernandez and (Former) Commissioner McNair, on separate occasions, to shave off my beard. At that time, no safety-related reason existed which required the removal of my beard. I pointed out to both Mr. Hernandez and Mr. McNair that my religious beliefs and actual text and observance of *Leviticus 19:27* were the reasons why I chose, and continue to this day to keep my beard. After my refusal to shave my beard off, I was often ridiculed and harrassed, particularly by (Former) Commissioner McNair often stating - "Ernie (Hernandez) asked again - you need to shave off your beard and don't give me that religious mumble jumble."

**March 29, 1998:** I, along with **all** members of the City Commission were invited to attend an "Accountability Session" with Valley Interfaith. Valley Interfaith is a local and very effective advocacy group for the poor. The group's membership, while open to members of all faiths, is mostly made up of congregational members of area churches. The needs of the poor are advocated before State, County and Local officials by Valley Interfaith at these accountability sessions. Former Mayor Henry Gonzalez, Commissioner John Wood and I were the only Brownsville officials who gladly accepted the invitation to attend.

**March 30, 1998:** Early in the morning I received a phone call from (Former) Commissioner Richards who began his conversations with me as follows: "What is a **Jew-Boy** like you doing driving the Mayor and Wood to see Valley Interfaith". I was puzzled by this comment and questioned it. (Former) Commissioner Richards responded - "What is a **Jew-Boy** like you doing driving the Mayor and Wood up to Edinburg(Texas) to see the Christians - Valley Interfaith". I told Mr. Richards that all of us had been invited and if he had been in my vehicle I gladly would have also driven him to the event.

Mr. Richards continued his conversation referring to a local police action. He stated the our local police department was *Gestapo* like and that as an effective city manager I should treat them like *Hitler* would have. I found these statements to be extremely offensive. I so mentioned it. Mr. Richards' response was - "you know I am right."

I then called Mr. McNair, Commissioner Wood and Former Mayor Gonzalez to notify them and complained of the call and offensive comments by Mr. Richards. Shortly thereafter, I received a second call from Mr. Richards who stated that I should forget about the statements - ending with "event though you know I am right." **(Witnesses-- Sylvia Price 956-546-3463, and Rachel Figueroa , 956-548-6005. The comments made by Mr. Richards were also verbally reported by me to Ivan Welker, Assistant City Manager 956-548-6007 and Efren Fernandez, HR Director 956-548-6000)**

24

I reduced my complaint to writing and addressed it to (Former) Mayor Gonzalez. Mr. Gonzalez brought this issue to Mr. Richards' attention the following day. Mr. Richards, received a copy of my letter, read it - crumbled it up and put it away.(**Witness - Former Mayor Gonzalez**) Since that day the level of harassment and retaliation escalated leading to my termination on January 6, 2000.

**May 12, 1998:** A special Executive Session was called by the City Commission to perform an "evaluation" of the City Manager. At this meeting I was chastised by Mr. Richards for having complained about his comments to me via the letter to Mr. Gonzalez. Mr. Gonzalez and Commissioner Wood stated their displeasure with Mr. Richards regarding his statements of March 30th and his treatment of me, as an employee, since then and now during the executive session. Mr. McNair and Commissioner Hernandez were not critical of the statements or actions of Mr. Richards, but did ask that the matter be resolved and done away with. Mr. Richards continued his verbal attacks during the meeting stating that he (Richards) <u>" would make sure that my letter of March 30th would follow me the rest of my life."</u> The meeting was moved and continued at City Hall. The continued meeting included some additional verbal assaults regarding my finding Mr. Richards' statements offensive and complaining of the same. He (Richards) did admit making the statements after much discussion, added that Rabbi Ed Rosenthal had called him to discuss and complain about the statements and only at the continued insistence by the Mayor and Commissioner Wood did he (Richards) offer the following statement to me - "out of respect for the Rabbi I apologize.".

**August 2, 1998--August 4, 1998:** Mr. McNair faxed to my home a draft press release he wanted me to deliver absolving him and Commissioner Hernandez of any criminal allegations against both of them of secret financial dealings with the City of Brownsville.

**August 7, 1998:** Commissioner Hernandez called my office at 3:23 PM and requested from my secretary that I meet him the next day at his office at 1:30 PM.

**August 8, 1998:** Mr. McNair and Commissioner Hernandez complained to me that they are disappointed in my defense of them and that I should have been more assertive in their defense against the charges of official misconduct alleged by BPOA. I explained to them the evidence that has been provided to my by Chief Reyna, and my cooperation with him in this investigation of Commissioner Hernandez' relationship with Ryder MLS. Mr. Hernandez responded that he does not know what I am talking about, then that if in fact he is towing for Ryder it is still OK, that maybe one of his drivers negotiated the deal, etc. I then explained to him that the police department has been provided with documents indicating that Ryder has listed Commissioner Hernandez' towing service as a preferred provider. Mr. McNair agrees that this arrangement is questionable at best.

25

**September 8, 1998:** During an executive session meeting of the Commission dealing with a land purchase Mayor Gonzalez made a statement to Mr. McNair, who was negotiating the land deal, asking for a better price since Mr. McNair, in the words of Mayor Gonzalez, was good at "Jewing people down." I was present during the meeting and found the comment, although not addressed to me, offensive. I brought this to the Mayor's attention immediately following the meeting and he offered an extensive and sincere apology. A week later the Mayor made an additional public apology for his statement during a regular public meeting of the City Commission. **(For witness list see documents referenced in action of September 11, 1998)**.

**September 11, 1998:** Commissioner Hernandez faxed to Mr. Iven Welker, Assistant City Manager, a letter to be delivered to me addressing the September 8th statements. In the letter **(copy attached to the pleadings)** Commissioner Hernandez, also forwarding a memo from Mr. Richards, both documents severely questioned my sincerity and sensibilities to my religious beliefs. Both Hernandez and Richards made direct reference to my initial complaint of March 30 regarding Mr. Richards' statements. The documents speak for themselves.

**September 16, 1998:** I delivered to Chief Reyna a personal memorandum from me further documenting the above noted actions and that since the meeting of August 8th Commissioner Hernandez had and has been reacting to me in an aloof and scornful manner.

**September 17, 1998:** In accordance with the City Personnel Policies a grievance was filed on my behalf relative to the continued discriminatory, harassing and retaliatory actions of Mr. Richards and Commissioner Hernandez.

**September 24, 1998:** The City Attorney issued an official opinion that I was not entitled to file a grievance and that the comments by Commissioner Hernandez and Richards to me, relative to my religious beliefs, practices and faith, were not a form of religious harassment.

**October 5, 1998:** A special meeting of the City Commission is called by Mr. Richards and Commissioner Hernandez calling for my removal from office as City Manager. The meeting was attended by many individuals, including Rabbi Ed Rosenthal, who addressed the Commission regarding the insensitive and offensive statements and treatment I had been subjected to. After many public comments against the contemplated termination, and disgust relative to the religious harassment - which now had become very public - the meeting ended without action. The minutes will however show that Commissioner Hernandez and Mr. Richards made a motion and seconded the same to terminate my employment. **(Verification - a copy of the Commission Meeting's audio tape for 10/5/98 and associated comments,**

26

including those of Rabbi Rosenthal, can be obtained from the City Secretary 956-548-6000).

Shortly after the election which resulted in a new Mayor being elected and Commissioners Wood and Hernandez re-elected, Mr. Richards began his renewed assaults. These were in the form of derogatory comments made to my staff and members of the public about me, and crude actions towards me, in front of my staff (often witnessed by Ivan Welker, Assistant City Manager, Pete Gonzalez, Finance Director, Paul Calapa, Purchasing Director, Sylvia Price, Carlos Barrera (Auditor), Larry Brown, Director of Planning and Community Development, Rachel Figueroa (already identified), and Bill Young, Public Information Officer. Most all of these employees, except for the now retired Sylvia Price, can be contacted by calling the City of Brownsville central number 956-548-6000). One such action, as an example, followed Mr. Richards' inability to park in his designated spot which led to him entering my office while I was holding a private meeting with the new Mayor (Blanca Vela) and screaming why as City Manager I was not enforcing parking standards that would have kept his parking spot available at all times for his use. This, in particular, was also witnessed by Sylvia Price and Rachel Figueroa. Additional examples are Mr. Richards' complaining about the Police Department participating in a Statewide memorial service (June, 1999), requesting information and then criticizing the response for being provided and alleging that his complaints had been turned over to "alternative media" calling into question Commissioner's ability to trust my actions (See e-mail of June 17th, 1999). Similarly there is the e-mail of July 27, 1999 from Richards alleging that I had been insubordinate by not adhering to the City dress policy when in fact I was in compliance with the same (the e-mail further evidence of his constant harassing relative to any actions I took as City Manager.)

**November 1-5, 1999:** Messrs. McNair and Richards, and Commissioner Hernandez travelled to New York City with PUB officials relative to the PUB Duke Energy bond rating issue. Upon return form the trip Bob Lackner and Pete Gonzalez on separate occasions, during the week of 11/8-12/99 make reference to the fact that while in NY, the three Commissioners repeatedly made comments about the purchase of the 4X4 SUV for EMS and the need to cancel the contract. Mr. Pete Gonzalez warned me to **"Be careful with Harry, he is not your friend"** referring to Mr. McNair. Mr. Lackner specifically referenced comments made by Mr. Richards while at a group dinner in New York City stating that he (i.e. Mr. Richards) would **"get even"** with me for having complained about his racist comments. He also mentioned that the purchase of the 4x4 would be used as an excuse to fire me.

27

**November 8, 1999:** Ivan Welker notifies me that Mr. Richards has asked him to cancel the 4X4 SUV form Tipton Ford and replace the same with a 15-passenger van. Apparently he states to Ivan that he (Richards) has already spoken to Tipton about this and they are OK with the exchange. Allegedly Richards also makes the statement that the majority of the City Commission wants the cancellation to take place.

I called Paul Calapa up to my office and confer with him and Ivan about the propriety of the situation. It is agreed that the only appropriate course of action, short of Commission action in a public meeting, is **not to** cancel the contract. The purchase order issued to Tipton is a binding contract and I do not have unilateral authority to cancel the same. I asked Ivan to explain the details to Mr. Richards in a memo, with copy to all Commissioners, outlining the reason why his request cannot be satisfied. I asked Paul Calapa to provide Mr. Welker with the relevant details to support our combined position.

Mr. Welker provided me with a draft memo on the same day via e-mail time stamped 6:05 PM.

I responded with a more direct draft to Mr. Welker, for consideration, the same date at 11:25 PM.

**November 9, 1999:** Mr. Welker finalized the changes to the memo and asks permission to send the memo only to Mr. Richards and not the other members since he is the only one making the requested change to the purchase order. I agree. The memo from Ivan is faxed to Mr. Richards.

Mr. Welker reported later that Mr. Richards had received his memo and will ask Mr. Warburton to review the same and find a way to do what he has requested. I instructed Mr. Welker to allow the matter to rest with Mr. Warburton and to no longer involve himself on the issue.

Mr. Welker also received a complaint, at the office in person, from the Tipton Ford business manager relative to Mr. Richards repeated attempts to cancel the contract.

I provided a copy of the memo from Mr. Welker to Mr. Richards to Chief of Police Ben Reyna in order to document what I believe to be an attempt to circumvent the purchasing laws of the State of Texas and the City of Brownsville, as well as inappropriate interference by Mr. Richards contrary to the City Charter and State Codes. Chief Reyna states that "they (the Commission) have gone to far – this is out of control – I will look into this". This meeting took place outside City Hall inside Chief Reyna's city vehicle.

28

Later in the week as a passing comment in my office Chief Reyna states to me that someone is already looking into the matter I reported to him relative to the actions of Mr. Richards and further requested that I continue to provide him with information on this issue.

**November 10, 1999:** At our weekly meeting, I informed the Mayor Vela of the reported actions by Mr. Richards relative to this vehicle. I explained to her my concerns. She stated that she has not really heard anything about this issue.

**November 15, 1999:** Mr. Welker reported to me that while touring the Brownsville Country Club (BCC) with Mr. Richards he questioned him relative to the status of the cancellation of the purchase order for the EMS vehicle. Ivan also stated that he had earlier that morning received a call from Mr. Richards asking the same. Ivan reported to have responded both times that as per their last conversation, the matter rested with the City Attorney. Ivan also reiterated that he himself had provided a copy of his memo on this subject to the City Attorney.

**November 17, 1999:** Late in the afternoon, about 4:00 o'clock p.m. during a phone conversation with Mayor Vela she stated to me that Commissioner Richards wants the 4X4 contract canceled and replaced with a 15-passenger van. I am further instructed to do as he wants. I advised the Mayor that I will not do as requested because:

- No thought has been given, by Mr. Richards, as to the actual needs of the EMS department, and
- That the cancellation needs to be approved by the City Commission.

I stated that the requested action is illegal. The conversation is heated. In order to better explain the issue I ask the Mayor if I can go to her house and talk more about this issue. She agreed. I traveled to the Mayor's house and we discussed the issue as well as other interference from the 3-member majority of the Commission and how frustrating this has become. She agreed to call Mr. Richards back that evening and tell him that the item must be placed on the agenda and to ask for specific wording on the subject.

The Chief of Police is advised.

**November 18, 1999:** In the morning, Mr. Warburton came to my office and told me that the Mayor has asked him to tell me to cancel the contract with Tipton for the 4X4. He further stated that the Commission wants this item to go away quietly. I told Geoff that if the Commission wants the item to go away quietly than to place the item on the agenda for cancellation and if I am authorized I will gladly cancel the contract otherwise I will not. Geoff further states that the Commission wants this done away with. I reminded him that we work

29

for five Commission members and that all of them have equal say in the matter – in open session. He told me to write a letter to Tipton. I told him I will not but it would be better for him to draft the necessary agenda item for Commission consideration. I called Paul Calapa up to my office and ask him to reiterate to Mr. Warburton the restrictions in doing as he (Geoff) requested and to provide Geoff with all necessary backup material to prepare the agenda item – including bid specification information. Mr. Warburton asked if my position on this issue is final. I affirmed my position. He told me that he will have to notify the Commission. I asked him to notify all of them. Both Mr. Warburton and Paul leave the office.

I called Mayor Vela and advised her that Mr. Warburton had instructed me, on her behalf, to cancel the contract. She states to me that she had not given such order, but had only requested a legal opinion from Mr. Warburton.

The Chief of Police is notified of this action.

Later in the day Rachel Figueroa told me that the Mayor had called and requested an item be placed on the agenda to discuss my duties in executive session. I take this request as being directly linked to the 4X4 issue, and retaliatory relative to my position on the same. I advise the Chief of Police of the same.

Later that afternoon, between 3 and 4 PM, Geoff Warburton came to my office with an un-solicited draft letter canceling the 4X4. He stated that this is what "our bosses" want me to use. I tell him that when "our bosses" authorize the signature of the letter in open session I will do so. I try to give him back the letter, and he tells me that it is mine to keep and consider.

I immediately contacted Chief Reyna who at that time is at Home Depot, and notify him of the actions. I meet him at Home Depot and provide him with a copy of the letter and a hand written statement on the back of his copy as to time Geoff provided the same to me.

The Chief states that they continue to look at other issues regarding Commissioner Hernandez and that a meeting on those issues (investigations or inquiries) should take place early next week but he will try to move it up to tomorrow. He again asks me to keep him informed on this issue. He states that he is surprised that Geoff would provide me with such a letter, and that the "Office of the City Attorney has been compromised".

November 23, 1999 – During Executive Session I am told by Commissioner Hernandez that the Commission does not want the 4X4 Expedition and that he would expect more cooperation from me on this issue. He stated that he does not want to explain to the world in open session why he wants to cancel the contract. I told him that cancellations must be in open session. He at the same time pulls out a letter from his coat and states that Jim Tipton has corrected the problem, as of 11/19/99, by canceling his bid award. He asks if I initiated this action, to which I respond absolutely not. None of the other members are aware of this

30

letter, the same circulated around the room for reading. I advised Commissioner Hernandez that the cancellation must be affirmed in open session to which he asks why and if that is the way I feel. Commissioner Wood also stated that if Tipton is pulling out of the bid then the award, in open session, must go to the next lowest bidder. Commissioner Richards asked why we need a 4X4. I explain the reason and the further fact that the item had been listed in the CIP for a long time and was already approved for purchase.

The normal agenda is heard in open session. During the regular meeting Paul Calapa is provided by Bill Young a copy of the letter from Jim Tipton, as obtained by Commissioner Hernandez. I tell Paul Calapa, in front of Commissioner Wood after the meeting to place the item on the agenda for cancellation and award to the next lowest bidder. Later that evening I report the actions of executive session to Chief Reyna.

Item is placed on the agenda for 11/30/99.

**November 24, 1999** – I receive a call from Ivan Welker and Paul Calapa to report a call Paul received from Ray Reinhart of Tipton Motors relative to our overall order. During the conversation Paul advised Ray that the city will honor their request to cancel the contract for the 4X4. Ray appears surprised and states that he is not aware of any cancellation letter of need for the same and that this is not consistent with the "deal" that had been reached. He states that Commissioner Richards and Jim Tipton had already discussed and agreed to on this issue.

I asked that Mr. Paul Calapa put this in writing, notarized and provide me with a copy. I told him to be as clear as possible on this issue.

I immediately notify the Chief of Police who asked me to not discuss this issue with any one else because it has now reached a higher level – that the conversation provided them (PD) with something they were missing and that the "deal" was now consummated.

He asked that I provide him a copy of Mr. Calapa's written statement on Monday.

I called Mr. Welker and Mr. Calapa back and ask that the conversation be treated as law enforcement sensitive and for Paul to have the statement notarized.

**November 29, 1999** – Paul Calapa called me to notify me that Ray Reinhart had a conversation with him over the phone and told him that Tipton would in fact deliver the 4X4 and wanted to withdraw their bid withdrawal request. Mr. Reinhart further makes some comments about how Commissioner Richards had been pushing for this cancellation and that Tipton did not want me to be hurt by the situation.

31

I return a phone call to Ray Reinhart who in essence states the same situation as described by Paul.

**The Chief of Police is informed and further provided substantial corroborating evidence to the facts of today which include telephone conversation recording performed by Paul Calapa of his conversation with Ray Reinhart as well as my conversation later in the day with Mr. Reinhart which is collected utilizing equipment provided by the Chief of Police.**

I advised the City Commission of the new Tipton position via memo.

**November 30, 1999** – During the City Commission meeting Commissioner Wood's repeated requests to discuss the cancellation of the 4X4, during the specific agenda item issue, are denied and drowned out by calls for a vote by Commissioner Richards and Hernandez. No discussion is held and the cancellation, without vendor consent, is approved 4-1. Immediately after the meeting Commissioner Hernandez follows me to my office and threatens me to get event because of the way the item was handled, Wood's comments about impropriety, and Henry Gonzalez's involvement. He stated that he would get even the following week and makes that a promise.

I report these actions to the Chief of Police via phone call. Has asked that I reduce to writing the conversation with Commissioner Hernandez and that I also advise my attorney of the same. This is done that same day.

**December 1, 1999**— While waiting to board a plane to Memphis, Mr. Dan Weber, the Airport Director,  notified me that Commissioner Hernandez had called him  and told him to cancel my trip the following week to St. Louis to meet with TWA because Hernandez could no longer travel with me. He also requested a schedule change for the meeting due to immediate family illness. Commissioner Hernandez further stated  that another elected official will travel in my place and that he will change all of this the following week.

E-mails from Hernandez to John Reed and Ivan Welker further substantiate the requested change.

I responded  later that evening to the entire Commission on the requested travel cancellation issue and how these actions can hurt us with TWA.

Via phone call – the Chief of Police is further advised on this issue.

**December 2, 1999:** Very early in the morning I asked Ivan Welker to print out a copy of the e-mail and provide the same to the Mayor.

While still in Memphis later that afternoon I received a call from my Secretary – Rachel

32

Figueroa in which she advised me that the Mayor wanted to meet with me the following morning at 8:15 AM. I called the Mayor and confirm our appointment and ask what the issues will be. She refused to tell me.

**December 3, 1999:** Mayor Vela called the office and told Ms. Figueroa to notify me that the meeting will take place at the Texas Café.

I arrived at 8:15 AM at the Texas Café with the Mayor, shortly followed by Commissioner McNair. We entered the conference room where the Mayor asked that I resign as City Manager. She stated that due to a breakdown in communication and her promise to unify the Commission she has come to realization that the problems between some Commissioners and myself will not get resolved, and in fact have gotten worse. She stated that 4 members of the Commission felt this way and that if I do not resign by noon an item will be placed on the Commission agenda terminating me. Mr. McNair added that I now know how a **"super majority"** of the Commission feels about this issue and that I will be terminated if I do not resign. It is affirmed that I have done a good job for the City and should be treated fairly. We discussed the financial implications of resigning versus termination. Commissioner McNair offers some sort of 30-day settlement if I resign. I told both Commission members that after I leave, in as much as they have stated that they want a new City Manager to go in a new direction, that the Commission must take a hard look at itself. I reaffirmed that the communication problems stem from the comments by Commission Richards in March of 1998 relative to my religious believes and heritage. Both the Mayor and Commissioner McNair confirmed this point. I asked for time to discuss this issue with my wife.

I notified the Chief of Police, via phone, of the same. The Chief of Police stated that it is a shame that this has gotten to this point and further states that it is also a shame that this issue – the cancellation of the 4X4 developed so fast that they were not able to act on it by this time. The Chief further stated that the community deserves to know the truth on this issue.

Later that afternoon the City Commission is provided with my written response to their request for resignation.

**December 6, 1999:** Via city courier I am notified that a hearing will take place on 12/7/99 relative to my termination and for me to have my attorney present.

**December 7, 1999:** Via fax I provided a copy of the narrative of Commissioner Hernandez's threat of the 30th to the Chief of Police.

I am placed on 30-day administrative leave with pay as official notification as required by Charter prior to termination. After the Commission took the noted action, Mr. McNair and I visited in my office where I was asked to turn in my keys and other city property. I informed him that all was now in their possession except for two radios that the Chief of Police wanted me to keep for a while. I called the Chief of Police into my office and asked

33

him to affirm what I just stated. It is agreed that I will keep these items until the Chief notifies me otherwise.

Mr. McNair affirmed that if terminated I would receive my 30 day severance as required by the City Charter and asks that we tell the "mob" in the Commission chambers that he is not against us.

I called Chief Reyna to inquire if any situations had been noted at City Hall due to the crowd. He stated that all was well. I informed him that my daughter would be hospitalized but that if he ever needed me for anything during the 30-day period to call and I would be there. I thanked him for his professionalism and above all, regardless of the actions of this day for him to continue to do what is right and not be influenced by outside sources. He thanked me for that comment. He stated that after I left City Hall, Mr. Warburton and then-Commissioner McNair asked him to retrieve the aforementioned radios.

**December 10, 1999** – Two PD officers arrived at my home, as previously arranged with Chief Reyna and retrieve the remaining city property. This action is confirmed via e-mail to then Commissioner McNair.

**December 13, 1999** – Via e-mail Mr. McNair advised me that the Mayor had requested that I remove all my personal belonging from my office at City Hall by the end of that week.

I contacted Ivan Welker and Chief Reyna by phone and advised them of the request that I remove my personal belongings. I asked that an inventory of all my belongings be conducted so that no second thoughts may be expressed about what I removed.

**December 28, 1999**—Criminal complaints were filed with the Brownsville Police Department (Roman Pineda III) witnessed by DA representative Nikki Arrias relative to alleged illegal action by Harry McNair, Bud Richards and Commissioner Ernie Hernandez.

**January 4, 2000**—The City Commission held an Executive Session regarding the termination of the City Manager.

**January 6, 2000** - By a 4-1 voted I was terminated as City Manager effective immediately. Motion made by Mayor Vela, second by Mr. Richards.

**January 14, 2000** - Fax to Roman Pineda, PD providing additional information relative to their investigations of Richards, Hernandez and McNair which may be substantiated by Pete Gonzalez and Bob Lackner.

34

7.    With respect to each adverse action identified in the foregoing questions, and with particular regard to the reasons or motives provided by you, identify each and every incident, event, and/or communication that you contend supports the motives that you attribute to the adverse action.

**ANSWER:**    **OBJECTION** is made to this Interrogatory on the ground that, as worded, it is overly broad, vague, and calls for a legal conclusion

Subject to and without the waiving the foregoing objection, please refer to my answer to Interrogatory No. 6.

8.    Identify each and every "report of a violation of law" that you are made and which is part of the basis of your complaint.  With regard to each violation of law you reported provide the following information (1) the nature of violation of law you reported (2) the time, place, and manner of the report (3) the person(s) or authorities to whom the report was made; (4) the identity of the person(s) involved in the conduct you believed to be a violation of law; (5) the adverse actions you believed you suffered as a consequence of making the report of a violation of law.

**ANSWER:**    **OBJECTION** is made to this Interrogatory on the ground that, as worded, it is overly broad, vague, and calls for a legal conclusion.

Subject to and without the waiving the foregoing objection, please refer to my answer to Interrogatory No. 6.

9.    With respect to each adverse action identified above connection with your report of a violation of law, identify each and every incident, event, and/or communication that supports your contention that the adverse action suffered by you was motivated against you for having made a report of a violation of law.  Be sure to identify the specific individual(s) that you contend were involved in the retaliatory adverse action.

**ANSWER:**    **OBJECTION** is made to this Interrogatory on the ground that, as worded, it is overly broad, vague, and calls for a legal conclusion.

Subject to and without the waiving the foregoing objection, please refer to my answer to Interrogatory No. 6.

35

10.    Identify each and every incident of retaliatory conduct that you allegedly suffered and which is contained as part of your complaint. With regard to each adverse action provide the following information (1) the nature of the retaliatory conduct of which you are complaining (2) the date, time and place in which the action occurred (3) the persons involved in the action; (4) the reasons or motives that you believe led to or caused the retaliatory conduct; (5) the impact or effect of the adverse action on you; and (6) the steps you took to mitigate the effects, if any, of the retaliatory conduct.

**ANSWER:**    **OBJECTION** is made to this Interrogatory on the ground that, as worded, it is overly broad, vague, and calls for a legal conclusion.

Subject to and without the waiving the foregoing objection, please refer to my answer to Interrogatory No. 6.

11.    With respect to each incident of retaliatory conduct identified in the foregoing question, and with particular regard to the reasons or motives provided by you, identify each and every incident, event, and/or communication that you contend supports the motives that you attribute to the retaliatory conduct.

**ANSWER:**    **OBJECTION** is made to this Interrogatory on the ground that, as worded, it is overly broad, vague, and calls for a legal conclusion.

Subject to and without the waiving the foregoing objection, please refer to my answer to Interrogatory No. 6.

12.    Identify each and every incident of discriminatory conduct (under Title VII) that you allegedly suffered and which is contained as part of your complaint. With regard to each incident of discriminatory conduct provide the following information (1) the nature of the discriminatory conduct of which you are complaining (2) the date, time and place in which the conduct occurred (3) the person(s) involved in the conduct (4) the reasons or motives that you believe led to or caused the discriminatory conduct (5) the impact or effect of the conduct action on you; and (6) the steps you took to mitigate the effects, if any, of the discriminatory conduct.

**ANSWER:**    **OBJECTION** is made to this Interrogatory on the ground that, as worded, it is overly broad, vague, and calls for a legal conclusion.

36

Subject to and without the waiving the foregoing objection, please refer to my answer to Interrogatory No. 6.

13.    With respect to each incident of discriminatory conduct (under Title VII) identified in the foregoing question, and with particular regard to the reasons or motives provided by you, identify each and every incident, event, and/or communication that you contend supports the motives that you attribute to the retaliatory conduct.

**ANSWER:**    **OBJECTION** is made to this Interrogatory on the ground that, as worded, it is overly broad, vague, and calls for a legal conclusion.

Subject to and without the waiving the foregoing objection, please refer to my answer to Interrogatory No. 6.

14.    With regard to your **federal** constitutional claims against the individually named defendants, identify with particularity, and in accordance with Anderson v. Creighton, 483 U.S. 635 (1987), the specific acts or conduct of COMMISSIONERS RICHARDS, HERNANDEZ, and MCNAIR that you contend establishes a violation of a clearly established constitutional right.

**ANSWER:**    **OBJECTION** is made to this Interrogatory on the ground that, as worded, it is overly broad, vague, and calls for a legal concusion.

Subject to and without the waiving the foregoing objection, please refer to my answer to Interrogatory No. 6.

15.    With regard to each action or conduct identified above, provide a citation or reference to the statutory or judicial authority that you rely upon to demonstrate that the individually named defendants violated a clearly established constitutional right.

**ANSWER:**    **OBJECTION** is made to this Interrogatory on the ground that, as worded, it is overly broad, vague, calls for a legal concusion, and requests information which is protected from disclosure by the attorney-work product.

37

STATE OF TEXAS                              §
                                           §
COUNTY OF CAMERON                          §

## VERIFICATION

BEFORE ME, the undersigned authority, a Notary Public, on this day personally appeared **CARLOS RUBINSTEIN**, who being duly sworn on his oath, deposed and said that he is duly qualified and authorized in all respects to make this affidavit; that he has read the above and forgoing answers to Interrogatories; that every statement contained in the answers is within his knowledge and true and correct.

_____
CARLOS RUBINSTEIN

SUBSCRIBED AND SWORN TO BEFORE ME by the said **CARLOS RUBINSTEIN** on this the  14th  day of June 2001, to certify which witness my hand and official seal.

_____
Notary Public
In and For the State of Texas



ELIZABETH R. RIVERA
Notary Public, State of Texas
My Commission Expires
MARCH 1, 2003

My Commission Expires:

_____3 - 01 - 03_____

56 UCINLR 569
(Cite as: 56 U. Cin. L. Rev. 569)

c

University of Cincinnati Law Review
1987

Editorial Note

*569 UNTIMELY FILING OF STATE CHARGES AND TITLE VII'S LIMITATIONS PERIODS

Michael L. O'Shaughnessy

Copyright 1987 by the University of Cincinnati; Michael L. O'Shaughnessy

## I. INTRODUCTION

Title VII of the Civil Rights Act of 1964 (Act) prohibits employment discrimination based on race, color, religion, sec, or national origin. [FN1]  Title VII also created the Equal Employment Opportunity Commission (EEOC), which is empowered to enforce Title VII's provisions. [FN2]  To facilitate local rather than federal resolution of employment discrimination complaints, section 706(c) of the Act provides that, where a state or local enforcement agency is established with authority similar to EEOC's, complaints of discrimination must first be deferred to that agency for processing and possible resolution under state law before EEOC may exercise jurisdiction over them. [FN3]  After deferring the charge, EEOC must wait for sixty days or *570 until the state agency has terminated its procedures--whichever occurs earlier--before the charge may be officially filed wth EEOC. [FN4]  In such deferral states with so-called 706 agencies, a charge must be filed with EEOC within 300 days of the allegedly discriminatory act in order to preserve a federal cause of action under Title VII. [FN5]  In states without such agencies, the filing period under Title VII is only 180 days. [FN6]  Timely filing of the initial charge is a prerequisite both to *571 agency proceedings and to any subsequent private suit by a charging party. [FN7]

One Title VII filing issue that is not yet settled is whether a charge filed with a 706 agency must be timely filed under the particular state's applicable period of limitations in order to make available the longer, 300-day period for federal claims.  While four circuits that have been presented with the issue have uniformly held that the timeliness of the state filing is irrelevant to the availability of the 300-day period, other courts, notably those in the Seventh Circuit, have disagreed, some arguing persuasively that an untimely state filing precludes the longer 300-day period for federal claims. [FN8] This split is symptomatic of a broader retrenchment by some federal courts on the liberality to be accorded the interpretation of Title VII's procedural requirements. [FN9]

This Note examines the conflicting rationales on the issue of whether a timely state filing is required to preserve the longer federal period of limitations for Title VII charges, and it concludes that the majority position, namely, that the timeliness of the state filing is irrelevant, is unconvincing.  This Note suggests that a different rationale is both necessary and justifiable to give effect to the policies of Title VII.  Such a rationale would give greater weight to the remedial nature of Title VII in recognition of the statute's embodiment of the constitutionally based principle of freedom from racial and other forms of invidious discrimination.  That approach would not only avoid the unsatisfactory results reached in prior Supreme Court decisions concerning Title VII, [FN10] but would also preserve a measure of simplicity in Title VII's procedural scheme, a result that the Court itself has acknowledged 'is particularly appropriate 'in a statutory scheme in which laymen, unassisted by trained lawyers, initiate the process." [FN11]

## *572 II. BACKGROUND

The opposing rationales on the issue of timely filing of state charges in Title VII cases rely on two Supreme Court decisions on employment discrimination.  A detailed explanation of these two cases is necessary for an evaluation of the current diverging rationales on the timely state filing issue. In the first of these, Oscar Mayer & Co. v. Evans, plaintiff Evans was involuntarily retired from employment with defendant company. [FN12]  He subsequently filed a notice of

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

EXHIBIT" C "

intent to sue with the United States Department of Labor, charging that he had been forced to retire because of his age in violation of the Age Discrimination in Employment Act (ADEA). [FN13] At about the same time Evans also inquired of the Department whether he was required to file state charges to preserve his federal rights. [FN14] Informed by the Department that ADEA contained no such requirement, Evans refrained from resorting to state proceedings. [FN15] After federal conciliation efforts failed, Evans brought suit against Oscar Mayer and company officials. [FN16] Defendants moved to dismiss the suit, arguing that ADEA required resort to state proceedings before commencing suit in federal court. [FN17] On appeal the Supreme Court, admitting that the question of statutory interpretation was 'close,' agreed with defendants and reversed the lower courts. [FN18]

The Court observed that section 14(b) of the ADEA, which provides in part that 'no suit may be brought . . . before the expiration of sixty days after proceedings have been commenced under State law,' was modeled after section 706(c) of Title VII and used almost identical language. [FN19]  The Court stated that the legislative history *573 and case law interpreting section 706(c) indicated an intention that states be given a limited opportunity to resolve employment discrimination complaints and avoid resort to federal remedies. [FN20]  The Court noted that section 706(c) had been interpreted to require resort to state proceedings before bringing suit under Title VII. [FN21]  Because ADEA and Title VII share the common purpose of eliminating discrimination in the workplace, and because the language and legislative history of section 14(b) indicated that section 706(c) was its source, the Court concluded that ADEA required resort to state proceedings before commencing suit. [FN22]

The Court then considered the effect of Evans's failure to file a state charge within the applicable limitations period. [FN23]  The Court held that the language of section 14(b) required only that a claimant 'commence' state proceedings before filing suit in federal court. [FN24]  Reasoning that even a time-barred action was 'commenced' under the Federal Rules of Civil Procedure by the filing of a complaint, the *574 Court noted that a requirement that a claimant also file his his state charge within the state's applicable limitations period was foreclosed by the last sentence of section 14(b), which expressly limits 'commencement' of state proceedings for purposes of ADEA to the sending of an initial charge to the appropriate state authority. [FN25] The Court observed that this had been the prevailing judicial interpretation of section 14(b) and of section 706(c) of Title VII, and was the interpretation given the statutory language by EEOC itself. [FN26] The Court added that such an interpretation comported with ADEA's remedial purposes and was 'particularly appropriate 'in a statutory scheme in which laymen, unassisted by trained lawyers, initiate the process." [FN27]  In addition, the Court noted, this interpretation was also consistent with the purposes of section 14(b): section 14(b) contained no exhaustion requirement; ADEA's own limitations periods were set forth in other, separate provisions; and the legislative history of 14(b)'s model, section 706(c) of Title VII, indicated congressional desire to avoid making federal suits dependent on possibly sham state procedures for redressing employment discrimination. [FN28]  Finally, the Court noted that the strongest argument against its interpretation of the statute was that a claimant might avoid resort to state remedies by deliberately waiting until the state limitations period expired before filing the state charge. [FN29] The Court found such a course of action unlikely since state and federal remedies were not mutually exclusive and since a federal lawsuit was deferred in any event for the required sixty days. [FN30] The Court therefore concluded that Evans could still comply with the state filing requirement by filing with the appropriate state agency and ordered that the federal suit be held in abeyance pending disposition of the state claim. [FN31]

In the following Term the Court considered the question of when a Title VII charge was timely filed in a deferral state. In Mohasco *575 Corp. v. Silver plaintiff Silver filed a Title VII charge 291 days after being discharged by his employer. [FN32]  EEOC promptly deferred the charge to the state 706 agency. [FN33]  The state agency reviewed the charge, and after Silver received a right to sue letter from EEOC, he commenced suit in federal court. [FN34]  Defendant Mohasco moved for summary judgment on the ground that Silver's charge had not been timely filed with EEOC. [FN35]  The district court granted the motion but a divided United States Court of Appeals for the Second Circuit reversed, concluding that the district court's literal reading of the statute failed to give sufficient weight to Title VII's purpose of redressing employment discrimination. [FN36]

On appeal the Supreme Court reversed the Second Circuit. [FN37] In so doing, the Court began by noting section 706(e)'s time limitations for filing a charge. [FN38]  The Court stated that in Silver's case EEOC's deferral of the charge made the 300-day period applicable. [FN39]  Noting that state proceedings had not been terminated until after the expiration of the sixty-day period of deferral, the Court concluded that the question presented was thus whether the charge could be considered filed for Title VII purposes on the date of its receipt by EEOC. [FN40]  The Court found that

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

the answer to this question was provided by section 706(c), which states that 'no charge may be filed . . . by the person aggrieved before the expiration of sixty days after proceedings have been commenced under the State or local law, unless such proceedings have been earlier terminated.' [FN41]  The Court concluded that section 706(c)'s language, read in conjunction with that of section 706(e), meant that a claimant could ensure a timely federal filing in a deferral state by submitting the charge to EEOC no later than 240 days after time began to run on the claim. [FN42]  Thus Silver's charge, received by EEOC on the 291st day, could not be considered 'filed' for Title VII purposes until the 351st day and was therefore untimely. [FN43]  The Court supported what it termed its 'straightforward' interpretation of the *576 two provisions by noting that its approach gave the same meaning to the term 'filed' in sections 706(c) and (e), was based on statutory language that was 'not ambiguous,' and reflected the legislative compromise between remedy and repose embodied in Title VII.  [FN44]  The Court traced the history of Title VII's enactment and subsequent amendment, and it rejected arguments that its interpretation of the statute was unfair to claimants proceeding without the assistance of counsel, was contrary to EEOC's own interpretation, and was unnecessarily restrictive in effectuating the policy of deferral to state and local agencies. [FN45]

In a lengthy dissent Justice Blackmun reexamined Title VII's legislative history, noting that the majority's reading requiring federal filing within 240 days not only was unsupported by that legislative history and prior case law, but also established a federal limitations period of 240 days that appeared nowhere in the statute. [FN46]  He found the majority's rule 'sadly wanting' in practicality and ease of administration, given the fact that even the 240- day time limit was subject to extension if the state agency terminated its proceedings in less than sixty days. [FN47]

### III.  CURRENT VIEWS ON THE ISSUE OF UNTIMELY STATE FILINGS IN TITLE VII CASES

#### A.  The Liberal, Majority View

Of the circuit court opinions that have held the timeliness of a state filing irrelevant to the availability of the longer, 300-day Title VII limitations period, the most thoroughly reasoned is the United States Court of Appeals for the Tenth Circuit's opinion in Smith v. Oral Roberts Evangelistic Association. [FN48]  Plaintiff Smith filed a Title VII sex discrimination complaint with EEOC 237 days after her allegedly discriminatory termination and 57 days after the applicable state limitations period had expired. [FN49]  EEOC deferred the charge to the state 706 agency, the Oklahoma Human Rights Commission, which waived jurisdiction pursuant to a work- sharing agreement with EECO. [FN50]  Smith subsequently filed suit after EEOC issued a *577 right to sue letter. [FN51]  Defendants moved to dismiss plaintiff's suit on the ground that the initial complaint to EEOC had been untimely filed. [FN52]  The district court granted the motion, relying in part on the Tenth Circuit's 1972 decision in DuBois v. Packard Bell, holding that a Title VII complainant whose state charge was untimely filed was only entitled to 180 days to file a charge with EEOC. [FN53]  Plaintiff appealed the dismissal, and the Tenth Circuit reversed the district court.  [FN54]

In so doing, the Tenth Circuit set out, first, the relevant statutory language and judicial precedent governing the basic filing and deferral requirements. [FN55]  Second, the Tenth Circuit noted its earlier, controlling decision in DuBois. [FN56]  The court of appeals then stated, however, that nothing in the statutory language explicitly required a timely state filing to preserve the longer federal period. [FN57]  The court observed that its decision holding timeliness irrelevant was both consistent with the remedial purpose of Title VII and especially appropriate "in a statutory scheme in which laymen, unassisted by trained lawyers, initiate the process." [FN58]

Third, turning to the precise language of the statute, the Tenth Circuit noted that Title VII required deferral by EEOC for sixty days 'after proceedings have been commenced under state or local law,' and that the 300-day period was available for complaints with respect to which proceedings had been "initially instituted . . . with a state or local agency." [FN59]  The court observed that such language established only minimum requirements and contained no requirement that the state charge be timely. [FN60]  The Tenth Circuit supported its interpretation by reference to the Federal Rules of Civil Procedure, under which the filing of a complaint "commences" even a time-barred action within the meaning of the Rules. [FN61]  The Tenth Circuit further noted that its analysis of the language of Title VII *578 was supported by the Supreme Court's decision in Oscar Mayer & Co. v. Evans. [FN62]  As discussed above, Oscar Mayer held that the timeliness of filing an ADEA charge with a state agency was irrelevant to the availability of the longer 300-day federal limitations period. [FN63]

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Fourth, the Tenth Circuit relied on Mohasco Corp. v. Silver, which had rejected a line of lower court cases holding that, regardless of a deferral state's applicable statute of limitations, a complainant under Title VII must in all cases file the state charge within 180 days in order to preserve federal rights. [FN64] The Supreme Court held that such a complainant had only to file the state charge within 240 days to ensure that federal rights were preserved. [FN65]

Finally, the Tenth Circuit noted that other courts within and without the Tenth Circuit had likewise held that the timeliness of a state charge was irrelevant to the availability of the longer federal period. [FN66] The court concluded that the Oscar Mayer and Mohasco decisions had implicitly overruled the Tenth Circuit's own decision in DuBois, and that the untimeliness of the state charge could not preclude the availability of the longer 300-day period for filing the Title VII charge. [FN67]

The other circuit courts presented with this timeliness issue have all held the 300-day limit available but have based their decisions on a variety of factors. In Rasimas v. Michigan Department of Mental Health, the United States Court of Appeals for the Sixth Circuit relied on EEOC's own position on the timeliness issue and on ADEA case law supporting the availability of the longer period. [FN68] In Howze v. Jones & Laughlin Steel Corp., the United States Court of Appeals for the Third Circuit relied, without detailed explanation, on Mohasco and on dicta in an earlier Third Circuit case. [FN69] Finally, in Thomas v. Florida Power & Light Co., the United States Court of Appeals for the Eleventh Circuit, noting the ADEA and Title VII case law from other circuits, concluded that the need for uniformity among the *579 circuits outweighed the need for independent and possibly conflicting consideration of the purpose of allowing the longer period. [FN70]

## B. The Restrictive View

Despite the fact that the four circuit courts of appeals that have been presented with the issue have held the 300-day period available regardless of an untimely state filing, persuasive arguments have been made, particularly in the Seventh Circuit, that suggest the opposite result. Four different Seventh Circuit courts have stated that an untimely state filing limits a Title VII complainant to the shorter, 180-day federal period for filing the charge with EEOC. [FN71] These opinions, including a recent one by the Seventh Cirduit itself, are especially significant in light of the Seventh Circuit's holding in Anderson v. Illinois Tool Works, Inc. that a claimant in an ADEA action has 300 days to file a federal charge, a holding accompanied by dicta suggesting that Mohasco made the same principle applicable to Title VII actions. [FN72]

In the first of these recent Seventh Circuit opinions, Lowell v. Glidden- Durkee, Division of SCM Corp., Judge Getzendanner of the United States District Court for the Northern District of Illinois, faced with a claimant's untimely state filing, rejected the argument that Mohasco made the longer filing period available. [FN73] The court noted, first, that Mohasco involved a claimant whose state filing was timely, and that the decision presented only the question of when the charge with EEOC could be considered filed in a deferral state. [FN74] Second, the court stated that the plaintiff claimant's argument, if accepted, would undermine the congressional purpose in requiring deferral. [FN75] As the court noted, the argument amounted to an assertion that state rights could be ignored and federal rights be nonetheless safely preserved. [FN76] Such a position would, the court stated, 'reduce the state filing to a procedural sham.' [FN77] Third, the court relied on *580 lower court decisions from other jurisdictions, as well as the Tenth Circuit's decision in DuBois, in concluding that only a timely filed state charge made the 300-day period available for Title VII filings. [FN78]

On motion for reconsideration, the district court again rejected plaintiff's argument, supporting its rejection by a careful analysis of the question presented and the dicta included in Mohasco. [FN79] The court further noted that the Supreme Court's opinion in Delaware State College v. Ricks, decided later the same year as Mohasco, strongly suggested that the timeliness question in deferral states was still an open one. [FN80] The district court concluded by reemphasizing that the policy consideration behind allowing the longer period, namely, giving states first opportunity to resolve employment discrimination complaints, was absent when the complainant's charge was untimely under applicable state law. [FN81]

Two years later in O'Young v. Hobart Corp., Chief Judge McGarr of the United States District Court for the Northern District of Illinois largely adopted the rationale of Lowell in dismissing certain counts in plaintiff's suit because the initial charge had been untimely. [FN82] After reiterating the factors relied on in Lowell, the district court explained that the extended filing period was applicable only when the 706 agency was 'authorized' to grant or seek relief. [FN83] As the court noted, when the state claim was time-barred, the 706 agency was, *581 strictly speaking, not 'authorized' to grant

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

or seek relief. [FN84] In addressing plaintiff's argument that EEOC's regulations made the longer filing period available, the court noted that such regulations were nto controlling where inconsistent with the statute. [FN85]

In Martinez v. Local 1373, United Automobile Workers, the United States Court of Appeals for the Seventh Circuit acknowledged in dicta the persuasiveness of the rationale limiting a claimant to the 180-day federal period where the state charge had been untimely filed. [FN86]  Martinez involved a claimant who had failed to file a charge within the 90-day state statute of limitations. [FN87]  When the 706 agency received the complaint on the 251st day, it promptly transferred the complaint to EEOC since it was time- barred under state law. [FN88]  Noting Title VII's mandatory 60-day deferral requirement, the Seventh Circuit reasoned that, if a deferral state complainant were allowed the 300-day federal filing period regardless of the timeliness of the state filing, hopes of a favorable EEOC resolution might lead a complainant to deliberately bypass the 706 agency by waiting to file a charge until after the state statute of limitations had run. [FN89]

The Seventh Circuit next acknowledged that Oscar Mayer had made the longer filing period available in ADEA actions regardless of whether the state charge was timely. [FN90]  The court noted, however, that ADEA did not vest exlcusive jurisdiction in the 706 agency during the deferral period as Title VII did, and that ADEA did not require that the federal charge be held in abeyance until the end of the deferral period, as the Supreme Court in Mohasco had held that Title VII required. [FN91]

The Seventh Circuit then noted the circuit opinions extending the  Oscar Mayer holding to Title VII cases, and the EEOC regulation holding the longer filing period available regardless of the timeliness of the state charge. [FN92]  The court concluded by stating that the different policies underlying ADEA and Title VII substance and procedure might well require a different result in Title VII cases. [FN93]

*582 Most recently, in Proffit v. Keycom Electronic Publishing, Judge Shadur of the United States District Court for the Northern District of Illinois, in a lengthy opinion citing and relying on the reasoning in Lowell, O'Young, and Martinez, held that a claimant was not entitled to the 300-day federal filing period if the state charge had been untimely filed. [FN94]

### C. Resolving the Conflict

If, as the Seventh Circuit cases seem to indicate, a strong, even compelling, argument can be made for permitting only 180 days for filing EEOC charges when the state filing is untimely, why have four circuits so readily extended Oscar Mayer to Title VII cases?  Why indeed, given the Supreme Court's suggestion in Delaware State College v. Ricks, stating in essence that the Title VII issue had not yet been settled? [FN95]  A stronger case can be made for the 300-day time limit than has been explicitly made by the courts of appeals. Such a case depends not on some factor overlooked by the courts, but rather on the consideration given the 'remedial' nature of the Act. [FN96]  Despite the Supreme Court's asserted unwillingness to weigh competing policies, the Court should in any case of statutory construction, but especially in one yielding such conflicting results as the timely filing issue presented here, clarify the meaning of the statute by taking account of the source of its purpose. To illustrate specifically, it is rather obvious that Title VII's provisions represented a marked change in the status quo. [FN97]  It is that change, not the status quo, that needs to be given appropriate weight in judicial reasoning, not to bend the statute to the personal beliefs of the individual judge or court, but to recognize that the change is just as significant a part of congressional 'intent' as the expressions in the legislative history. [FN98]  *583 Giving such added content to the notion of 'remedial' is an appropriate way for the courts to decide the truly close cases. Moreover, such an interpretation comports with the hierarchy of objectives the statute is designed to serve. In Title VII, those objectives are, in order of importance:  1) a remedy for the enumerated forms of discrimination; 2) protection of courts and defendants from stale claims; and 3) a first chance at resolution of complaints at the state or local level through deferral. [FN99]  Were the first objective not provided for, there would be no need for the second and third objectives.

More importantly, while it is true that the express constitutional authority for Title VII is the commerce power, [FN100] its protections implicate fundamental constitutional ideals in a way that, for example, the Federal Employers' Liability Act (FELA) does not. [FN101]  This distinction suggests that the 'remedial' nature of Title VII is significantly different from the 'remedial' nature of FELA. [FN102]  Whether or *584 not this difference in the importance of remediation in one type of statute as compared to another is reflected in the legislative history, the conscious 'weighting' of the purpose of the

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

legislation gives content to otherwise colorless recitations about the 'remedial' nature of the legislation. It should be emphasized that this approach to statutory construction is intended to resolve the close questions such as those on the timely filing issue discussed above. [FN103]

What support is there for such as approach? First, despite the Supreme Court's apparent rejection of any suggestion that it weigh competing policies, [FN104] the Court itself has implicitly done so in promulgating different tests for judging the constitutionality of legislation: witness the 'rational basis' and 'strict scrutiny' tests applied in equal protection jurisprudence. [FN105] In addition, in Davis v. Passman the Court held that, because the Constitution has as one of "its important objects' . . . the designation of rights,' a cause of action should more readily be implied from fundamental constitutional guarantees than from legislation. [FN106] An analogous principle should inform construction of the intent of Congress in enacting statutes: where the statute derives its impetus, in whole or in part, from fundamental constitutional ideals, close questions of interpretation should be resolved in favor of realizing those constitutional ideals. Applied to Title VII, that means that the ambiguity in the statutory language as to what effect an untimely state charge has on the federal filing period should be resolved in favor of the claimant.

*585 A realistic reading of the circuit court opinions discussed above leads to the conclusion that this sort of implicit weighting is probably what has produced a unanimous trend in favor of the longer filing period. [FN107] That is, without explicitly admitting it, and in the face of strong arguments to the contrary, the courts of appeals have been giving this added weight to the remedial purpose Title VII was intended to serve. [FN108] When the next Title VII procedural question is presented to the Supreme Court, it should do likewise, but explicitly.

## IV. CONCLUSION: 'HURRY UP PLEASE ITS TIME' [FN109]

Title VII's procedural requirements have produced a morass of case law turning on nice distinctions as to the meaning of statutory language such as 'commence' and 'authorize.' [FN110] The issue of untimely state filings is only a small stretch of a procedural quagmire that embraces everything from equitable tolling [FN111] to wrong-agency filings [FN112] to defective EEOC-706 agency work-sharing agreements. [FN113] Of course, a certain amount of difficult statutory construction is the usual business of any court. It is, however, unfortunate that such procedural complexities have developed from a statute whose purpose was the protection of the ordinary citizen in the street. [FN114] It is also ironic that the same courts that create the complexities are so fond of repeating Justice Stewart's remark in Love v. Pullman: 'Such technicalities are particularly inappropriate in a statutory scheme in which laymen, unassisted by trained lawyers, initiate the process.' [FN115]

*586 The majority rationale that holds the state filing period in deferral states irrelevant to the availability of the 300-day federal period is not convincing. Recent decisions demonstrate that the majority rationale relies on Supreme Court opinions that are inapposite and fails to take account of language in the Court's opinions suggesting that the question is still an open one. If the majority rationale is recognized for what it in fact is, the courts of appeal have been giving more weight to the remedial purpose of Title VII than they admit. That is a defensible approach and one that, properly limited, does not substitute the court's wisdom for that of the legislature. Instead, a rationale that weighs the purposes of legislation in accordance with its constitutional source and its historical context clarifies the intent of the legislature at the time of enactment. [FN116] If the courts are unable or unwilling to clarify and simplify the law of Title VII, the Congress should.

### Footnotes

[FN1]. Title VII is currently codified at 42 U.S.C. §§ 2000e to e-17 (1982). Prohibited employment practices are set out in §§ 703-704 of the Act. For example, § 703(a), as amended, provides:
  (a) Employer practices
It shall be an unlawful employment practice for an employer--
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

*of such individual's race, color, religion, sex, or national origin.*
42 U.S.C. § 2000e-2(a) (1982).

[FN2]. See 42 U.S.C. §§ 2000e-4 to -5 (1982).

[FN3]. Section 706(c) provides:
   (c)  State or local enforcement proceedings; notification of State or local authority; time for filing charges with Commission; commencement of proceedings
In the case of an alleged unlawful employment practice occurring in a State, or political subdivision of a State, which has a State or local law prohibiting the unlawful employment practice alleged and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, no charge may be filed under subsection [b] of this section by the person aggrieved before the expiration of sixty days after proceedings have been commenced under the State or local law, unless such proceedings have been earlier terminated, provided that such sixty-day period shall be extended to one hundred and twenty days during the first year after the effective date of such State or local law.  If any requirement for the commencement of such proceedings is imposed by a State or local authority other than a requirement of the filing of a written and signed statement of the facts upon which the proceeding is based, the proceeding shall be deemed to have been commenced for the purposes of this subsection at the time such statement is sent by registered mail to the appropriate State or local authority.
42 U.S.C. § 2000e-5(c) (1982) (subsection [b] in text of statute erroneously indicated as (a) in original).

[FN4]. Mohasco Corp. v. Silver, 447 U.S. 807, 821 (1980).

[FN5]. 42 U.S.C. § 2000e-5(e) (1982).  Section 706(e) provides:
   (e)  Time for filing charges; time for service of notice of charge on respondent; filing of charge by Commission with State or local agency
A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) shall be served upon the person against whom such charge is made within ten days thereafter, except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieve within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier, and a copy of such charge shall be filed by the Commission with the State or local agency.
Id.
   The Supreme Court in Mohasco Corp. v. Silver, 447 U.S. 807 (1980), interpreting the interplay between the deferral requirements and the limitations periods, held that, because the 706 agency's jurisdiction was exclusive for 60 days after the charge was deferred, an initial filing with EEOC--whether by original receipt of the charge or by cross-filing by the 706 agency--had to occur within 240 days in order to ensure that EEOC might formally file the charge within 300 days. Id. at 814 n.16.  The majority opinion in Mohasco is discussed infra at text accompanying notes 32-45. Charges initially filed with EEOC are routinely cross-filed with the appropriate 706 agency. See 29 C.F.R. § 1601.13(a)(5) (1986). The cross-filing procedure was held by the Court in Love v. Pullman Co. to amount to 'initially institut[ing]' state proceedings within the meaning of § 2000e- 5(e). 404 U.S. 522, 525 (1972).  The charge is held in 'suspended animation' until the end of the deferral period, then officially filed by EEOC.  Id. at 526.

[FN6]. 42 U.S.C. § 200e-5(e) (1983).  For the text of § 2000e-5(e), see supra note 5.

[FN7]. See 42 U.S.C. § 2000e-5(f)(1) (1982).  In Zipes v. Trans World Airlines, Inc. the Supreme Court held that these statutory time limits are not in the strict sense jurisdictional prerequisites to suit, but rather are the equivalent of statutes of limitation subject to waiver, estoppel, and equitable tolling.  455 U.S. 385, 393 (1982).

[FN8]. For a discussion of these Seventh Circuit case, see the discussion infra text accompanying notes 71-94.  See also 2 A. LARSON & L. LARSON, EMPLOYMENT DISCRIMINATION § 48.13(c)(2) (1986) [hereinafter LARSON].

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

[FN9]. See B. SCHLEI & P. GROSSMAN, EMPLOYMENT DISCRIMINATION LAW 1013-14 (2d ed. 1983) [hereinafter SCHLEI & GROSSMAN].

[FN10]. For a discussion of two of these decisions, Oscar Mayer and Mahasco, see infra note 31 and text accompanying notes 12-47.

[FN11]. Oscar Mayer & Co. v. Evans, 441 U.S. 750, 761 (1979) (quoting Love v. Pullman Co., 404 U.S. 522, 527 (1972)).

[FN12]. Id. at 754.

[FN13]. Id. ADEA is currently codified at 29 U.S.C. §§ 621-634 (1982 & Supp. II 1984). While originally the Secretary of Labor was responsible for enforcing ADEA, EEOC now has that responsibility. SCHLEI & GROSSMAN, supra note 9, at 489. The charging party's right to sue is codified at 29 U.S.C. § 626(c) (1982). ADEA requires that a charging party wait sixty days before filing a civil suit. Id. at § 626(d). Unlike Title VII, ADEA does not require that the charging party receive a right to sue notice before filing suit. SCHLEI & GROSSMAN, supra note 9, at 494.

[FN14]. Oscar Mayer, 441 U.S. at 754. The Iowa State Civil Rights Commission was empowered to remedy age discrimination in employment. Id.

[FN15]. Id.

[FN16]. Id.

[FN17]. Id. The district court denied the motion, and the court of appeals affirmed. Id.

[FN18]. Id. at 754-55.

[FN19]. Id. at 755. Section 14(b) provides:
  (b) Limitation of Federal action upon commencement of State proceedings
In the case of an alleged unlawful practice occurring in a State which has a law prohibiting discrimination in employment because of age and establishing or authorizing a State authority to grant or seek relief from such discriminatory practice, no suit may be brought under section 626 of this title before the expiration of sixty days after proceedings have been commenced under the State law, unless such proceedings have been earlier terminated: Provided,
  That such sixty-day period shall be extended to one hundred and twenty days during the first year after the effective date of such State law. If any requirement for the commencement of such proceedings is imposed by a State authority other than a requirement of the filing of a written and signed statement of the facts upon which the proceeding is based, the proceeding shall be deemed to have been commenced for the purposes of this subsection at the time such statement is sent by registered mail to the appropriate State authority.
29 U.S.C. § 633(b) (1982). For the text of § 706(c) of Title VII, see supra note 3.

[FN20]. Oscar Mayer, 441 U.S. at 755 (citing 110 Cong. Rec. 12725 (1964) (remarks of Sen. Humphrey); Voutsis v. Union Carbide Corp., 452 F.2d 889 (2d Cir. 1971)).

[FN21]. Id. at 756 (citing Love v. Pullman Co., 404 U.S. 522 (1972); Olson v. Rembrandt Printing Co., 511 F.2d 1228 (8th Cir. 1975)).

[FN22]. Id.

[FN23]. Id. at 758-59. The Iowa age discrimination statute's period of limitations was 120 days. Id.; Iowa Code Ann. § 601A.14(15) (West 1975). As of the date of the Court's decision, over three years had passed since Evans's discharge. See Oscar Mayer, 441 U.S. at 758-59.

[FN24]. Id. at 759. For the text of § 14(b), see supra note 19. Plaintiff Evans pleaded excuse based on the Department of Labor's misleading advice, a defense that implicates the issue of equitable tolling of the statute of limitations. For a

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

discussion of the relevant principles in Title VII's context, see Annotation, Equitable Considerations as Tolling, for Purposes of Civil Action, Time Limitations of § 706 of Civil Rights Act of 1964, as Amended (42 USCS § 2000e-5(e)), for Filing Charge with Equal Employment Opportunity Commission, 53 A.L.R. FED. 859 (1981) [hereinafter Equitable Tolling]. Defendant Oscar Mayer asserted that Evans's failure to file a state charge was a jurisdictional bar to suit. Oscar Mayer, 441 U.S. at 758-59. That argument has probably been laid to rest by the Supreme Court's Title VII decision in Zipes v. Trans World Airlines, Inc., 455 U.S. 385 (1982), which is almost certainly applicable to ADEA actions as well. SCHLEI & GROSSMAN, supra note 9, at 491. For a discussion of Zipes, see supra note 7.

[FN25]. Oscar Mayer, 441 U.S. at 759-60 (citing Fed. R. Civ. P. 3). For the text of § 14(b), see supra note 19.

[FN26]. Oscar Mayer, 441 U.S. at 760-61 (citations omitted).

[FN27]. Id. at 761 (quoting Love v. Pullman Co., 404 U.S. 522, 527 (1972)).

[FN28]. Id. at 761-64.

[FN29]. Id. at 763-64.

[FN30]. Id. at 764.

[FN31]. Id. at 764-65. Justice Blackmun concurred separately. Id. at 765 (Blackmun, J., concurring). Justice Stevens, joined by Chief Justice Burger and Justices Powell and Rehnquist, dissented in part. Justice Stevens objected to the majority opinion's disposing of the issue of the timely filing of plaintiff's state claim, when--in his view--all the Court was required to do was to dismiss the suit until Evans had resorted to state proceedings, which if time-barred would then present the timeliness issue. Id. at 767 (Stevens, J., dissenting).

[FN32]. 447 U.S. 807, 810 (1980).

[FN33]. Id.

[FN34]. Id. at 810-11. The claimant's right to sue is provided in § 706(f)(1). 42 U.S.C. § 2000e-5(f)(1) (1982).

[FN35]. Id. at 811-12.

[FN36]. Id. at 813.

[FN37]. Id. at 815.

[FN38]. Id. at 815-16. For the text of § 706(e), see supra note 5.

[FN39]. Mohasco, 447 U.S. at 816-17.

[FN40]. Id. at 817.

[FN41]. Id. (citing § 706(c)). For the full text of § 706(c), see supra note 3.

[FN42]. See Mohasco, 447 U.S. at 817.

[FN43]. Id.

[FN44]. Id. at 818-20.

[FN45]. Id. at 819-26.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

[FN46]. Id. at 827-33 (Blackmun, J., dissenting).

[FN47]. Id. at 833-34.

[FN48]. 731 F.2d 684 (10th Cir. 1984).

[FN49]. See id. at 686.

[FN50]. Id. Depending on the terms of the work-sharing agreement, deferral of the charge followed by waiver pursuant to such an agreement may not constitute 'institution' of state proceedings within the meaning of the statute. See Dixon v. Westinghouse Elec. Corp., 787 F.2d 943, 946 (4th Cir. 1976), aff'g 615 F. Supp. 538 (D. Md. 1985); Lopez v. Sears, Roebuck and Co., 493 F. Supp. 801, 805 (D. Md. 1980).

[FN51]. Smith, 731 F.2d at 686.

[FN52]. Id.

[FN53]. Id. (citing DuBois v. Packard Bell, 470 F.2d 973, 975 (10th Cir. 1972)).

[FN54]. Id. at 690.

[FN55]. Id. at 686-87 (citing 42 U.S.C. §§ 2000e-5(c), (e) (1982); Love v. Pullman, 404 U.S. 522 (1972); Mohasco Corp. v. Silver, 447 U.S. 807 (1980)).

[FN56]. Id. at 687.

[FN57]. Id. (noting that its 'understanding of employment discrimination law ha[d] been enhanced by Supreme Court decisions since DuBois').

[FN58]. Id. (quoting Love, 404 U.S. at 527).

[FN59]. Id. at 687-88 (quoting 42 U.S.C. §§ 2000e-5(c), (e) (emphasis in original)).

[FN60]. Id. at 688.

[FN61]. Id. (quoting Oscar Mayer v. Evans, 441 U.S. 750, 759 (1979) (relying on the language of FED. R. CIV. P. 3)).

[FN62]. Id. (citing Oscar Mayer, 441 U.S. at 756, 761).

[FN63]. Oscar Mayer, 441 U.S. at 759. For a discussion of Oscar Mayer, see supra text accompanying notes 12-31.

[FN64]. Smith, 731 F.2d at 689. For a discussion of Mohasco, see supra text accompanying notes 32-47.

[FN65]. Mohasco, 447 U.S. at 814 n.16.

[FN66]. Smith, 731 F.2d at 689-90 (citing Jones v. Airco Carbide Chem. Co., 691 F.2d 1200 (6th Cir. 1982)).

[FN67]. Id. at 689-90.

[FN68]. 714 F.2d 614, 621-22 (6th Cir. 1983).

[FN69]. 750 F.2d 1208, 1211 (3d Cir. 1984) (citing Mohasco, 447 U.S. at 816-17 and Kocian v. Getty Ref. & Mktg. Co., 707 F.2d 748, 751 (3d Cir. 1982), cert. denied, 464 U.S. 852 (1983)).

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

[FN70]. 764 F.2d 768, 770-71 (11th Cir. 1985); see also Citicorp Person-to-Person Fin. Corp. v. Brazell, 658 F.2d 232, 234 (4th Cir. 1981) (dictum).

[FN71]. Martinez v. Local 1373, United Auto. Workers, 772 F.2d 348, 351-52 (7th Cir. 1985) (dicta); Proffit v. Keycom Elec. Publishing, 625 F. Supp. 400, 407 (N.D. Ill. 1985); O'Young v. Hobart Corp., 579 F. Supp. 418, 421 (N.D. Ill. 1983); Lowell v. Glidden-Durkee, Div. of SCM Corp., 529 F. Supp. 17, 23 (N.D. Ill. 1981). But see Sere v. Board of Trustees, 628 F. Supp. 1543, 1545 (N.D. Ill. 1986); EEOC v. Pattin-Marion, Div. of Eastern Co., 588 F. Supp. 41, 44 (S.D. Ill. 1984).

[FN72]. 753 F.2d 622, 628-29 (7th Cir. 1985).

[FN73]. 529 F. Supp. 17, 23 (N.D. Ill. 1981).

[FN74]. Id. at 21.

[FN75]. Id. at 22.

[FN76]. Id.

[FN77]. Id.

[FN78]. Id. at 22-23 (citing, in addition to DuBois, Mobley v. Acme Markets, Inc., 473 F. Supp. 851, 857 (D. Md. 1979); Mills v. National Distillers Prod. Co., 435 F. Supp. 72, 75 (S.D. Ohio 1977); DeGideo v. Sperry-Univac Co., 415 F. Supp. 227, 230 (E.D. Pa. 1976).

[FN79]. Id. at 23-25.

[FN80]. Id. at 25. In Ricks plaintiff, a college professor, was denied tenure but offered a one-year 'terminal' contract to expire at the end of the following school year. 449 U.S. 250, 252-53 (1980). In the spring of that final year Ricks filed an employment discrimination charge with EEOC. Id. at 254. After deferral to the Delaware 706 agency and subsequent filing by EEOC, EEOC gave Ricks notice of his right to sue. Id. The district court granted the college's motion to dismiss on the ground that the initial charge had been untimely. Id. Thus the precise question presented to the Court was when the Title VII time periods began to run on Ricks' claim. See id. at 256. The Supreme Court held that time began to run from the date the tenure decision was made and communicated to Ricks. Id. at 258. In a footnote the Court also stated:

Delaware is a State with its own fair employment practices agency. According to the EEOC, therefore, Ricks was entitled to 300 days to file his complaint . . .. Because we hold that the time-limitations periods commenced to run no later than June 26, 1974, we need not decide whether Ricks was entitled to 300 days to file under Title VII. Counting from the June 26 date, Ricks' filing with the EEOC was not timely even with the benefit of the 300-day period.

Id. at 260 n.13 (emphasis supplied).

[FN81]. Id.

[FN82]. 579 F. Supp. 418, 421 (N.D. Ill. 1983).

[FN83]. Id. at 421.

[FN84]. Id.

[FN85]. Id.

[FN86]. 772 F.2d 348, 350-52 (7th Cir. 1985).

[FN87]. Id. at 350.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

[FN88].  Id.

[FN89].  Id. at 351.

[FN90].  Id.

[FN91].  Id.

[FN92].  Id.

[FN93].  Id. at 351-52.

[FN94].  625 F. Supp. 400, 405-07 (N.D. Ill. 1985).

[FN95].  For the facts and pertinent language in Ricks, see supra note 80.

[FN96].  See Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 398 (1982).

[FN97].  See Mohasco Corp. v. Silver, 447 U.S. 807, 818-20 (1980) (summarizing the Act's 'tempestuous' legislative history).

[FN98].  Support and criticism of this view can be found in analogous principles drawn from the field of conflict of laws. Although not widely adopted, Professor Leflar's 'better law' approach recognizes that certain laws are more in accord with contemporary notions of justice by giving weight to that factor in deciding what state's law should be applied to the facts. See Leflar, Conflicts Law: More on Choice-Influencing Considerations, 54 CALIF. L. REV. 1584, 1588 (1966) ('The law's legitimate concerns with 'justice in the individual case,' . . . are furthered by deliberate preference for the better rule fo law.'); see also Milkovich v. Saari, 295 Minn. 155, 203 N.W.2d 408 (1973) (adopting the 'better law' approach in automobile guest statute case).

On the other hand, the substance-procedure distinction, used to determine whether to apply the law of the forum or that of a foreign state, may result in characterizing a statute of limitations as substantive, that is, as a substantive limit on the scope of the right created. See, e.g., Gillies v. Aeronaves de Mexico, S.A. 468 F.2d 281 (5th Cir. 1972) (foreign lapse provision substantive), cert. denied, 410 U.S. 931 (1973). But see Grant v. McAuliffe, 41 Cal.2d 859, 264 P.2d 944 (1953) (survival of cause of action procedural).  It would seem doubtful the substance-procedure distinction is at all helpful in construing a statute that, like Title VII, draws on constitutional ideals for its force.  This is especially so when the problem is an inherent ambiguity in the statute, not whether to apply one or the other of two states' limitations periods.

[FN99].  See 42 U.S.C. §§ 2000e-5(b) to -5(d) (1982); cf. Delaware State College v. Ricks, 449 U.S. 250, 259-60 (1980) ('It should not be forgotten that time-limitations provisions themselves promote important interests; 'the period allowed for instituting suit inevitably reflects a value judgment concerning the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale ones,'' quoting Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 463-64 (1975)).

[FN100].  See 110 Cong. Rec. 7202-12, 8453-56 (1964); SCHLEI & GROSSMAN, supra note 9, at 983.

[FN101].  The Federal Employers' Liability Act, currently codified at 45 U.S.C. §§ 51-59 (1982), provides in part:

Every common carrier by railroad while engaging in [interstate or foreign] commerce . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her personal representative, for the benefit of the surviving widow or husband and children of such employee; and, if none, then of such employee's parents; and, if none, the of the next of kin dependent upon such employee, for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

42 U.S.C. § 51 (1982).

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

[FN102]. Both statutes are remedial in nature. See Johnson v. Southern Pac. Co., 196 U.S. 1, 17 (1904) (FELA); Mohasco Corp. v. Silver, 447 U.S. 807, 816 (1980) (Title VII). Nevertheless, it is an acknowledged fact that the term 'remedial' has been applied to a wide and varied range of legislation.  3 SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION § 60.02 (N. Singer 4th ed. 1986). Furthermore, '[t]he mere fact that a statute is characterized as 'remedial,' therefore, is of little value in statutory construction unless the term 'remedial' has for this purpose a more discriminate meaning.' Id.

[FN103]. Cf. Bell v. Brown, 557 F.2d 849, 853 (D.C. Cir. 1977):
    The initial guidepost is the consideration that 'where congressional purpose is unclear, courts have traditionally resolved ambiguities in remedial statutes in favor of those whom the legislation was designed to protect.' We have heretofore recognized 'that Title VII is remedial in character and should be liberally construed to achieve its purposes'; '[f]or this reason,' we have observed, "courts confronted with procedural ambiguities in the statutory framework have, with virtual unanimity, resolved them in favor of the complaining party." 'That approach,' we have added, 'reflects not only the manifest importance of Title VII rights to complaining parties, but also the broad national commitment to eliminating such discrimination and the importance of private suits in fulfilling that commitment.'
(footnotes omitted).

[FN104]. See Mohasco, 447 U.S. at 813-15 (1980). The Mohasco majority's rationale is itself premised on a weighing of competing policies in order to ascertain the intent of Congress in enacting the statute. See id. at 818-21.

[FN105]. J. NOWAK, R. ROTUNDA & J. YOUNG, CONSTITUTIONAL LAW § 14.3 (3d ed. 1986).

[FN106]. 442 U.S. 228, 241 (1979).

[FN107]. For a discussion of the four circuit court opinions, see supra text accompanying notes 48-70.

[FN108]. The court in Thomas v. Florida Power and Light Co. admitted the persuasiveness of the argument prohibiting use of the longer federal filing period where the state claim was untimely, but it judged uniformity among the circuits the greater good. 764 F.2d 768, 770 (11th Cir. 1985).

[FN109]. T. S. Eliot, The Waste Land, line 141.

[FN110]. For the weight the courts attach to this statutory language, see supra text accompanying notes 24-27, 59-61, and 83-84.

[FN111]. The literature on equitable tooling is voluminous. See, e.g., Equitable Tolling, supra note 24; Note, Equitable Modifcations of Title VII Time Limitations to Promote the Statute's Remedial Nature, 18 U.S. DAVIS L. REV. 749 (1985).

[FN112]. On wrong-agency filings, see, e.g., EEOC v. Delaware Trust Co., 416 F. Supp. 1040, 1045-46 (D. Del. 1976) (filing with Office of Federal Contract Compliance held sufficient to preserve Title VII claim); EEOC v. Nicholson File Co., 408 F. Supp. 229, 233 (D. Conn. 1976) (same).

[FN113]. For cases dealing with the effect of such work-sharing agreements, see supra note 50.

[FN114]. See supra note 11 and accompanying text.

[FN115]. 404 U.S. 522, 527 (1972).

[FN116]. See Mohasco Corp. v. Silver, 447 U.S. 807, 824 n.42 (1980) (quoting Teamsters v. United States, 431 U.S. 324, 354 n.39 (1977), to the effect that the intent of the Congress enacting the section controls).

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

CHARGE OF DISCRIMINATION

| | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form. | ☐ FEPA | |
| | ☐ EEOC | 360A02016 |

Texas Commission on Human Rights _____ and EEOC
*State or local Agency, if any*

| NAME *(Indicate Mr., Ms., Mrs.)* | HOME TELEPHONE *(Include Area Code)* |
|---|---|
| Mr. Carlos Rubinstein | (956) 546-8066 |
| STREET ADDRESS        CITY, STATE AND ZIP CODE | DATE OF BIRTH |
| 1570 Capistrano Drive, Brownsville, TX 78526 | 01/13/1959 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE *(Include Area Code)* |
|---|---|---|
| Brownsville City Of | Cat A (15-100) | (956) 548-8000 |
| STREET ADDRESS        CITY, STATE AND ZIP CODE | | COUNTY |
| P O Box 911, Brownsville, TX 78520 | | 061 |

| NAME | TELEPHONE NUMBER *(Include Area Code)* |
|---|---|
| | |
| STREET ADDRESS        CITY, STATE AND ZIP CODE | COUNTY |

| CAUSE OF DISCRIMINATION BASED ON *(check appropriate box(es))* | DATE DISCRIMINATION TOOK PLACE |
|---|---|

☐ RACE  ☐ COLOR  ☐ SEX  ☒ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER *(Specify)*

EARLIEST 12/07/1999   LATEST 12/07/1999
☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional space is needed, attach extra sheet(s))*:

On March 1, 1997, I was appointed as City Manager. Toward the end of the initial interview I was asked to disclose my religious affiliation and beliefs.

During my tenure as City Manager I was subjected to offensive, insensitive and anti-Semitic comments, harassment and retaliation for complaining these actions.

On December 7, 1999, I was placed on 30 days paid leave by the City Commission. I was terminated on January 6, 2000.

I believe I have been discriminated against because of my religious beliefs, Jewish, and in retaliation for complaining of a protective activity in violation of Title VII of the Civil Rights Act of 1964, as amended.

Rubinstein

EXHIBIT NO. 19
1-24-02
Bryant & Stingley, Inc.

| ☐ I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| Date 9/29/00   Charging Party *(Signature)* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Month, day and year) |

EEOC FORM 5 (Rev. 06/99)

FILE COPY

"EXHIBIT" A.1

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To: Carlos Rubinstein
    1570 Capistrano Drive
    Brownsville, Tx. 78526

From: Equal Employment Opportunity Commission
    San Antonio District Office
    5410 Fredericksburg Rd.  Suite 200
    San Antonio, Tx  78229

[   ]   *On behalf of person(s) aggrieved whose identity is*
*CONFIDENTIAL (29 CFR § 1601.7(a))*

| Charge No. | EEOC Representative | | Telephone No. |
|---|---|---|---|
| 360 A0 2016 | GUILLERMO ZAMORA, SUPV. | , | 210/281-7603 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

[   ]   The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[   ]   Your allegations did not involve a disability that is covered by the Americans with Disabilities Act.

[   ]   The Respondent employs less than the required number of employees or is not otherwise covered by the statues.

[   ]   We cannot investigate your charge because it was not filed within the time limit required by law.

[   ]   Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

[   ]   While reasonable efforts were made to locate you, we were not able to do so.

[   ]   You had 30 days to accept a reasonable settlement offer that afford full relief for the harm you alleged.

[   ]   The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[   ]   The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ X ]   Other *(briefly state)*   Charging Party is in a court of competent jurisdiction regarding the same issues and basis.

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed **WITHIN 90 DAYS** from your receipt of this Notice; otherwise, your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.

On behalf of the Commission

*Esther Y Herrera*
/ Pedro Esquivel, Director

10/31/00
*(Date Mailed)*

Enclosure(s)

cc:   Brownsville ( city of )

Rubinstein
**EXHIBIT NO.** 20
1-24-02
Bryant & Stingley, Inc.